### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| RASHAD WILLIAMS, | |
| Plaintiff, | |
| v. | No. 3:13-cv-1154 (MPS) |
| DENNIS MARINELLI, ET. AL. | |
| Defendants. | |

### RULING ON POST-VERDICT MOTIONS

## I.  Introduction

Inmate Rashad Williams claimed that officials of the Connecticut Department of Correction ("DOC") violated the Eighth Amendment by exposing him to assault by a cellmate on October 28, 2010, at the Northern Correctional Institution ("Northern") in Somers, Connecticut. After a trial, a jury agreed as to one defendant – Captain Dennis Marinelli – and awarded Williams $650,000 in damages, but disagreed as to the three others.  Williams and Marinelli have both filed post-verdict motions, including (1) Marinelli's motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), for a new trial under Fed. R. Civ. P. 59, and for remittitur (ECF No. 190), (2) Williams' motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) as to the three other defendants (ECF No.192), (3) Williams' motion for reimbursement of costs (ECF No. 184), and (4) Williams' "Objection to State of Connecticut's Claim for Repayment of Cost of Incarceration" (ECF No. 185), which seeks to enjoin the State from imposing a statutory lien on his damages award to recover the costs of his incarceration.

I deny the Rule 50 motions because there was legally sufficient evidence to support the verdict as to each defendant.  As a captain and housing unit manager at Northern, Marinelli outranked the other defendants, had more information than they about Williams' circumstances,

including his history of living alone and his frequently voiced fears of being attacked by a cellmate, and participated in the decision to house him with a cellmate who had a history of assaults.  In addition, the jury could reasonably have found that Marinelli either ignored or failed to investigate Williams' claim that mental health staff at Northern had recommended that he remain living alone.  Marinelli was also on notice that when Williams was placed in the cell with the new cellmate, Williams would likely be handcuffed behind his back while his cellmate's hands were free, and that in these circumstances cellmate-on-cellmate attacks occurred at Northern with some frequency.  Unlike Marinelli, the remaining defendants did not participate in the decision to place Williams with the cellmate.  Further, the two correctional officer defendants had no discretion to disobey Marinelli's order to return Williams to the cell with the cellmate after Williams voiced a concern.  The third defendant, a lieutenant, was not involved in Williams' transfer to a dual cell and spoke with Williams only briefly on the morning of the assault.  In short, there was sufficient evidence from which a reasonable jury could infer that Marinelli was aware of a substantial risk of serious harm to Williams and failed to respond reasonably to the risk, but the evidence in Williams' favor was not so overwhelming that the jury was required to reach the same conclusion as to the other three defendants.

I also deny Marinelli's motion for a new trial.  My decision to exclude evidence of Williams' specific disciplinary incidents – all of which occurred at least four months before he was assaulted by his cellmate – was, I think, a correct application of Fed. R. Evid. 402 and 403.  The ruling did not prohibit the defendants from introducing evidence that Williams had a serious disciplinary history or that he was allowed to live in a single cell because of his behavioral problems, rather than because of his fears of having a cellmate or any staff concerns for his safety.  What the ruling did prohibit was the introduction of evidence of the specific nature of

those incidents – including that Williams had masturbated in front of female staff – because that evidence was not relevant to whether the defendants violated his Eighth Amendment rights on October 28, 2010.  And even if it had some relevance, its probative value was substantially outweighed by a danger of unfair prejudice and confusing the issues.

I grant in part and deny in part the motion for remittitur.  The motion is denied with respect to the compensatory damages award of $250,000 but granted with respect to the punitive damages award of $400,000.  Because the punitive damages award greatly exceeds the range of punitive damage awards in similar cases, I order a new trial on damages unless, within 21 days of this ruling, Mr. Williams agrees to remit the punitive damages award to $50,000 for total damages of $300,000.

I dismiss as moot Williams' claims for injunctive relief because those claims seek changes to handcuffing and celling practices at Northern, at which Williams has not resided since 2011.  He made no showing at trial that the DOC was likely to return him to that facility.

Finally, I deny Williams' Motion for Reimbursement of Costs of Suit (ECF No.184), without prejudice to his filing a bill of costs; deny his motion to enjoin the State from setting off the costs of his incarceration (ECF No.185), without prejudice to his refiling the motion when issues arising from collection of the judgment become ripe; and deny as moot his Motion for Clarification (ECF No. 200) and Motion to Receive a Status Report (ECF No. 202).

These are just summaries.  Each of these rulings is explained in further detail below.

## II.  Procedural History

Relying on 42 U.S.C. § 1983, Williams brought his Eighth Amendment claim against a long list of correctional officials whom he blamed for the events of October 28, 2010, including the then Commissioner, the Warden at Northern, and Deputy Warden Powers; Captains Cahill,

Dennis Marinelli, and Butkiewicus; Lieutenant Melvin Saylor and Correctional Officers Alphonso Lindsey and Dishana Robinson; Dr. Frayne, mental health workers Eileen Redding and Jill Haga; an unidentified nurse; and the University of Connecticut.[1]   Before trial, I dismissed the claims against the Commissioner, the Warden, Deputy Warden Powers, Captains Cahill and Butkiewicus, Dr. Frayne, mental health worker Redden, the unidentified nurse, and the University of Connecticut.  (ECF Nos. 8, 162.)[2]  Further, after Williams rested his case, I dismissed his claim against mental health worker Haga, granting the Defendants' motion under Fed. R. Civ. P. 50(a) with respect to her; I found that there was legally insufficient evidence to support the claim of deliberate indifference as to Haga due to her minimal involvement in the events of October 28, 2010.  (ECF No. 206 at 29-34.)  After the defendants rested, Williams made his own Rule 50(a) motion as to the remaining defendants.  Except as to Haga, I reserved as to both Rule 50(a) motions, and Mr. Williams' Eighth Amendment claim was submitted to the jury with respect to Marinelli, Saylor, Robinson, and Lindsey.  The jury returned a verdict in favor of Williams with respect to the claim against Marinelli, awarding $250,000 in compensatory damages and $400,000 in punitive damages, and a verdict in favor of Defendants Saylor, Robinson, and Lindsey.

Williams and Marinelli have both renewed their motions for judgment as a matter of law under Rule 50(b).  In addition, Marinelli moves for a new trial under Rule 59 and a remittitur.

---

[1] 42 U.S.C. § 1983 makes "[e]very person who, under color of any statute … of any State …, subjects … any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" liable to the injured party in an action at law.
[2] I originally dismissed the claim against the unidentified nurse in the initial review order.  (ECF No. 8.)  A later version of the complaint identified the nurse as Paul Wilbur and alleged that he had provided inadequate medical attention to Williams following the assault.  (ECF No. 156 at 6.)  Shortly before trial, I granted summary judgment to Wilbur, finding that Williams had failed to comply with the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) as to this claim.   (ECF No. 162.)

Finally, Williams has filed motions for reimbursement of costs, to prevent the State from setting off the costs of incarceration from his damages award, for clarification, and for a status report.

## III.  Facts the Jury Reasonably Could Have Found[3]

### A.  Northern and the Administrative Segregation Program

In 2010, Williams was an inmate at Northern, the most secure prison in Connecticut's prison system.  Williams was assigned to the Administrative Segregation Program ("AdSeg"), one of the most restrictive programs run by the DOC.  AdSeg is designed for inmates who have compiled serious disciplinary records while in prison – due to assaults on staff or other inmates and other serious behavioral problems.  AdSeg consists of three phases, and when each inmate arrives at Northern for placement in AdSeg, he is placed in Phase I, the most restrictive phase.  At the relevant time in 2010, each phase of the AdSeg program at Northern was assigned to a different housing unit and overseen by a different "unit manager."  Captain Cahill oversaw Phase I, which was located in the 1 East housing unit, and Captain Marinelli oversaw Phases II and III, which were located in the 3 East housing unit.

As an inmate progressed through the phases of AdSeg, certain restrictions would be

---

[3] As discussed in more detail below, I must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor in deciding a Rule 50 motion.  Further, I must leave credibility determinations to the jury and disregard all evidence favorable to the moving party that the jury was not required to believe.  *See, e.g., Lore v. City of Syracuse*, 630 F.3d 127, 150 (2d Cir. 2012)("A jury is entitled to believe part and disbelieve part of the testimony of any given witness, and its assessments of witness credibility and its choices between competing factual inferences are not to be second-guessed."); *Wat Bey v. City of New York*, 2013 WL 12082743, at *7 (S.D.N.Y. Sep. 4, 2013)("[T]he jury was not legally required to believe any of Caruso's testimony ….").  Although I have reviewed all of the evidence presented at trial, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."), I have, in some cases where the evidence conflicted, set forth in the factual recitation only the version of the evidence favorable to the non-moving party.  I have noted in other places where there was conflicting evidence.

removed.  For example, although the precise timing of this change was disputed at trial, it was undisputed that inmates in Phase I were handcuffed with their hands behind their backs when they had to be moved outside the cell (to recreation, for example), while inmates in Phase II were handcuffed with their hands in front, for the first thirty days in Phase II, for out-of-cell movements.  To advance from Phase I to Phase II, an inmate had to remain free of disciplinary "tickets" for four months.

From the time he arrived at Northern in November 2009 until the time he left in June 2011, Williams never had a cellmate – except for the day he was attacked by his new cellmate shortly after their placement into the same cell, i.e., October 28, 2010.  During that time frame, Williams advanced through all three phases of the AdSeg program and left Northern for a less restrictive facility in June 2011.  Other inmates in the AdSeg program did have cellmates, although not all of them did.  More specifically, there was evidence that some of the inmates in Phase I did not have cellmates, in part, because Phase I was considered a "cooling off" period. Phase II, however, ordinarily involved double celling, and defense witnesses testified that a goal of the AdSeg program – and Phase II in particular – was to promote interaction with other inmates.  An exhibit introduced at trial describing the AdSeg program states that "[i]nmates are housed two per cell" in Phase II.  (Ex. 40.)  Nonetheless, defense witnesses admitted that "there are circumstances when inmates are placed on single cell status" or otherwise housed in a single cell, and that this might reflect a determination by "custody," (which, the evidence suggested, meant the Warden, deputy warden, or a unit manager), the product of "an informal agreement based on appropriate care and treatment of the offenders at Northern," or the inmate's presence on the "mental health single cell list" due to a diagnosis of an "Axis I mental health disorder." (ECF No. 204 at 42, ECF No. 205 at 112, ECF No. 206 at 52-53.)  As noted, Williams never had

a cellmate in any of the three phases of AdSeg – except for the day of the assault.  Williams

testified that although Phase II "ordinarily" involves double celling, not everyone in Phase II was

double-celled.  (ECF No. 205 at 146, ECF No. 206 at 20.)

### B.  Williams Expresses Fears About Threats from Gang Members, Receiving A Cellmate, and the Sequential Uncuffing Practice

In March 2010, Williams wrote to an attorney at an inmates legal assistance organization

that gang members occupying nearby cells in Phase I at Northern were calling him a "snitch" and

threatening him.  He also informed the lawyer that he was worried about being double celled

with a gang member as he progressed through the phases of the AdSeg program.  Williams was

not a gang member at the time.  The lawyer's colleague contacted Northern and spoke with

Deputy Warden Powers.  Shortly thereafter, Captain Butkiewicus interviewed Williams, who

conveyed fears for his safety and, in particular, concerns about receiving a cellmate and the

possibility of attacks by gang members.  Williams had previously been attacked by other inmates

(ECF No. 206 at 24), although there was no evidence this had occurred at Northern or that any

defendants were aware that he had previously been a victim of inmate attacks.  In his

conversation with Butkiewicus, Williams requested that he be granted "rec alone" status, which

would have entailed letting him participate in out-of-cell recreation by himself.

Williams also told Butkiewicus that he was afraid that he would be unable to defend

himself from assaults, due to what I will refer to as the "sequential uncuffing practice" used at

Northern.  Under that practice, two inmates who are living in the same cell in Phase I at Northern

are placed in the cell with their hands cuffed behind the back; staff then leave the cell and lock

the cell door; and then one inmate squats and pushes his cuffed hands through the "trap," a hole

in the door, and his hands are then uncuffed by staff.  Thereafter, the second inmate squats and

places his hands – behind his back – through the trap and he is uncuffed.  Williams expressed the

concern repeatedly to Butkiewicus and others, as described below, that this sequential uncuffing practice exposed the second inmate to assault by his cellmate, whose hands would be free while the second inmate remained shackled behind his back.  Williams expressed fear that he would be the victim of such an assault.  At trial, he presented evidence that from 1998 through 2010, 53 inmates had been the victim of such assaults at Northern as a result of the sequential uncuffing practice.  There was evidence that Captain Marinelli, who had been at Northern since 1999, learned of these assaults, both as a unit manager and during roll calls at which each incoming shift of correctional staff was advised of significant events on the previous shift.   (ECF No. 204 at 156-57.)  Marinelli testified that staff at Northern move inmates between cells "probably a few hundred times a week" and "thousands a year," but he, along with other defense witnesses, acknowledged that there was "always a risk" of an assault when one inmate is cuffed behind the back and the other is not.  (ECF No. 204 at 146.)  He and other defense witnesses also testified that the practice was necessary to protect correctional staff, and that there was no other way to remove handcuffs from inmates in Phase I that did not pose a risk to staff.

Williams testified that Captain Butkiewicus did nothing in response to his concerns, but he remained living alone.   In May 2010, Williams conveyed the concerns about his safety and his fear about receiving a cellmate to mental health staff.  Specifically, he told Eileen Redden, a mental health worker assigned to Northern, and Dr. Frayne, the supervising psychologist at Northern, that there had been an "abundance of assaults with inmates cuffed behind their back," that he feared he would be assaulted while cuffed behind the back, and that he did not want to receive a cell partner because he feared for his safety.  (ECF No. 205 at 137, 141.)  Williams continued to see Redden for treatment between May 2010 and October 2010, and conveyed these concerns to her each time he saw her.  (Id. at 144.)  Although the trial evidence did not place a

number on these conversations, Redden, who also testified at trial, agreed that Williams had conveyed these concerns to her "many times" and "constantly."  (*Id* at 103, 105-06.)   Redden told him on each occasion that he would continue living alone.  (*Id.* at 144.)

In August 2010, while Williams was in Phase I, Captain Cahill, the unit manager, told Williams that he would need to move to a different cell because Williams was occupying a cell with two bunks and "because I was on single cell status I was going to be moved to the cell with one bunk."  (*Id*.)  Williams was, in fact, moved to a single-bunk cell in another part of 1 East at that time.

### C.  Progression to Phase II

At some point in October 2010, the staff at Northern decided that Williams, who had been discipline-free for four months, was ready to progress to Phase II of the AdSeg program. Williams met with Dr. Frayne on October 19, 2010, and told him that in connection with the possible transition to Phase II, he was concerned about receiving a cellmate, about being assaulted, and about the possibility of being housed with a gang member. Frayne told him that he "was on the list of single cells" (ECF No. 205 at 146), and made a note in Williams' medical record at the time, stating that Williams was "anxious" and "seems invested in advancing, but also remaining single cell."  (Ex. 2B.)  On October 22, 2010, Williams signed an agreement under which he would advance to Phase II; the document said nothing about whether or not he would have a cellmate.  (Ex. 39.)

The staff at Northern, including Captain Marinelli, examined information and communicated frequently about each inmate before deciding on whether that inmate was ready to advance to the next phase of the AdSeg program.  Each month, the Warden, the deputy wardens, the unit managers, including Marinelli, and mental health staff participated in

"progression meetings" to discuss whether each inmate in AdSeg should be promoted to the next phase.  In addition, Marinelli had frequent discussions with Captain Cahill, the unit manager of 1 East, about the inmates who were preparing to advance from Cahill's housing unit to Marinelli's in 3 East, i.e., from Phase I to Phase II.  He and Captain Cahill would also communicate about, among other things, the size, disciplinary history, disposition, gang affiliation (or not), and other characteristics of the inmates who were moving from Phase I to Phase II to determine which inmates should live together in Phase II.  Marinelli also worked closely with mental health staff, especially Dr. Frayne, and included Frayne in all decisions concerning inmates.  Marinellli testified that through these communications, he would be advised if an inmate in 1 East, i.e., Phase I, was "on single cell." (ECF No. 204 at 176.)

### D.     October 28, 2010

On October 28, 2010, Williams met with Redden and other medical staff.   Later that day, Correctional Officers Lindsey and Robinson arrived at his cell to move him to 3 East to begin Phase II of the AdSeg program.  They informed him that he would have a cellmate, inmate Darnell Walker.  Williams immediately asked to speak with mental health staff.  Mental Health worker Haga, who called his cell on the intercom, told him she could not do anything about his housing status and had to defer to Dr. Frayne, her supervisor.  She could not recall during her trial testimony whether she spoke with Dr. Frayne at the time.  Williams also told Lieutenant Saylor, who was touring 1 East at that time, that he had heard that morning from mental health staff (i.e., Redden) that he would remain single cell but that Officers Lindsey and Robinson were now telling him he would be sharing a cell with inmate Walker in Phase II.  Williams was distraught.  Saylor told him to calm down, that he would investigate, and that he would not be moving until Saylor returned.  During his testimony, Saylor did not dispute the substance of this

10

conversation and said that he became occupied with other matters and was unable to return to 1
East before the move.

Inmate Walker was an active member of the Bloods who was, in addition to being in
AdSeg, designated by the DOC as a "Security Risk Group Threat Member," which means that he
was an active gang member who had engaged in violence in the prison system and who
"potentially pose[d] a threat to institutional operations." (ECF No. 204 at 32; ECF No. 205 at 20-
21.)  Walker's disciplinary history, which was introduced at trial, included assaults on inmates
and staff as well as threats and other violations.  (Ex. 45A) Marinelli would have reviewed
Walker's DOC designations and disciplinary history before the move, and he and other staff
learned of inmate assaults during roll call.  (ECF No. 204 at 156-57, 196, 198.)  Williams, too,
was aware that Walker was an active Blood.  He had had a prior encounter with Walker on the
street, and he became concerned for his safety when he was told they would be living together in
Phase II.  (ECF No. 205 at 154-55.)  Williams and Walker were approximately the same size;
both had substantial disciplinary histories; and both had been ticket-free for four months.

Lindsey and Robinson escorted Williams to 3 East.  During the escort, Williams' hands
were cuffed to the front.  At trial, the parties disagreed about the reason for this.  Williams
contended that it owed to the fact that he was progressing to Phase II, where inmates cuff to the
front for the first 30 days.  The defendants, however, took the position that the "handcuff-to-the-
front" policy applicable in Phase II did not take effect until the day after the move, after the
inmates had accepted their cellmates and appeared for recreation.  They contended that the
decision to cuff Williams' hands to the front for the escort was simply a permissible exercise of
Lindsey's and Robinson's discretion.

Robinson testified that, before the move, she considered Williams to be generally

11

cooperative.  According to her and Lindsey's testimony, however, his demeanor changed and he became "anxious" once they entered 3 East "based on … his concerns of mental health single cell status" – such that they began to worry about their decision not to cuff his hands in the back. (ECF No. 204 at 70-71, 104, 108.)  They placed him in the cell with inmate Walker, whose hands were also cuffed in front at the time.[4]  Williams told Robinson and Lindsey that he had been told by mental health that he would be living alone, and urged them to contact Frayne or Redden.  Robinson told him she would check, and Williams and Walker were left in the cell together for four to six minutes, during which both were uncuffed, neither spoke to the other, and no assault occurred.  After this short interval, Robinson and Lindsey returned and instructed Williams to cuff up – in the back – by placing his hands through the trap.  Lindsey testified that he ordered Williams to cuff to the back, rather than the front, out of concern for his and Robinson's safety, as Williams appeared "agitated" at the time.  (ECF No. 204 at 47-51, 65).  Walker was also ordered to cuff up so that the control room – down the hall – could open the cell door and the two correctional officers could remove Williams from the cell.  Robinson and Lindsey removed Williams from the cell without incident and brought him to the day room. Robinson then went to speak with Marinelli.  When Robinson returned, she reported that Marinelli had instructed that Williams be returned to the cell with Walker and that, if he refused, he would be issued a disciplinary report and returned to Phase I of the program.[5]  Williams

---

[4] Williams testified that the two were escorted from 1 East to 3 East at the same time; Lindsey and Robinson denied this, testifying that Williams was placed into the cell after Walker was already there. A reasonable juror could have credited Williams' version, which may help explain, along with the handcuffing in the front, why Walker did not assault Williams when they were first placed into the cell together.

[5] Marinelli testified that, during this interval, he telephoned Dr. Frayne, who reported that Williams had not been designated single cell by mental health staff.  As discussed below, however, the jury was not required to believe this testimony.

understood this to mean that if he refused to return to the cell with Walker, he would not be allowed to leave the AdSeg program or Northern and might also be placed on in-cell restraints as a sanction.  He did not refuse, and Robinson and Lindsey led him back to the cell he had just left.  Upon reaching the cell, Robinson and Lindsey opened the trap and cuffed Walker behind the back.  The cell door was then opened, Williams entered, also cuffed behind the back, and the door closed.  At his own initiative, Walker went immediately to the trap to uncuff, and Robinson and Lindsey removed his cuffs.  Once he was uncuffed, Walker assaulted Williams, who remained in the locked cell, cuffed behind his back.  Walker punched him in the head, knocked him to the floor, kicked him, and "stomp[ed]" on him.  (ECF No. 205 at 164.)  Williams was unable to defend himself.  Neither Robinson nor Lindsey could immediately open the cell door, which was operated by the control room.  Williams suffered wounds to his face and head, as well as injuries to his ankle and back and exacerbation of a preexisting knee injury.  The jury observed a video showing his injuries shortly after the attack, including a visible cut on his cheek and a knob on his head.  The knob remained for two months.  He testified that he continues to suffer headaches as a result of the attack (which occurred six years before trial) and continues to have back and knee pain.  He also testified that he has recurring nightmares about being killed by cellmates, and feels anxious whenever he hears inmates being moved between cells.  He continues to take medication to reduce the nightmares and anxiety, and the medication causes tremors in his hands.

After the assault, Williams was taken to a medical unit to treat his injuries.  As noted, his treatment in the medical unit was filmed, and the jury viewed the video.  The jury also viewed a video of inmate Walker who, immediately after the assault, appeared angry and said that the correctional staff "knew what [they] were doing" when they put him into a cell with an inmate

"on single cell status doing 30 years."  (Def. Ex. Code Blue Walker.)

Williams testified that after the assault and after the camera was turned off, Marinelli approached him and told him that he would receive another cellmate and that Williams "didn't dictate cell assignment in his unit."  (ECF No. 205 at 179-180.)  Williams testified that this comment left him "terrified" that he would be assaulted again.  (*Id*. at 180.)

### E.  Events After October 28, 2010

As noted, Williams continued to live alone as he progressed through the phases of AdSeg at Northern, but both he and another inmate who had been at Northern at the time testified that, after the assault, Marinelli repeatedly threatened to place him with a cellmate while he was in Phases II and III.  Marinelli told the other inmate – also a gang member – that he was going to be housed with Williams.  Even after Deputy Warden Powers specifically told Marinelli that he could not place anyone in the cell with Williams – following a written complaint by Williams about Marinelli's threats – Marinelli continued to tell Williams he would receive a cellmate. Marinelli also spoke with Eileen Redden in an attempt to persuade her take Williams "off single cell status."  (ECF No. 205 at 181.)

After the assault, Walker was placed on the tier a few cells away from Williams.  Walker and other prisoners would taunt Williams about the assault, and told him it would happen again. When Williams complained to Marinelli about being housed with gang members, Marinelli told him to "shut up" and to lie down on his bunk. [6]

---

[6] Marinelli denied that he threatened to place Williams with another cellmate after the assault.

**IV. Analysis of the Post-Verdict Motions**

  **A. Rule 50 Motions**

    *1.   Legal Standards*

      *a.   Rule 50*

Federal Rule of Civil Procedure 50(a)(1)(B) states,

> If a party has been fully heard on an issue during a jury trial and the court finds
> that a reasonable jury would not have a legally sufficient evidentiary basis to find
> for the party on that issue, the court may . . . grant a motion for judgment as a
> matter of law against the party on a claim . . . that, under the controlling law, can
> be maintained . . . only with a favorable finding on that issue.

A motion under the rule must "specify the judgment sought and the law and facts that entitle the

movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  If the court does not grant the motion, it is

"considered to have submitted the action to the jury subject to the court's later deciding the legal

questions raised by the motion," in which case the movant may renew the motion following the

entry of judgment and "include an alternative or joint request for a new trial under Rule 59."

Fed. R. Civ. P. 50(b).  "In ruling on the renewed motion, the court may (1) allow judgment on

the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment

as a matter of law."  *Id.*

    "Judgment as a matter of law may not properly be granted under Rule 50 unless the

evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a

reasonable juror to find in her favor."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136

F.3d 276, 289 (2d Cir. 1998).

> [T]he district court must [also] draw all reasonable inferences in favor of the
> nonmoving party, and it may not make credibility determinations or weigh the
> evidence. . . . Credibility determinations, the weighing of the evidence, and the
> drawing of legitimate inferences from the facts are jury functions, not those of a
> judge. . . . Thus, although the Court should review the record as a whole, it must
> disregard all evidence favorable to the moving party that the jury is not required

to believe.

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)(citations and internal

quotation marks omitted).  "Although a party making a Rule 50 motion always faces a heavy

burden, that burden is particularly heavy, where, as here, the jury has deliberated in the case and

actually returned its verdict in favor of the non-movant."  *Newton v. City of New York*, 779 F.3d

140, 146 (2d Cir. 2015).

> Under such circumstances, the district court may set aside the verdict only where there is
> such a complete absence of evidence supporting the verdict that the jury's findings could
> only have been the result of sheer surmise and conjecture, or there is such an overwhelming
> amount of evidence in favor of the movant that reasonable and fair minded [jurors] could
> not arrive at a verdict against him.

*Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)(alternations and internal

quotation marks omitted).

Although a Rule 50 motion is "[u]sually" brought by the party opposing a claim, federal

courts have also permitted the claimant – here, Williams – to make such a motion.  Wright &

Miller, Fed. Practice and Procedure § 2535 (citing cases).[7]  The courts have suggested that Rule

---

[7] I have been unable to find a Second Circuit case authorizing such a motion by the claimant, and
the text of the rule appears to contemplate granting Rule 50 motions only *against* the party
bearing the burden of proof.  Fed. R. Civ. P. 50(a)(1)("If a party has been fully heard on an issue
during a jury trial and *the court finds that a reasonable jury would not have a legally sufficient
evidentiary basis to find for the party on that issue*, the court may: (A) resolve the issue against
the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or
defense that, under the controlling law, can be maintained or defeated only with a favorable
finding on that issue." (emphasis added)); *see also* Advisory Committee Note to 1991
Amendment ("The revision authorizes the court to perform its duty to enter judgment as a matter
of law at any time during the trial, *as soon as it is apparent that either party is unable to carry a
burden of proof that is essential to that party's case*." (emphasis added).)  Still, because a wide
range of federal courts have allowed such a motion, Wright & Miller § 2535, and because I could
have in any event allowed Williams to move for summary judgment after the Defendants rested
– which would have entailed application of the same standard as Rule 50 –, I will reach the
merits of Williams' Rule 50 motion.  Fed. R. Civ. P. 56(b)("*Unless ... the court orders
otherwise*, a party may file a motion for summary judgment at any time until 30 days after the
close of all discovery." (emphasis added)); *Reeves*, 530 U.S. at 150 ("And the standard for

50 motions by claimants should rarely be granted, because the high standard applicable to Rule 50 motions "is rarely satisfied by the party bearing the burden of proof at trial." *Sachs v. Musa*, 2014 WL 1855615, at *1 (S.D.N.Y. May 8, 2014.) Specifically, a claimant making a Rule 50 motion must show that "there is such an overwhelming amount of evidence in favor of [him] that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Cross*, 417 F.3d at 248; *see also Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165-66 (D.C. Cir. 2015)("It is rarely appropriate to grant a directed verdict or judgment n.o.v. in favor of the party having the burden of proof; such action is reserved for those extreme circumstances where the effect of the evidence is not only sufficient to meet his burden of proof, but is overwhelming, leaving no room for the jury to draw significant inferences in favor of the other party." (internal quotation marks and citation omitted)).

### b.   Eighth Amendment

The Eighth Amendment's prohibition against "cruel and unusual punishments" imposes on prison officials "a duty…to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)(citation and internal quotation marks omitted). Violations of this duty are actionable under section 1983. *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996)("[U]nder 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate…"). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Instead, "prison officials are liable for harm incurred by an inmate if the officials acted with deliberate indifference to the safety of the inmate." *Hayes*, 84

---

granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." (internal quotation marks and citation omitted)).

F.3d at 620 (internal quotation marks and citation omitted).

An inmate's claim for violation of his Eighth Amendment rights is comprised of an objective and subjective component. *Branaham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) ("In examining [an] Eighth Amendment claim, [courts] consider both the subjective and objective components of the alleged violation."). To satisfy the objective prong, the deprivation "must be in objective terms sufficiently serious such that the deprivation denied the minimal civilized measures of life's necessities." *Id.* at 77 (internal quotation marks, alterations, and citation omitted). This requirement is satisfied where an inmate shows "he [was] incarcerated under conditions posing a substantial risk of serious harm." *Hayes*, 84 F.3d at 620.

The subjective prong requires an inmate to show that the "defendant prison officials possessed sufficient culpable intent." *Id.* "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* The prison official "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assault by the specific prisoner who eventually committed the assault." *Id.* at 843; *see also Hayes*, 84 F.3d at 621 (noting an inmate need not "identify his enemies to the [prison officials]" by name). Rather, "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." *Farmer*, 511 U.S. at 837 (citation and internal quotation marks omitted). For example, if there is "evidence that a substantial risk of inmate attacks was longstanding, pervasive, well-

documented, or expressly noted by prison officials in the past and the circumstances suggest that the [defendant]…had been exposed to information concerning the risk," a factfinder may infer that the defendant had the requisite intent. *Id*. at 842-43.

The jury was instructed on these principles. (ECF No. 171.)

2. *Discussion of Marinelli's Rule 50 Motion*[8]

After Williams rested, Marinelli argued that there was no evidence that he was aware that Williams feared for his safety and that the evidence showed that, at most, he was aware of a risk of assault arising from the sequential handcuffing procedure – one that was not specific to Williams – and that he took precautionary measures and investigated Williams' claims that mental health staff had told him he would remain in a single cell. In the brief supporting his renewed motion, Marinelli adds to these arguments challenges to my rulings excluding certain evidence. That addition is improper, both because it goes beyond what Marinelli argued at the close of the Williams' case and because Rule 50 motions must be based on the evidence, not on matters excluded from the evidence. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)(Rule 50 "limit[s] the grounds for judgment n.o.v. to those specifically raised in the prior motion for a directed verdict."); *Reeves*, 530 U.S. at 150 (court deciding Rule 50 motion "should review all of the evidence in the record."). Instead, I will consider his challenges to my evidentiary rulings in the discussion of his Rule 59 motion for a new trial, below.

Marinelli also argues that he has qualified immunity – a defense he did assert at trial and on which I reserved decision – because (1) no case law clearly established that Williams had a

---

[8] The three other defendants also made a Rule 50(a) motion after the plaintiff rested his case, and the docket reflects that they renewed it orally on the same day the jury rendered its verdict. (ECF Nos. 168 and 173). They did not file a brief in support of the renewed motion, presumably because the verdict was in their favor. In any event, to the extent they have made a Rule 50(b) motion, it is denied as moot.

right to continue to live alone while he progressed through AdSeg, and (2) no case law clearly established that Williams had the right not be placed in a cell while he was handcuffed behind his back at the same time that his cellmate's hands were free.

### a.   Objective Prong

Defendants made no argument in their Rule 50(a) motion, and Marinelli makes no argument in the renewed motion, that Williams failed to satisfy the objective prong of his Eighth Amendment claim.  In any event, the evidence of Williams' injuries from the assault by Walker while Williams remained handcuffed behind his back – injuries to his face, lip, and head, including a knob that remained for two months; recurring headaches and nightmares; injury to his back and exacerbation of an injury to his knee – are sufficiently serious to show that he was incarcerated under conditions posing a risk of serious harm.  The trial evidence was sufficient to support the jury's finding that Williams satisfied the objective component of the claim.

### b.   Subjective Prong

Marinelli's Rule 50 challenge to the verdict focuses on whether there was sufficient evidence to support the jury's finding of deliberate indifference.  Viewing the evidence in the light most favorable to Williams and drawing all reasonable inferences in his favor, I find that there was.  Specifically, there was enough evidence from which a reasonable jury could find that Marinelli was aware of a substantial risk of serious harm to Williams and failed to respond reasonably to the risk.  While there was no evidence that Williams specifically told Marinelli before the assault that he feared that Walker or another inmate would assault him, there was ample evidence that Marinelli knew of Walker's fears about assault by a cellmate, especially a gang member, before October 28, 2010.  *Compare Ziemba v. Lajoie*, 2016 WL 5395265, at *4 (D. Conn. Sept. 26, 2016)(where plaintiff was attacked by his cellmate who had recently been transferred

following his assault on a previous cellmate at another prison, and where previous assault was documented in health records, a hearing notice, and a letter between correctional officials other than the defendant warden of the transferee prison, court denied summary judgment on *Farmer* claim against defendant warden, in part on ground that "a trier of fact could conclude that [defendant warden] was aware of transferee inmate's dangerousness," even in absence of specific evidence showing he was directly informed of the risk posed by the transferee prisoner).

A major theme of the defense at trial was that the staff at Northern and, in particular, those who decided to advance an inmate through the phases of the AdSeg program, worked closely together as a team and kept each other informed about the inmates, especially candidates for "progression" through the phases.  All the captains – which would include Marinelli, Cahill, and Butkiewicus – attended the monthly "progression" meetings at which the candidates for advancement (and, in fact, all inmates in AdSeg) were discussed, as did Deputy Warden Powers and mental health staff, which would have included Redden and Frayne.  Before October 28, 2010, Williams had specifically voiced his fears about gang members and about being assaulted by a cellmate while his hands were uncuffed to Butkiewicus and Frayne, and repeatedly to Redden.  (A reasonable jury could have found that Powers, too, was aware of his concerns, because there was evidence that she had sent Butkiewicus to interview him after she was contacted by a lawyer on his behalf.)  Marinelli testified that he worked very closely with mental health staff, especially Frayne, and included Frayne in all decisions concerning inmates; Williams had conveyed his fears to Frayne – for at least the second time – only the week before the October 28 move.  Frayne noted in Williams' medical record on that occasion that Williams was "anxious" and "invested in … remaining single cell."  (Ex. 2B.)  Marinelli also testified that he was in "constant" and "ongoing" contact with Cahill about the inmates in Phase I who might be progressing to Phase II (ECF No.

204 at 173), and Cahill was certainly aware that Williams had always resided in the housing unit he supervised in a single cell and was committed to continuing to do so; in fact, Cahill arranged for Williams to move to a single-bunk cell in 1 East (Phase I) after Cahill determined that he needed to house two other inmates in the double-bunk cell in which Williams had been living alone.  Marinelli acknowledged that he would have been aware if an inmate in 1 East was "on single cell."  (ECF No. 204 at 176.)  Further, Marinelli's reaction immediately after the assault – or at least Williams' version of it, which the jury was entitled to credit – is telling: shortly after the camera showing Williams' injuries was turned off, Marinelli approached Williams and told him that Williams did not "dictate cell assignment" in his unit and that he would be receiving another cell partner – a refrain he repeated over the next few months.  This suggests that Marinelli was aware – before the assault – of Williams' strong commitment to "remaining single cell," which he had communicated to Frayne only the previous week and to Redden on multiple occasions.

And there was evidence from which a reasonable juror could have inferred that that commitment – and mental health's and Cahill's accommodation of it in Phase I – was based at least in part on Williams' fears of assault by a cellmate and mental health staff's recognition of those fears.  Williams had been attacked by inmates previously, and Redden testified that he had shared his concerns about being assaulted by a cellmate with her "many times" and "constantly" between May and October 2010; Frayne, too, testified that Williams was "focus[ed]" on remaining single cell.  Williams testified that Redden – repeatedly – and Frayne in the week before the move assured him that he would remain living alone.  Frayne denied this, but the jury was permitted to credit Williams' version of events.  Redden could not recall whether she had told Williams he would remain single cell in Phase I but agreed that, after the assault, she advocated on his behalf to remain single cell in Phases II and III.

Admittedly, there were a variety of accounts offered to the jury about what, exactly, it meant that Williams was "single cell" in Phase I – that he was just living alone, as opposed to being on "single cell status;" that he was on "single cell status" per "custody" (i.e., the unit manager, Warden, or Deputy Warden), not per mental health; that he lived alone based on a recommendation of mental health staff; or that he did so because he had behavioral problems and difficulties getting along with other inmates.  But among all these accounts, there was evidence from which a reasonable jury could draw the inference that mental health workers at Northern – especially Redden – recommended that Williams remain alone in a cell based on "appropriate care and treatment of the offenders at Northern;" presumably, this is also why she advocated that he remain single cell after the assault.  (ECF No. 205 at 106, 111-12.)

To be sure, this was not the only inference a reasonable jury could have drawn from Williams' history of living alone in Phase I.  The Defendants presented evidence that Williams was left in a single cell because of his behavioral issues and his inability to get along with other inmates.  Frayne testified, for example, that Northern's mental health staff was treating Williams for "primarily behavioral disordered behaviors," that he first saw Williams following "a line of aggressive behavior," that Williams did not suffer from the type of mental disorder that would have warranted placing him on the "mental health single cell list," that only Frayne could place him on that list, and that Frayne never did so.  The jury, however, was not required to credit this testimony.  And even if it did, it could still have found that *one* reason for Williams' remaining "single cell" was that he had repeatedly expressed fears about being celled together with another inmate, especially a gang member.  Indeed, the notion that the *only* reason Williams was single cell was his misconduct is difficult to square with Redden's testimony that, after the assault, she advocated that he remain single cell, even at a time when was no longer receiving disciplinary

23

tickets.  In any event, the drawing of inferences from the evidence is the province of the jury, not the Court, and this jury could reasonably have inferred that Williams was kept "on single cell" due in part to his frequently voiced fears of assault and that some mental health staff at Northern were concerned that placing him with a cellmate would pose a risk to his mental health.  And, for the reasons already discussed, the jury could have further inferred that Marinelli was aware of all this.

There was also ample evidence that Marinelli participated in the decision to pair Williams with Walker, an inmate he knew was an active Blood who had assaulted other inmates.  Marinelli and Cahill reviewed the disciplinary histories of each inmate when deciding who would cell together in Phase II, and given the information made available to Captain Butkiewicus and Deputy Warden Powers before October 28 and the frequent communication between captains and other staff at progression meetings, a reasonable jury could have inferred that Marinelli knew that Williams was specifically afraid of gang members.  To be sure, Marinelli was also aware of Williams' own disciplinary history – which the jury learned was serious, "aggressive," and involved "behavior-disordered" conduct –, and there was evidence that Williams and Walker were about the same size.  But Marinelli knew that when Williams was first placed into the cell with Walker, there was an even chance that Walker would be un-handcuffed first, leaving Williams in the locked cell with his unfettered new cellmate while his own hands remained cuffed behind his back.  There was evidence that Marinelli would have learned of the 53 assaults that took place in this situation – a cellmate whose hands were free attacking one whose hands were cuffed – over the twelve years leading up to the assault, and Marinelli and other defense witnesses acknowledged that there was a risk of assault in this situation.  Admittedly, Marinelli testified that the denominator against which this figure must be assessed – the number of moves of inmates – was likely to be in the tens of thousands, which, he suggested, meant the risk was small.  But the jury was not required

to accept his testimony on this point, and the denominator might not be as large as Marinelli's testimony suggested.  First, the evidence was that only inmates in Phase I cuff to the back – so the risk was likely limited to inter-cell moves of inmates in Phase I or from Phase I to Phase II.  Second, a reasonable jury could have inferred that, however it was quantified, the risk of a cellmate-on-cellmate attack was at its highest when the two were first celled together (i.e., were not yet accustomed to living together), the door locked behind them, and one of the new cellmates remained cuffed behind the back while the other's hands were free.[9]  Indeed, there was evidence that Phase II did not even begin until the two new cellmates coming from Phase I "accepted" each other – itself suggestive that sometimes they did not.  (ECF No. 204 at 62.)

Finally, there was evidence from which a reasonable jury could infer that, once he was advised on the day of the assault that Williams was resisting the placement with Walker and telling Robinson and Lindsey that mental health had said he would remain in a single cell, Marinelli failed to investigate this claim – or simply dismissed it.  To begin with, Robinson and Lindsey apparently considered Williams' claim to raise a concern serious enough to warrant removing him from the

---

[9] I do not suggest that the risk of an inmate assault from the sequential uncuffing practice – standing alone – would be sufficient to uphold the verdict against Marinelli.  It might not be, although I need not and do not decide that issue.  In *Warren v. Goord*, 579 F. Supp.2d 488 (S.D.N.Y. 2008), the court found that there was enough evidence that the prison superintendent, who was aware that there had been thirty-seven inmate assaults in the prison recreation yard in the four years preceding the attack against the plaintiff, was aware of the danger of assault to deny summary judgment on that portion of the plaintiff's Eighth Amendment claim under *Farmer*.  579 F. Supp.2d at 496.  That frequency factor – 9 assaults a year – is about twice the one in this case (i.e., approximately 4.4 assaults per year in the twelve years leading up to 2010).  More importantly, the court in *Goord* ultimately granted summary judgment to the superintendent (and the other defendant), on the ground that the defendants had taken reasonable measures to address the risk of attacks in the yard.  In this case, Marinelli and the other defendants testified that, while there was a risk to inmates from the sequential handcuffing practice, there was a risk to staff from handling the placement of the two AdSeg inmates in a cell any other way.  While Williams disputed this, he did not offer evidence of an alternative mechanism that would have allowed the two inmates to be unhandcuffed while staff remained outside the cell – and thus out of harm's way.

cell with Walker – where both had been placed cuffed in front and then uncuffed and had remained together without incident for a few minutes – while they investigated the matter further. They both testified that Williams was "agitated" at the time, and the jury could have reasonably inferred that Robinson conveyed that fact to Marinelli when she went to see him about Williams' claim. The jury could also reasonably have inferred that Marinelli ultimately overrode Robinson's and Lindsey's concern, ordering them to return Williams to the cell with Walker. *Compare Beckles v. Bennett*, 2008 WL 821827, at *18 (S.D.N.Y. Mar. 26, 2008)(denying summary judgment on *Farmer* claim against defendant correctional sergeant where plaintiff had told sergeant he was afraid to return to cell block because of threatening behavior by specifically identified correctional officers and was refusing to return to the cell block, thereby "communicat[ing to the sergeant] his belief in the immediacy of the potential danger," and where sergeant responded by telling him he had nothing to fear and sending him back to the cellblock, where he was assaulted hours later).

To be sure, Marinelli testified that after hearing from Robinson about Williams' statements, he tried to reach Redden, but she was "out of the building" at the time. He also testified that he telephoned Frayne, who, according to Marinelli, told him that Williams was not on mental health's "single cell list." But the jury was not required to believe any of this testimony – and it had some reason not to. First, Marinelli also testified that he had had few dealings with Redden and that only Frayne had the authority to declare an inmate "single cell" for mental health reasons – raising the question why he would have called her at all. Second, Frayne was not asked during his testimony whether Marinelli called him the day of the assault, and testified that he was meeting with someone – possibly another "inmate privately" – in a different housing unit around the time of the assault. (ECF No. 206 at 56-58.) Third, the evidence of Marinelli's strongly held view that Williams should have to accept another inmate – directing Robinson to tell Williams right before

26

the assault that he would be disciplined if he did not accept Walker as a cellmate, approaching Williams after the assault to tell him he did not "dictate" housing arrangements in Marinelli's unit and would be receiving a cellmate, visiting his cell repeatedly in the following months to tell him he would receive a cellmate, even after Deputy Warden Powers said Williams would not, and attempting to persuade Redden that Williams should receive a cellmate – would have supported a reasonable inference that he was aware of at least Redden's view that Williams should remain single cell but disagreed with it and was unwilling to abide by it.  To be clear, I am not suggesting that Marinelli was not truthful in his testimony – only that the jury was not required to believe his testimony that he checked with Frayne or investigated Williams' claim, and could reasonably have found he would not have bowed to a recommendation from mental health staff (at least not one from Redden).  In light of all this, a reasonable jury could have concluded both that Marinelli was aware of a substantial risk of serious harm and failed to take reasonable measures to avoid the risk.

> c.  *Qualified Immunity*

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, __ S. Ct. ___, 2017 WL 69170 *4 (U.S. Jan. 9, 2017)(internal quotation marks and citation omitted).  The Supreme Court recently "reiterate[d] the longstanding principle that clearly established law should not be defined at a high level of generality" and "must be particularized to the facts of the case."  *Id.* (internal quotation marks and citations omitted).  The Court also reiterated, however, that the law "does not require a case directly on point for a right to be clearly established."  *Id.*

As of 2010, it was "clearly established law" that correctional officials have a duty to protect prisoners from assaults by other inmates where they are aware of a substantial risk of such assaults. *Farmer*, 511 U.S. at 833, 837 (1994)("prison officials have a duty to protect prisoners from

violence at the hands of other prisoners" and violate that duty when they "know[] of and disregard[] an excessive risk to inmate health or safety"); *Hayes*, 84 F.3d at 621 (2d Cir. 1996) (applying *Farmer* to reverse summary judgment for correctional official, where inmate had "identif[ied] the source of the threats" to the defendant official, even if he had not "identified his enemies by name"). The precise nature of the risk – and the evidence that the defendant was aware of it – will necessarily vary with the circumstances of each case, but there is no doubt that Williams' right to protection from an assault by a cellmate after telling numerous officials of his fears of such an assault was clearly established. *See Rodriguez v. Connecticut*, 169 F. Supp.2d 39, 48 (D. Conn. 2001)(denying qualified immunity to correctional officers on *Farmer* claim involving murder of inmate by other prisoners because the *Farmer* decision "clearly outlined the standard to be employed by courts … and … established guidelines for prison officials regarding when liability will be imposed for such violations.").

Marinelli argues that there was no clearly established law prohibiting the double celling of inmates or the use of the sequential handcuffing practice, but that argument leaves out the most important risk factors in this case – the repeated expressions of fear by Williams of gang members and assaults by cellmates, the apparent view of at least some at Northern that he should remain single cell in Phase II and the assurances given to him that he would, his state of agitation when first removed from the cell with Walker and continued insistence that he was supposed to be single cell, and the fact that Lindsey and Robinson were concerned enough to remove him from the cell with Walker to verify his claim. These factors, together with the evidence that he would be placed with his hands cuffed behind his back in a cell for the first time with an active gang member who had a history of inmate assaults, situate this case well within clearly established law imposing a duty to protect prisoners from assaults by other inmates.

"Finally, the Court notes that the jury's determination that punitive damages were appropriate in this case makes [Marinelli's] assertion of qualified immunity seem especially hollow. The jury having found that [Marinelli's] conduct was malicious or wanton cuts deeply against [his] argument that the Court should find him immune on the ground that he acted in [an] objectively reasonable manner." *Harewood v. Braithwaite*, 64 F. Supp.3d 384, 401 (E.D.N.Y. 2014)(internal quotation marks and citations omitted).

I conclude that Marinelli does not have qualified immunity here and deny his Rule 50 motion.

### 3. *Discussion of Williams' Rule 50 Motion*

Williams' Rule 50 motion does not warrant lengthy discussion. His case against Saylor, Robinson, and Lindsey did not present the "rare[]" situation involving "those extreme circumstances where the effect of the evidence [was] not only sufficient to meet his burden of proof, but [was] overwhelming, leaving no room for the jury to draw significant inferences in favor of the other party." *Radtke*, 795 F.3d at 165-66. As for Saylor, the evidence against him was simply that Williams told him while he was touring 1 East on October 28, 2010, that he was being moved to a new cell with Walker after mental health had told him he would remain single cell. Saylor said he would check and get back to Williams but did not do so before the move and the assault. But there was no evidence that Saylor was aware of Williams' earlier expressions of fear about gang members and assaults by a cellmate, no evidence that he was aware of any single cell status Williams might have or any recommendation by Redden or anyone else that he remain single cell (except through what Williams told him that morning), no evidence Saylor attended the "progression meetings" at which information about the AdSeg inmates was discussed, no evidence that he participated in the decision to pair Williams and Walker or that he was otherwise involved

in the progression of inmates, and no evidence that he was aware of Walker's history of assaults. In short, the evidence left ample room for the jury to find in Saylor's favor on the deliberate indifference claim.

The same is true of Robinson and Lindsey, and for some of the same reasons. There was no evidence that they participated in the progression meetings or in the decisions to place Williams with another cellmate, no evidence that they were aware of Walker's assault history, and no evidence that they were aware of Redden's recommendation and assurances (again, other than what Williams told them on October 28). The evidence supported a reasonable inference that they were not as well informed of the risk as Marinelli was. In addition, the evidence supported a finding that, even if they knew enough to be aware of a substantial risk of harm, they acted reasonably to avoid that risk – by removing Williams from the cell with Walker after he appeared agitated and so that they could verify his claim that mental health had said he would remain single cell. *See, e.g., Warren v. Goord*, 579 F. Supp.2d 488 (S.D.N.Y. 2008)(finding genuine issue of material fact as to prison superintendent's awareness of substantial risk of serious harm but granting summary judgment on grounds that superintendent took reasonable measures to avoid the risk).

I therefore deny Williams' Rule 50 motion.

### B.  Marinelli's Rule 59 Motion

### 1.    *Legal Standards*

"In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to [Rule] 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of*

*New York*, 414 F.3d 381, 392 (2d Cir. 2005) (alterations, citation, and internal quotation marks omitted).  "[O]n a Rule 59 motion the court may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014)(internal quotation marks omitted).  However, "a high degree of deference is accorded to the jury's evaluation of witness credibility, and…jury verdicts should be disturbed with great infrequency."  *Id.*

    2.    *Discussion*

Marinelli's Rule 59 motion principally challenges my evidentiary ruling limiting the evidence the defendants could introduce about Williams' disciplinary history in the DOC.  Courts in this Circuit have held that, to obtain a new trial on the ground of erroneous evidentiary rulings, "a litigant must do more than merely voice a disagreement with the court's evidentiary rulings.  Rather, a motion for new trial on the basis of improper evidentiary rulings will be granted only where the improper ruling affects a substantial right of the moving party."  *Litras v. Long Island R.R.*, 2006 WL 1455466, at *11 (E.D.N.Y. May 23, 2006)(internal quotation marks and citations omitted).  I conclude that the challenged evidentiary ruling was correct, and note that defense counsel expressed her agreement with it before trial.  But even if it was erroneous, it did not significantly prejudice Marinelli, because he was able to present ample evidence to rebut Williams' claims.

Some procedural history is necessary to address this issue.  Before trial, Williams filed motions in limine seeking to exclude his DOC disciplinary history, which included instances of "public indecency" allegedly involving masturbating in front of female staff.  (ECF Nos. 84, 136, 137; ECF No. 210 at 2).  The defendants opposed the motions, arguing that an inmate's disciplinary history was "relied on by custody in making treatment decisions and cell assignments"

and "may be admissible to demonstrate the defendants' state of mind." (ECF No. 97 at 4.) At a

pretrial hearing, defense counsel argued that the disciplinary history was also admissible to rebut

Williams' argument that he had been assigned a single cell due to mental health issues: "As to the

public indecency, ... I think [the disciplinary tickets] come in ... as evidence that ... it was his

behavior that put him there [i.e., in a single cell], not necessarily his mental health issues." (ECF

No. 210 at 3.) After hearing this argument, I had the following colloquy with defense counsel:

> THE COURT: I hear you, which is that there has to be, from your perspective,
> some explanation for why he was single cell. He may have his own, but you'd like
> to present yours.
> [DEFENSE COUNSEL]: Yes.
> THE COURT: Again, though, why couldn't that be tailored so that it would be,
> you know, he had behavioral issues, that's why he was in Ad Seg to begin with.
> The behavioral issues were such that the DOC determined that a single cell was
> necessary in his case, and because of interactions with other inmates. And then at
> such and such a point he got to a point where the tickets stopped and he was
> ready, in the DOC's estimation, to move on to Phase II and be back with a second
> inmate, which is the goal. Why wouldn't that be sufficient?
> [DEFENSE COUNSEL]: As you just said, it would be sufficient.

(ECF No. 210 at 8-9.) Later in the same proceeding, after hearing from Williams (who

was pro se, but had assistance from stand-by counsel at the trial), I confirmed defense

counsel's agreement with the ruling:

> THE COURT: ... Just to be clear, my view is and my order is that
> there should be no reference by a witness or by an exhibit
> that's admitted into evidence of Mr. Williams masturbating,
> of him of public indecency, of his standing naked, of other
> sexual activity he might or might not have engaged in,
> unless, this is important for you to understand,
> Mr. Williams, unless you were to open the door.
>
> Now, you may have seen on TV, but basically you have
> to be careful when you're questioning witnesses, because if
> you get into an area, even if you don't ask a specific
> question, but if you get into a general area with a question
> and the other side says, Judge, he opened the door, I'm going
> to have to think, okay, what the did the witness say and did
> it really touch on this area. And I may say, you know, if I

think that, gosh, in fairness, he's now been allowed to
elicit a fact that is misleading on its own without evidence,
further evidence of that fact, just so you know, you could
open the door to letting in some of this evidence, depending
on what you say. That's why I think it's helpful to have
Mr. Thomas [i.e., Williams' stand-by counsel] there, because I think he can help
you with that.

MR. WILLIAMS: That's only from my questions, not
from what the Defendants say?

THE COURT: Correct. So my ruling is, short of the
Defendant [sic] opening the door, that there should be no evidence,
either testimony or exhibits, and to the extent there are
exhibits they must be redacted before being admitted into
evidence, referring to his sexual misbehavior, public
indecency. And I think also -- I don't see a reason like,
let's say, there was an assault. I just don't see the point
of it. You're going to get across he's in Ad Seg. They know
he wasn't an angel. Ad Seg is going to be described as a
program for folks who are difficult inside, which they'll be
allowed to do. He had a number of tickets for misbehavior,
which they will be allowed to say. I just don't think we
need to get into the misbehavior here.

[DEFENSE COUNSEL]: I agree. I agree.

THE COURT: So let's make sure the exhibits are all
redacted to reflect that.

[DEFENSE COUNSEL]: Yes, I will have a new exhibit book to
you with the redactions, but if the door is opened –

THE COURT: Absolutely. If the door is opened,
that's a different story.

(ECF No. 210 at 14-15.)  After the hearing, I made the following entry on the docket:

As discussed on the record at the most recent pretrial conference, the 84 , 135 ,
136 , and 137 motions in limine are granted in part and denied in part. The
Defendants may not introduce evidence of the specific grounds for the Plaintiff's
discipline and, in particular, may not introduce evidence of sexual misconduct or
assaults by the plaintiff. The Defendants may introduce general evidence about
the Ad Seg program, the fact that the plaintiff had a lengthy disciplinary record,
how the plaintiff was or was not progressing in the program, and the like. They
may not delve into specific incidents of discipline.

(ECF No. 163.)  Defense counsel's agreement with my ruling at the pretrial hearing raises a question as to whether Marinelli has preserved his objection to the ruling.   "[A]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course."  *United States v. Ward*, 506 F.3d 468, 477 (6th Cir. 2007).  Still, inasmuch as defense counsel did submit a brief opposing Williams' motion in limine, I will consider the evidentiary challenge on the merits.

The relevance of Williams' specific disciplinary incidents –  including his allegedly masturbating before female DOC staff – to the issue of whether the defendants acted with deliberate indifference in failing to protect him from the October 28 assault does not leap off the page. It was common ground at the trial that for Williams to have been promoted from Phase I to Phase II of the AdSeg program, he must have been free of disciplinary tickets for a period of four months – suggesting that he had not, for four months, engaged in any of the sexual misconduct Marinelli now says he should have been allowed to present to the jury.  Further, defendants have never suggested – and Marinelli does not argue in his motion for new trial – that any of Williams' past disciplinary incidents involved Walker, that Walker was aware of the nature of those incidents, or that Williams' past sexual misconduct before female staff had anything to do with Walker's assault on Williams.   That leaves Marinelli's arguments that (1) specific incidents of past discipline were probative of the reason Williams was allowed to live alone in Phase I – and rebutted the suggestion that his single cell status was for mental

health reasons – and (2) they were relevant to explaining Marinelli's state of mind in pairing Williams and Walker.[10]

I agree with the first argument but find that the probative value of that evidence lies in the fact that, according to the defendants, Williams was single-celled due to misconduct, not due to concerns about his mental health; the specific nature of that misconduct – whether it was threats, assaults, attempted escapes, or masturbation – adds little, if anything, to this basic point. What the specific nature of his conduct in this case would have done is inject a danger of unfair prejudice into the trial – a danger that the jury would have been so disgusted by Williams' alleged sexual activities directed at female staff it would have lost sight of the issue before it. *See* Fed. R. Evid. 403 (allowing court to exclude evidence if its probative value is "substantially outweighed by a danger of … unfair prejudice, confusing the issues ….."). I made the same point at the pretrial hearing. (ECF No. 210 at 6 ("Why wouldn't I be -- in light of the prejudice to the Defendant in eliciting evidence about the sexual activity that you described, the

---

[10]The motion for new trial also offers two new reasons – never raised before – why this evidence might be relevant. First, Marinelli argues that the evidence of Williams' sexual misconduct was relevant because it showed Williams' "desire to continue to masturbate alone in his cell." (ECF No. 190-1 at 21.) Defendants never made this argument previously and never suggested that any witness or document would support it. (Without an admission from the defendant that he wanted to continue to live alone so that he could masturbate, and I am not aware of any, how would Defendants have proved this?) The argument also overlooks the undisputed fact that Williams had been discipline-free for four months before October 28, 2010, i.e., that he was no longer masturbating in front of female staff. The second new reason now urged by Marinelli is that Williams was allowed to offer the disciplinary history of Walker – the inmate who assaulted him – and that the admission of his own disciplinary history was necessary "to balance the scale." (ECF No. 190-1 at 21.) The relevance of Walker's disciplinary history, however, was confined to Marinelli's awareness of his prior assaults. And as for "balancing the scale," the defendants were allowed to introduce ample evidence that Williams, too, had a long disciplinary history, had had behavioral problems, and was approximately Walker's size – as discussed further below. Thus, even if these two grounds had been timely asserted, I would find that they lack merit.

nature of which has nothing to do with the merits of this case, why wouldn't I be justified under Rule 403 in essentially limiting that testimony and evidence so that you could elicit what Ad Seg is generally, that it consists of these phases, that Mr. Williams was in Ad Seg because he had acquired a number of disciplinary tickets for behavioral infractions or issues, and leave it at that?").

The second argument is more difficult to grasp. It was surely relevant that Marinelli and Cahill and others considered background information about the inmates in Phase I – including disciplinary history, size, gang membership, and the like – in deciding whether to advance them to Phase II and with whom to cell them, and there was ample evidence introduced at trial in an attempt to show Marinelli's care and diligence in this regard. (*See, e.g.*, ECF No. 204 at 172-78, ECF No. 206 at 99-101, 103-04.) But how would the fact that Williams, at least four months earlier, had masturbated in front of female staff make it more or less probable that Marinelli was deliberately indifferent to his safety in forcing him to return to the cell with Walker on October 28, 2010? *See* Fed. R. Evid. 401. The defendants never explained this before trial, and Marinelli does not explain it in his motion for new trial. And, again, even if it had some relevance to Marinelli's state of mind, whatever probative value it had was substantially outweighed by the danger of unfair prejudice to Williams.

In my view, the manner in which the evidence developed at trial confirmed the soundness of this evidentiary ruling. The Defendants were allowed to elicit ample evidence that Williams had a long disciplinary history, that Marinelli considered that history along with Walker's in placing the two together, that Williams had demonstrated aggressive behavior, that Ms. Redden was treating him for his improper behaviors, that

he was given a single cell as a result of those behaviors and not for any other reason, and

that he was not on the "mental health single cell list."  (*See, e.g.,* ECF No. 204 at 34

(inmates assigned to AdSeg at Northern "pose a significant threat to the population or

staff and have conducted themselves in a manner where they more often than not have

displayed behavior that is assaultive to either other inmates or staff"); ECF No. 205 at

172-78, 196-97 & ECF No. 206 at 99-101, 103-04 (Marinelli and Cahill examined

information, including disciplinary histories, about inmates in deciding on progression

and cellmates, and would have been aware that Williams and Walker "both had a number

of DR's in their previous history"); *id.* at 200 (inmates can be placed "on single cell"

because of "a custody or a behavior managerial issue", as well as a mental health issue);

ECF No. 205 at 90 (Williams exhibited "behavioral issues … that would enable him to …

remain single celled" and "succeed[ed] in remaining single cell because of his behavioral

issues"); *id.* at 114 (Williams had anger issues for which Redden was treating him); ECF

No. 206 at 44 (Williams was being treated by mental health staff for "primarily

behavioral disordered behaviors"); *id.* (Williams' testimony that he was not being treated

for behavioral issues while at Northern was untrue); *id.* at 72 (Williams' single cell status

was "purely a custody decision"); *id.* at 84 (reason for Williams being cell was a

"behavioral issue")).[11]  My ruling did not prevent the defendants from eliciting evidence

---

[11] In spite of my ruling, some defense witnesses went further, testifying that Williams had a long
criminal history, and was being treated for "hatred"and to reduce his sexual misconduct towards
female staff.  *See, e.g.,* ECF No. 205 at 103 (Redden's function at Northern was to "help improve
the environment for the female staff" and "help and treat inmates so they decreased their
behaviors against staff"); ECF No. 206 at 47-48 (Redden's role was to "serve[] as a consult for
sex offender individuals," "[s]he came into the building to help us consult, work with Mr.
Williams," and Frayne requested that Redden work with Williams "following a line of
aggressive behavior"); ECF No. 205 at 115 (Redden was working with Williams on his "anger
and hatred issues"); *id.* at 116 (Williams "had a long criminal history").  Although I sustained

that Marinelli considered Williams' disciplinary history in connection with the move to the cell with Walker. Nor did it prevent them from eliciting evidence that Williams had been placed in a single cell because of his own misconduct or evidence to rebut Williams' claim that he had been placed in a single cell out of concern for his mental health and due to his expressed fears of an attack by a gang member.[12]

Finally, Marinelli argues that the jury must have improperly disagreed with Northern's "practice of compelling inmates to accept cellmates" in Phase II of AdSeg or speculated "that a specific characteristic or trait" of Williams "made him so likely to be assaulted … that Defendant Marinelli's decision to have him share a cell" violated the Eighth Amendment. (ECF No. 190-1.) As I have already explained, however, the jury had evidence of deliberate indifference before it that went well beyond the "practice of

---

objections to or cut off some of this testimony, not all of it prompted an objection and thus the jury was allowed to consider some of it.

[12] The Rule 50 motion also asserts that I prevented Frayne from discussing Williams' "actual mental health diagnosis to rebut plaintiff's testimony that he suffered PTSD and anxiety" and improperly excluded evidence that "plaintiff was not included" on the "mental health single cell list." (ECF No. 213 at 4.) As noted, challenges to evidentiary rulings do not belong in a Rule 50 motion, but even if considered as part of the Rule 59 motion, these assertions lack merit. During the trial, defense counsel sought to elicit testimony that Williams had a propensity to lie as a result of his alleged Anti-social Personality Disorder. (ECF No. 206 at 41.) I barred that evidence because its proposed source, Dr. Frayne, had not been disclosed as an expert under Fed. R. Civ. P. 26 and because I found that it would cross a line, even for a properly disclosed and qualified expert, to tell the jury that a witness has a propensity to lie. (*Id.*); *see generally The New Wigmore. A Treatise on Evidence: Impeachment and Rehabilitation* § 3.2.1 & n.32 ("Courts continue to reject expert testimony that amounts to an assertion that the witness has an abnormal propensity to lie."); *United States v. Provenzano*, 688 F.2d 194, 203-04 (3d Cir. 1982)("The use of [psychiatric] evidence at trial to attack or support a witness's credibility has not been generally favored."). The second assertion – that I excluded evidence that Williams was not on the "mental health single cell list" – is incorrect: Frayne testified that he was not. (ECF No. 206 at 49.) I did exclude meeting notes purportedly showing that Williams was not on the list, because the defendants had not listed them as trial exhibits or previously shown them to Williams, and because they did not directly impeach any of Williams' testimony. (*Id.* at 53-54, 60, 78-80).

compelling inmates to accept cellmates," which, the evidence suggested, was not always followed anyways.  There is no reason to think the jury's verdict reflected a general policy disagreement with the double-celling practice at Northern.    The second point regarding a "specific characteristic or trait" of Williams is less clear; Marinelli does not argue, for example, that there is any reason to believe the jury concluded that Williams was especially vulnerable to assault, or that my Rule 403 ruling made it more likely that the jury would think there was.  In developing this argument further, Marinelli ultimately rehashes the same evidentiary arguments discussed above, i.e., that my ruling excluding the evidence of specific disciplinary incidents and, in particular, the alleged masturbation in front of female staff, prevented him from "testifying fully as to what he knew at the time he ordered the cell assignment," and "allowed the plaintiff to invite the jury to speculate as to the motives of the defendant."  (ECF No. 190-1 at 22-23.)  But for the reasons I have already discussed, I disagree.

The trial was largely a credibility contest between Williams and several of the defense witnesses, especially Marinelli.  While I have the authority to weigh the credibility of the witnesses on a motion for a new trial, I still must accord "a high degree of deference to the jury's evaluation of witness credibility."  *ING Global v. United Parcel Service Oasis Supply Corp*., 757 F.3d 92, 99 (2d Cir. 2014).  Because I find that the jury's evaluation in this case falls within that zone of deference, I cannot conclude that its verdict was seriously erroneous or a miscarriage of justice.  I therefore deny the motion for new trial.

### C. Remittitur

#### 1. Legal Standards

"It is well settled that calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). There is, however, "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435 (1996)(citation and internal quotation marks omitted). Moreover, "[w]hile a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1996)(citation and internal quotation marks omitted).

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)(internal quotation marks omitted). Whether a jury's award for compensatory or punitive damages was excessive is governed by federal law for an Eighth Amendment claim. *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)("In a federal question case, a district court will ordinarily deem an award excessive if it shock[s] the judicial conscience.")(citation and internal quotation marks omitted). Federal law provides that a verdict is excessive if "the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" or if "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)(internal quotation marks omitted).

To determine whether an award is so excessive as to "shock the judicial conscience," "a review of comparable cases is appropriate." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655,

671 (2d Cir. 2012)(alterations, citation, and internal quotation marks omitted).  The court's task, however, is not simply to "average the high and low awards." *Id.*  Rather, the court must "focus instead on whether the verdict lies within the reasonable range." *Id.*

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or under, the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).  If a district court opts for the remittitur procedure, it "should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl*, 917 F.2d at 1330.

### 2.  *The Compensatory Damages Award Is Not Excessive*

The jury awarded Williams $250,000 in compensatory damages.  (ECF No. 176). Marinelli argues that the compensatory damage award is "so high as to shock the judicial conscience" because (i) the jury awarded damages for emotional harm based solely on Williams' testimony, (ii) there was no evidence that Williams' emotional distress was proximately caused by the assault, (iii) Williams suffered only "*de minimis*" physical injuries, which cannot support a compensatory award for emotional harm, and (iv) the award exceeds other awards for comparable injuries and conduct.  (ECF No. 213 at 25.)  I assess the first two arguments together as the pertinent evidence is the same, and assess the third and fourth arguments in subsections b and c, respectively.

### a.  *The Evidence Supports A Finding of Causation and An Award for Emotional Harm*

"It is well settled that a court may award damages for emotional suffering in a § 1983 case." *Miner v. City of Glen Falls*, 999 F.2d 655, 662 (2d Cir. 1993).  To win such an award, the "plaintiff [must] convince the trier of fact that he actually suffered distress because of the

41

[constitutional violation]." *Id.*  Where a plaintiff's evidence of an emotional injury consists of his own testimony, however, that testimony "must be substantiated by other evidence" such as "testimony of witnesses to the plaintiff's distress….or the objective circumstances of the violation itself." *Patrolmen's Benevolent Ass'n. of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 55 (2d Cir. 2002); *see Miner*, 999 F.2d at 662 (affirming award for emotional distress based upon testimony of plaintiff and plaintiff's spouse); *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995)(affirming award of emotional distress damages based on plaintiffs' testimony about the circumstances of the violation and their reaction to it).

In addition, "[t]o recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by the constitutional violation." *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994)(internal quotation marks and citation omitted). Accordingly, the jury was instructed that to find the defendants liable, they must find that the defendants' acts were a "substantial factor in bringing about the injury, and the injury or damage was a reasonably foreseeable consequence of the [defendants'] act[s]."  (ECF No. 171 at 21.) The jury is presumed to have followed these instructions.  *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006)("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge.")(internal quotation marks and citation omitted).

Williams' testimony about his psychological injuries is supported by the "objective circumstances of the violation itself" *Patrolmen's Benevolent Ass'n.*, 310 F.3d at 55, and the same evidence is sufficient to support the jury's finding of causation.  Walker's attack realized all the fears Williams had frequently voiced to mental health staff.  Williams was handcuffed behind his back (leaving him defenseless), placed in a cell with a gang member who had a violent history, and then brutally assaulted.  Furthermore, after the assault, Marinelli began

stopping by Williams' cell, threatening to place him with another cellmate.  According to

Williams, Marinelli's threats made him "terrified" that "[he] was going to be assaulted again."

(ECF No. 205 at 180.)  Williams testified that he suffered from psychological injuries — anxiety,

nightmares, and "PTSD" — and that those injuries revolved around his fear of a subsequent

assault by an inmate while his hands were cuffed.[13]  Williams testified that his anxiety grew after

the assault due to Marinelli's threats and because Walker "would yell from his cell over to

[Williams'] cell and taunt [him], jeer at [him], reference what he did to [him]."  (*Id*. at 173.)

Also, Walker "would have his buddies on the tier yell, scream, reference what [Walker] did to

[him]" and "when [Walker's friends] c[a]me out for recreation or...[to] take showers they would

walk past [Williams'] cell, knock on [his] door and look in [his] cell" to "taunt [him], jeer at

[him]" and threaten to assault Williams like Walker did.  (*Id*.)  The jury could have reasonably

found that the "objective circumstances" of the assault, which left Williams bloodied, bruised,

and beset by chronic pain, realized his worst fears and proximately caused his psychological

injuries.  *See DiSorbo v. Hoy*, 343 F.3d 172, 184 (2d Cir. 2003)("While she was handcuffed, and

defenseless, Rebecca DiSorbo was brutally attacked by a law enforcement officer who was

substantially larger and stronger than she.  In light of the highly traumatic nature of this attack, it

would have been quite reasonable for the jury to find resulting psychological injuries."); *see also*

*Miner*, 999 F.2d at 663 (concluding "the anguish [plaintiff] described has some objective

---

[13] To be sure, Williams is not a doctor or mental health provider, and he called no expert witness
at trial.  His testimony that he suffered from "PTSD" as a result of the assault was thus improper
opinion evidence.  *See e.g.*, *Barnes v. Anderson*, 202 F.3d 150, 159
(2d Cir. 1999)(noting "[t]he requirement that plaintiffs produce expert medical evidence in order
to prove proximate causation of medical injury [or mental disease]…").  But the defendants did
not object to this testimony, move to strike it, or seek a curative instruction.  In any event, the
reference to "PTSD" was brief and Williams did not say that he had received a formal diagnosis
of PTSD.

correlation with events described by Miner and by his wife: loss of their house, family tensions, certain potentially demeaning aspects of a former police officer having to seek benefits, and so on.").

   b.  *De Minimis* Physical Injuries

Marinelli argues that the physical injuries sustained by Williams were minor and, therefore, not a proper basis for the jury to award compensatory damages for mental and emotional harm.  (ECF No. 213 at 25.)  The Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), bars an inmate from recovering damages for mental or emotional injury without a showing of actual physical injury.  *Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002)("We agree with the majority of our sister circuits that Section 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.").  Accordingly, the jury was instructed that it should award compensatory damages to Williams "for mental and emotional harm only if [the jury] first find[s] that Mr. Williams has suffered a physical injury that is more than *de minimis*, that is, so minor as to warrant being disregarded.  A physical injury is harm to the body.  You may not award any compensatory damages to Mr. Williams if you find that he has proven only mental or emotional harm."  (ECF No. 171 at 21.)

Contrary to Marinelli's characterization, Williams' injuries were not so minor as to warrant being disregarded.  Williams testified to the extensive nature of his injuries after the assault: multiple lacerations on his head, a large bump above his eye, two knots on the top of his head, an abrasion on his face, a swollen forehead, a swollen cheek, a swollen lip, a swollen knee, a scratched ankle, and black and blue bruises all over his body.  (ECF No. 206 at 169.)  Not only

did Williams receive treatment for his physical injuries immediately after the assault, he testified

that – almost six years after the assault – he still suffered pain in his back and knee and had

recurring headaches.  Furthermore, Lawson testified that Williams had difficulty walking

following the assault, and that he observed Williams limping.  The jury also watched a video

depicting Williams' injuries shortly after the attack, including a visible cut on his cheek and a

knob on his head, the latter of which remained for two months.  There was evidence from which

the jury could conclude that Williams' injuries were not so minor as to be disregarded and,

therefore, a proper basis for Williams to recover damages for emotional harm.

   c.  *Excessiveness*

I now consider whether the compensatory damages award here is so high as to "shock the

judicial conscience and constitute a denial of the justice."  *DiSorbo*, 343 F.3d at 186.  For this

analysis, I "consider damages awards in similar cases in assessing the propriety of the amount of

damages awarded here."  *Blissett v. Coughlin*, 66 F.3d 531, 536 (2d Cir. 1995).  The jury's award

is within the reasonable range based on comparable cases.[14]  *See Ismail*, 899 F.2d at 185

(affirming jury award of $650,000 for non-economic damages where defendant police officer

"struck [the plaintiff] on the back of his head without warning, causing a brief loss of

consciousness," and then placed his knee in the plaintiff's back and handcuffed the plaintiff with

his hands behind his back causing "two displaced vertebrae, a cracked rib, and serious head

trauma."); *Tatum v. Jackson*, 668 F.Supp.2d 584, 602 (S.D.N.Y. 2009)(upholding award of $1

million where plaintiff was attacked by other inmates causing him to suffer a fractured jaw

---

[14] Though the cases I rely upon involve instances where a defendant intentionally inflicted
physical harm upon a plaintiff, I rely on the cases to assess what is the "reasonable range" of
awards based on the nature of injuries sustained by the plaintiffs, not the conduct that gave rise to
the injury.  As discussed below, however, the nature of Marinelli's conduct is relevant to the
analysis of the punitive damages award.

which required surgery, loose teeth, a numb lip, and emotional distress); *Alla v. Verkay*, 979

F.Supp.2d 349, 357-58, 363-65 (E.D.N.Y. 2013)(finding $250,000 compensatory non-economic

award not excessive where plaintiff fractured facial bone after an officer punched him in the face

while handcuffed, causing him chronic "pressure headaches," limited jaw function, recurring

nightmares, and emotional harm);  *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992)(affirming

jury award of $216,000 for compensatory damages where defendant officer struck plaintiff once

on the cheek causing an injury that required surgery and permanent damage to his face);

*Hutchinson v. McCabee*, 168 F.Supp.2d 101, 104 (S.D.N.Y. 2001)(upholding jury award of

$120,000 where plaintiff was attacked by two other inmates leading plaintiff to be hospitalized

for injuries to his shoulder, face, neck, and nose); *Ziemba v. Armstrong*, 433 F. Supp.2d 248, 252

(D. Conn. 2006)(upholding jury award of $100,000 in compensatory damages where, although

the plaintiff did not present evidence of permanent physical harm or "long–term psychological

effects," officer "punched Ziemba's face and pressed it down onto a solid steel 'bed' while

Ziemba was restrained and not resisting" and "us[ed] a nerve compression technique that

involved digging his thumb into Ziemba's head just behind his ear."); *Blissett*, 66 F.3d at 533-34

(affirming jury award of $75,000 for compensatory damages where inmate claimed prison

guards assaulted punched him, struck him repeatedly with a baton, kicked him, and choked him);

*Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996)(remitting award of $300,000 to

$150,000 where the plaintiff suffered "a physical blow to the mouth that resulted in no bruise or

cut, much less any permanent injury" and nightmares and occasional loss of sleep for little more

than a year, as well as wrongful confinement for a day); *DiSorbo*, 343 F.3d at 179 (remitting

award of $400,000 to $250,000 where plaintiff had two hematomas and bruises on various parts

of her body but no injuries that required surgery or were  permanent); *Morales v. City of New*

*York*, 99 Civ. 10004, 2001 WL 8594, at *7 (S.D.N.Y. Jan. 2, 2001)(reducing $2,750,000 award to $50,0000 where plaintiff suffered bruises on her legs and arm that required no serious medical treatment, "she could not identify the specific sources of her bruises…[,] did not remember being punched, struck, or hit with any object").

In comparison, Williams sustained injuries that, while not identical to the injuries suffered by the plaintiffs in those cases, were comparable both physically and psychologically. Physically, like the plaintiffs in those cases, he incurred multiple injuries to his body, swelling and bruising on his head and face, and (as in the cases with the higher awards) some permanent physical damage, including his ongoing knee and back pain and headaches. Those injuries, at a minimum, are on par with (and in fact appear to exceed) the injuries of the plaintiff in *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003). To be sure, Williams did not require surgery, but neither did other plaintiffs who received substantial compensatory awards. *DiSorbo*, 343 F.3d at 179 (remitting award to $250,000 where plaintiff had two hematomas and bruises on various parts of her body but no injuries that required surgery or were permanent); *Bender*, 78 F.3d at 787 (remitting award to $150,000 where the plaintiff suffered "a physical blow to the mouth that resulted in no bruise or cut, much less any permanent injury" and suffered nightmares). Psychologically, Williams, like some of the plaintiffs in the cases above, had psychological injuries in the form of anxiety and nightmares. His psychological injuries appear to be more profound than those of his comparators because his symptoms lasted longer. *See Bender*, 78 F.3d at 791 (plaintiff suffered nightmares and occasional loss of sleep for little more than a year).

Marinelli points to a line of cases where courts have remitted excessive compensatory awards and relies principally on *DiSorbo*. (ECF No. 213-1 at 27.) The *DiSorbo* court remitted the $400,000 compensatory award to $250,000 because there was no evidence that plaintiff

"require[d] surgery" nor did plaintiff "complain of any permanent injuries, as most of her bruises healed within several days."  *DiSorbo*, 343 F.3d at 179. Unlike the plaintiff in *DiSorbo*, however, some of Williams' injuries "did not heal[] within several days" but months, and Williams testified to permanent injuries.  *Id.*  In any event, the compensatory award here equals the award in *DiSorbo* – a 2003 case.[15]  This is noteworthy because, as discussed above, both cases included similar evidence supporting the claim of psychological harm.

Marinelli also cites cases where juries (or judges) awarded compensatory damages significantly less than $250,000, even though, Marinelli claims, those plaintiffs suffered more severe injuries and the defendants engaged in more egregious conduct.  *See Armstrong*, 433 F.Supp.2d at 252 ($100,000 awarded for the conduct described above); *Hygh*, 961 F.2d at 366 (awarding $216,000 for the conduct and injures above); *Blissett*, 66 F.3d at 533 ($75,000 award where multiple prison guards struck plaintiff in the head with a baton, punched and kicked him, and choked him); *Byrnes v. Angevine*, 2015 WL 3795807, at *1-3 (N.D.N.Y. June 17, 2015)(adopting recommended ruling of magistrate judge for $10,000 in compensatory damages where plaintiff had been choked and kicked by a correction officer); *Medina v. Donaldson*,  No. 10 Civ. 5922, 2014 WL 1010951, at *1-2 (E.D.N.Y Mar. 14, 2014)(upholding jury award of $5,000 in compensatory damages where police officer used excessive force by punching plaintiff while he was handcuffed in back of police car causing bruises to his right eye, dizziness, nightmares, and a worsening of his PTSD); *Anderson v. Aparicio*, 25 F.Supp.3d 303, 308

---

[15] It is proper "when considering the sizes of the awards in earlier cases… [to] take into account inflation."  *DiSorbo*, 343 F.3d at 185.  For example, according to the inflation calculator provided by the Bureau of Labor Statistics of the United States Department of Labor, the award of $216,000 in *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) would be approximately $369,504.00 in 2016 (the latest date at which data are available).  Consumer Price Index Inflation Calculator, Bureau of Labor Statistics, at https://www.bls.gov/data/inflation_calculator.htm (last visited February 8, 2017).

(E.D.N.Y. 2014)(upholding jury award of $20,000 in compensatory damages where officers used excessive force against plaintiff by restraining him and "punched him in the face" and "delivered kick[s] to his lower back"); *Zhiwen Chen v. County of Suffolk*, 927 F.Supp.2d 58, 67 (E.D.N.Y. 2013)(upholding jury award of $20,000 in compensatory damages where officers punched and kicked plaintiff while she was handcuffed, leaving bruises on her face, arm, leg, wrists, and hands); *Romaine v. Rawson*, 140 F.Supp.2d. 204, 208 (N.D.N.Y. 2001)(award of $1,000 in compensatory damages where "[d]efendant struck [plaintiff] across the face three times").

 Several of these cases are distinct from this case in that the plaintiffs did not sustain permanent injuries, and in the cases where there was evidence of permanent injuries, the awards are not as low as Marinelli suggests once inflation is taken into account.  (*See* note 15 *supra.*) But in any event, the primary task of the court here is not to "balance the number of high and low awards."  *DiSorbo*, 343 F.3d at 183.  Rather, as discussed above, the inquiry is to "consider[] whether a compensatory damages award falls within a reasonable range."  *Id*.  So, although juries (and judges) have rendered lower awards in similar cases (accepting Marinelli's characterization that the injuries are similar to those here), Marinelli has not shown that the jury's award of $250,000 falls outside the reasonable range.[16]  *Id*.  Because the compensatory award lies within the reasonable range, it is not "so high as to shock the judicial conscience" and, therefore, is not excessive.

---

[16] The Second Circuit has acknowledged that cases involving similar injuries can have substantially different awards.  *See e.g.*, *DiSorbo*, 343 F.3d at 185 (remitting the plaintiff's award to $250,000 even though the "the plaintiff in *O'Neill* suffered injuries similar in terms of severity to those endured by Rebecca DiSorbo" yet was awarded only $80,000 in compensatory damages.).

3.      *The Punitive Damages Award Is Excessive*

The jury awarded Williams a total of $400,000 in punitive damages against Marinelli.  I charged the jury that they could "award punitive damages against a Defendant with respect to Mr. Williams' claims under § 1983 if [they found] that the Defendant engaged in any of the following conduct (a) [m]alicious or oppressive violation of Mr. Williams' constitutional rights or (b) [r]eckless disregard or callous indifference as to whether he or she was violating Mr. Williams' constitutional rights."  (ECF No. 171 at 24- 25.)

Marinelli's first challenge to the punitive damages award is that there was no basis for it: he asserts that there was "simply no evidence that he possessed an evil motive or intent."  (ECF No. 213 at 29.)  Because this argument challenges the sufficiency of the evidence to support the predicate findings for punitive damages, however, Marinelli was required to raise it in his Rule 50(a) motion, and he did not.  "[A]lthough a motion for [judgment as a matter of law] may be renewed after the jury returns its verdict, it may be renewed only on grounds that were specifically articulated before the submission of the case to the jury.  As to any issue on which no proper Rule 50(b) motion was made, [judgment as a matter of law] may not be properly granted by the district court, or upheld on appeal, or ordered by the appellate court unless that action is required in order to prevent manifest injustice."  *Kirsch*, 148 F.3d at 164 (internal quotation marks, citation, and alterations omitted). Where "defendants' Rule 50(a) motion for [judgment as a matter of law] d[oes] not challenge the sufficiency of [plaintiff's] evidence with respect to punitive damages" that issue is waived and cannot be raised  in the defendants' renewed Rule 50(b) motion. *Tolbert v. Queens College*, 242 F.3d 58, 76 (2d Cir. 2001)(finding that the defendants had waived their challenge to the sufficiency of evidence supporting the jury's award of punitive damages for both renewed Rule 50(b) motion and for appeal).

50

After Williams rested, as discussed above, defense counsel moved under Rule 50(a) for judgment as a matter of law on the grounds that there was no evidence that Marinelli was aware that Williams feared for his safety, and that he investigated Williams' claims that mental health staff had told him he would remain in a single cell.  Defense counsel's Rule 50(a) motion did not mention punitive damages or challenge the sufficiency of plaintiff's evidence regarding Marinelli's motive or intent. Therefore, the argument is waived for purposes of Marinelli's renewed Rule 50(b) motion.[17]

In any event, there was legally sufficient evidence to support the jury's award of punitive damages against Marinelli.  Immediately after the assault, Marinelli began what the jury reasonably could have found amounted to a campaign of threats to place another inmate in Williams' cell.  Marinelli threatened Williams on his frequent visits to Williams' cell, even after Deputy Warden Powers directed that Williams was to remain single cell.  There was also evidence that Marinelli attempted to make good on his threats by trying to persuade Redden that Williams should be required to accept a cellmate.  Furthermore, when Williams raised concerns about being housed with gang members, Marinelli told him to "shut up."  (ECF No. 205 at 181.) As noted above, although this conduct took place after the assault, the jury could have reasonably inferred that the dismissive attitude it betrayed about Williams' fears of being doubled celled preexisted the assault, and informed Marinelli's decision to house Williams with Walker in Phase II.  All of this is sufficient to support a finding of at least "reckless disregard or

---

[17] I may excuse Marinelli's waiver and consider his argument on the merits "if that action is required to prevent manifest injustice." *Kirsch*, F.3d at 164.  But analysis of that issue is unnecessary because there is legally sufficient evidence to support the jury's finding of the type of intent necessary to support a punitive damages award.

callous indifference as to whether [Marinelli]…was violating Mr. Williams' constitutional rights."  (ECF No. 171 at 24-25.)

The next issue is whether the punitive damages award was excessive.  As with compensatory damages, the standard for determining whether an award of punitive damages is excessive is "whether the award is so high as to shock the judicial conscience and constitute a denial of justice."  *DiSorbo*, 343 F.3d at 186.  "The Supreme Court in [*BMW of North America v. Gore*, 517 U.S. 559 (1996)] identified three 'guideposts' for determining whether a punitive damages award is excessive: 1) the degree of reprehensibility; 2) the disparity between the harm or potential harm and the punitive damages award; and 3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases."  *Id*.  I now examine each of these factors in the context of this case.[18]

### a.  Degree of Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendants' conduct."  *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996).  Reprehensibility is "more than merely asking whether the conduct was unacceptable."  *DiSorbo*, 343 F.3d at 186.  "The fact that conduct is sufficiently reprehensible so as to trigger tort liability and damages does not establish the high degree of culpability that warrants a substantial punitive damages award."  *Id*. (internal quotation marks and citation omitted).  The Supreme Court identified three factors that are to be considered in

---

[18] A defendant's financial circumstances may be a basis for assessing a punitive award's excessiveness.  But Marinelli offered no evidence of his financial circumstances at trial and does not assert this ground.  *See Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373 (2d Cir. 1988) (declining to consider defendant's argument on appeal that his financial net worth was a basis for reducing the punitive damages because "the incompleteness of the record as to [defendant's] net worth" was on account of his failure to develop the record at trial).

assessing reprehensibility: "1) whether a defendant's conduct was violent or presented a threat of violence; 2) whether a defendant acted with malice as opposed to mere negligence; and 3) whether a defendant has engaged in repeated instances of misconduct." *Id*.

The jury's verdict on liability shows the first factor was present in this case — that Marinelli's conduct presented a threat of violence to Williams. As already shown, there was sufficient evidence to support the jury's finding of deliberate indifference to a substantial risk of serious harm, namely assault by Walker while Williams' hands were cuffed behind his back. (The distinction between Marinelli's conduct — exposing Williams to a substantial risk of violence — and cases in which the defendant purposely inflicted violence is discussed below.)

As for the second factor, it is already clear from the discussion of the Rule 50 motion above that there was sufficient evidence to find that Marinelli's state of mind exceeded negligence. Deliberate indifference itself implies at least recklessness. *Farmer*, 511 U.S. at 839–40 (1994)("[s]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."). In addition, there was evidence from which the jury could have inferred malice, specifically, the evidence summarized above regarding Marinelli's threats to place Williams with another cellmate and dismissing his fears of gang members. (ECF No. 205 at 179-80.) There was evidence — including a grievance dated February 16, 2011 (Ex. 36 ) — that Marinelli did this repeatedly for months. Both Lawson and Williams testified that as Williams and he progressed through Phase II and Phase III of the Administrative Segregation program, Marinelli "on several occasions" came to Williams' cell to inform Williams that he would be receiving a cell partner

despite Deputy Warden Powers' instructions to the contrary.  (ECF No. 205 at 14-16).  There

was thus evidence to find Marinelli's conduct reprehensible.[19]

> b.  *Disparity Between the Harm and Punitive Damages Award*

"To assess the appropriateness of the ratio of the punitive damages award to the harm, the

proper inquiry is whether there is a reasonable relationship between the punitive damages award

and the harm likely to result from the defendant's conduct as well as the harm that actually has

occurred."  *DiSorbo*, 343 F.3d at 187.  This inquiry aims to "ensure that the measure of

punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the

general damages recovered."  *Id*. (internal quotations marks and citation omitted).  The

reasonableness determination is not "a simple mathematical formula," *id.*, but "[c]ourts often

consider the ratio of the punitive damages award to the compensatory award, and consider

whether that ratio is reasonable in the circumstances of the case."  *Payne v. Jones*, 711 F.3d 85

(2d Cir. 2012).  When evaluating the reasonableness of the award, courts have observed that "in

cases of very small injury but very reprehensible conduct, the appropriate ratios can be very

high" *id.*, but "[w]hen the compensatory damages are substantial, then a lesser ratio, perhaps

only equal to compensatory damages, can reach the outermost limit…"  *State Farm Mut. Auto.*

---

[19] It is debatable whether Marinelli's repeated threats, by themselves, amounted to "repeated instances of misconduct" within the meaning of the *Gore* factors.  The threats themselves did not constitute deliberate indifference in violation of the Eighth Amendment, and there was no evidence that Marinelli actually exposed Williams to a substantial risk of serious harm on a second occasion.  Still, there was evidence that Marinelli's threats exacerbated the psychological harm to Williams, who testified that he was "terrified" that he would again be double celled with a gang member.  In any event, courts have found reprehensibility under *Gore* even when there was evidence to support only the first two aggravating factors.  *See*, *e.g.*, *Ziemba*, 433 F.Supp.2d at 256 (finding that the "evidence supporting the first two factors, even without the third, [was] sufficient to establish a high degree of reprehensibility.").

*Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  The Supreme Court, however, has

"decline[d]…to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.*

In this case, the ratio of punitive damages to compensatory damages is a modest 1.6: 1.

But Marinelli contends that the punitive damages award cannot be sustained here in light of the

"minor injuries" sustained by Williams.  (ECF No. 213 at 33.)  Marinelli relies on *Allam v.*

*Meyers*, 906 F.Supp.2d 274, 281 (S.D.N.Y. 2012), arguing that the court there rejected a punitive

damage award as excessive, though there was not a great disparity in the ratio between

compensatory and punitive damages, because the plaintiff lacked "severe or permanent injury."

(ECF No. 213 at 33.)  Here, however, there was some evidence of "permanent injur[ies],"

*Allam*, 906 F.Supp.2d at 281, and it is worth noting that the court in *Allam* remitted a $300,000

punitive award by only $100,000 – finding a $200,000 punitive award to be lawful.  The other

cases are likewise distinguishable.[20]   In any event, the Second Circuit has acknowledged that

"the use of the multiplier to assess punitive damages" may "not [be] the best tool."  *Lee v.*

*Edwards*, 101 F.3d 805, 811 (2d Cir. 1996). This is commonly the case where the "ratio, without

regard to the [punitive and compensatory] amounts, tells [courts] little of value in….answering

the question," *Payne v. Jones*, 711 F.3d 85, 103 (2d Cir. 2013), of whether there is a "reasonable

relationship between the punitive damages award and the harm likely to result from the

defendant's conduct as well as the harm that actually [] occurred."  *DiSorbo*, 343 F.3d at 187.

---

[20] In *Shukla v. Sharma*, No. 07-CV-2792, 2012 WL 481796, at *15-16 (E.D.N.Y. Feb. 14, 2012),
the court acknowledged that the "case was unusual" because the jury found "that plaintiff had
libeled defendants" and because plaintiff's "civil cause of action [was] too new to have generated
a body of case law on [compensatory] damage awards."  The jury did not find any such legal
wrongdoing on the part of Williams, and the $250,000 compensatory award is well within the
reasonable range of awards.  *Thomas v. i Star Financial, Inc*., 508 F.Supp.2d 252, 260 (S.D.N.Y.
2007) is inapposite because the ratios between the punitive damages and compensatory damages
were far greater in that case – 3:1 and 4:1 –  than the ratio here.

This is such a case.  Though the ratio is not great, the ratio does not say much about whether there is a reasonable relationship between the punitive damages and the harm likely to have resulted from Marinelli's conduct.  Therefore, I "look to the punitive damage awards in other civil rights cases to find limits and proportions."  *Lee*, 101 F.3d at 811.

### c.   *Difference Between Remedy and Civil and Criminal Penalties*

"The final *Gore* factor compares the punitive damages award with the civil and criminal penalties for comparable misconduct."  *DiSorbo*, 343 F.3d at 187.  In this case, the parties have not suggested, nor am I aware, of any criminal or civil penalties that might attach to Marinelli's conduct.

### d.   *Punitive Awards in Comparable Cases*

"[E]ven where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three *Gore* guideposts," it is necessary to "review punitive awards for excessiveness ... [which] requires comparison with awards approved in similar cases ... [and] determin[ing], as with compensatory awards, whether the punitive award is so high as to shock the judicial conscience and constitute a denial of justice."  *Mathie v. Fries*, 121 F.3d 808, 816–17 (2d Cir.1997)(internal quotation marks and citation omitted); *see Milfort v. Prevete*, 3 F. Supp.3d 14, 26 (E.D.N.Y. 2014)("When there are no comparable civil or criminal penalties, a court may compare the award to awards upheld in other cases.");  *DiSorbo*, 343 F.3d at 188 (after analyzing *Gore* factors, court separately considered "awards in other police misconduct cases" "[t]o determine the appropriate level of punitive damages.").

Marinelli points to cases where defendants were found to have used excessive force against plaintiffs, arguing that the award here greatly exceeds the awards in those cases.  *Ismail*, 899 F.2d at 185 (affirming jury award of $150,000 of punitive damages); *Hygh*, 961 F.2d at 366

(affirming jury award of $1,000 in punitive damages); *Armstrong*, 433 F. Supp.2d at 252-55

(upholding jury award of $150,000 in punitive damages for); *O'Neill v. Kreminski*,  839 F.2d 9,

10 (2d Cir. 1998)(affirming punitive damages awards of $125,000 and $60,000 where plaintiff

was struck in the face repeatedly while handcuffed and dragged by his throat); *DiSorbo*, 343

F.3d at 189 (remitting award of punitive damages from $1.275 million to $75,000 for the conduct

described above); *Mathie*, 121 F.3d at 810-11 (reducing award from $500,000 to $200,000 where

plaintiff was repeatedly sexually abused by prison staff member); *King v. Verdone*,  No. 97-CV-

1487, 1999 WL 33432177, at *4 (D. Conn. Sept. 30, 1999)(reducing jury award of $1 million to

$150,000 in punitive damages where plaintiff was kicked in the face and body as well as

punched); *Blackledge v. Carlone*, 126 F.Supp.2d 224, 225 (D. Conn. 2001)(upholding $40,000

punitive award where officer pepper sprayed plaintiff, handcuffed plaintiff behind her back,

placed her in back of police cruiser, and sprayed her again); *Morales*, 2001 WL 8594, at *7

(S.D.N.Y. Jan. 2, 2001)(eliminating punitive award entirely where "[a]t most, [defendant] was

unnecessarily rough in subduing [plaintiff] as she struggled, and in forcing her into his car");

*Alla*, 979 F.Supp.2d at 378-79 (upholding $150,000 punitive award where court found the

defendant's conduct "unquestionably qualifies as 'violent'" and noting the award was , "if

anything somewhat conservative.").   Indeed, in the excessive force context, the Second Circuit

has "described [punitive] awards ranging from $125,000 to $175,000 as substantial."  *Payne*, 711

F.3d at 105 (internal quotation marks and citation omitted).  With respect to punitive damages

imposed on individual officers, the Second Circuit has observed that "[it has] never approved a

punitive damage award against an individual police officer as large as the $300,000 award."  *Id.*

The $400,000 punitive damages award against Marinelli clearly exceeds the awards in these

cases.  Further, there is a critical distinction between these cases and the present case: Marinelli did not assault Williams or purposely inflict physical harm on him.

With that distinction in mind, I have supplemented the pool of comparators with cases where punitive damages were assessed against defendants found to be deliberately indifferent to plaintiffs' safety or serious medical needs.  These case are by no means ideal comparators as each could be factually distinguished from the instant case, and more importantly, the set of these cases is small.  In fact, one court recently commented on the "relative dearth of punitive damages awards for claims of deliberate indifference to serious medical needs" in particular. *Perry v. Roy*, 2016 WL 1948823 (D. Mass. May 3, 2016).

Nonetheless, I find that these additional cases provide further insight into assessing the excessiveness issue here because, like Marinelli, the defendants did not deliberately inflict physical harm upon the plaintiffs.  *See David Scott Harrison v. Warden Debra Dexter, et. al*., No. 06-cv-7423, 2010 WL 2635906 (C.D. Cal. Feb. 17, 2010)(jury awarded punitive damages of $2,500 after defendants released six other inmates from their cells who attacked plaintiff); *Gevas v. Harrington*, No. 10-CV-493-SCW, 2014 WL 4627689, at *5 (S.D. Ill. Sept. 16, 2014)(upholding $10,000 punitive damage award for deliberate indifference of defendants to plaintiffs' cell conditions where he languished in a cell without running water or sanitation for seven days); *Hamilton v. Lalumiere*, No. 3:07CV148 JBA, 2011 WL 674023, at *3 (D. Conn. Feb. 16, 2011)(jury awarded damages of $1,000 in punitive damages to prisoner on deliberate indifference claim where correction officers failed to remove him from a contaminated area after he was pepper sprayed); *Miranda-Ortiz v. Deming*, No. 94 CIV. 0476 (CSH), 2001 WL 604017, at *14 (S.D.N.Y. June 1, 2001)(upholding $10,000 punitive damage award against a correction officer for deliberate indifference to his medical needs because she did not get plaintiff medical

attention and later informed a superintendent that no medical attention was necessary for the

plaintiff despite plaintiff's claims to the contrary); *Reilly v. Grayson*, 157 F. Supp. 2d 762, 764

(E.D. Mich. 2001), *aff'd*, 310 F.3d 519 (6th Cir. 2002)(awarding punitive damage of $18,250

where correction officers were deliberately indifferent to plaintiff's health by failing to place him

in a smoke-free housing unit despite knowledge of his asthma); *Beckford v. Irvin,* 49 F.Supp.2d

170, 182 (W.D.N.Y.1999)(upholding punitive damages award of $15,000 and $10,000 against

defendant correctional officers for being deliberately indifferent to plaintiff's serious medical

needs in taking away plaintiff's wheelchair); *Matthew KielBowick v. Charles Lewis*, No. 96-cv-

392, 1999 WL 33591149 (E.D. Mo. Jan. 13, 1999)(jury award of $1,500 in punitive damages for

defendant's deliberate indifference to plaintiff's serious medical needs after plaintiff's two front

teeth were knocked out and defendant refused to obtain medical care for plaintiff's injury).  The

punitive award here dwarfs the punitive awards in these cases.

      Considering the *Gore* factors and the punitive awards in both the deliberate indifference

(despite their paucity) and excessive force contexts, and the circumstances of this case, I

conclude I should remit the punitive award to $50,000, which is the maximum amount that

would not be excessive. *See DiSorbo*, 343 F.3d at 188 (2d Cir. 2003)("We are thoroughly

convinced that this conduct was sufficiently reprehensible to justify some degree of punitive

damages. There must, however, be an upper limit to that award, and after carefully evaluating the

*Gore* factors, and taking into consideration the sizable compensatory damages award Rebecca

DiSorbo would receive if she remits, we are compelled to conclude that the $1.275 million

punitive damages award exceeded that limit.").[21]   Therefore, I order a new trial on damages

---

[21] I again find it helpful to look to *DiSorbo*, where the police officer, who was substantially larger than the
plaintiff, beat the plaintiff while she was handcuffed, and the constitutionally maximum punitive award
against that defendant was only $75,000.  The conduct at issue here, while reprehensible, is of a

unless, within 21 days of this ruling, Mr. Williams agrees to remit the punitive damages award to

$50,000 for total damages of $300,000.[22]

## V. Williams' Remaining Post-Verdict Motions

### A.  Motion for Reimbursement of Costs

Williams' (ECF No. 184) Motion for Costs is denied without prejudice to his filing a verified

bill of costs no later than 44 days from entry of this ruling (if he accepts the remittitur) or, in the

event that Marinelli appeals, 14 days after the issuance of the appellate mandate.  Specifically,

Williams must "file with the Clerk and serve on all other parties a verified bill of costs pursuant

to 28 US.C. §§ 1821, 1920, 1923 and 1924, setting forth each item of costs that is claimed."

L. Rule Civ. P. 54 (a)(1); *see also* Fed. R. Civ. P. 54(d)(1).

### B.  Motion to Enjoin the State from Imposing Statutory Lien

I deny Williams' (ECF No. 185) motion to enjoin the State from imposing a statutory lien on

his damages award to recover the costs of his incarceration, without prejudice to his refiling the

motion when issues arising from collection of the judgment become ripe.  Those issues are not

yet ripe as I have ordered a new trial on damages and, even if Williams accepts the remittitur,

Marinelli is entitled to appeal the judgment.  Should any appeal be successful, any decision on

this motion, which raises a potential conflict between federal civil rights law and a state statute

aimed at protecting the public fisc, will have been unnecessary.  *See National Organization for

Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013)("A claim is not ripe if it depends upon

---

qualitatively different degree of reprehensibility as compared to the conduct by the police officer in
*DiSorbo.*

[22] A new trial limited to the issue of punitive damages would be inappropriate because the issues
of compensatory and punitive damages cannot be neatly disentangled in this case.  *See
DePascale v. Sylvania Elec. Prod., Inc.*, 510 F. App'x 77, 79 (2d Cir. 2013)("It is well
established that a partial new trial may not properly be resorted to unless it clearly appears that
the issue to be retried is so distinct and separable from the others that a trial of it alone may be
had without injustice.")(internal quotation marks and citation omitted).

contingent future events that may not occur as anticipated, or indeed may not occur at all.")
(internal quotation marks and citation omitted).  In *Harkins v. Finnel*, 759 F.Supp. 569 (W.D.
Mo. 1991), on which Williams relies in his motion, the court reached the merits of the issue only
after resolution of the appeal by the circuit court.

### C.  Williams' Motion for Clarification and Motion for Status Report

Williams' motion for (ECF No. 200) clarification and motion (ECF No. 202) regarding status
report are denied as moot.

## VI.  Injunctive Relief

Williams' operative complaint also seeks "[a] permanent injunction barring the
defendants, their employees, employers, agents and officials from placing another inmate inside
the cell with the plaintiff" and "[a] permanent injunction barring the defendants, their employees,
employers, agents, and officials from placing an inmate inside a cell handcuffed with an un-
cuffed inmate for any period of time."  (ECF No. 156 at 9.)  Both of these claims for injunctive
relief are moot, and I thus lack jurisdiction to adjudicate them.  The Defendants – three of whom
(including Marinelli) have retired – all worked at Northern, and the trial evidence involved
handcuffing and celling practices in the AdSeg program at Northern.  But Williams left Northern
five years before the trial, and presented no evidence suggesting he is likely to be returned there.
Further, the trial evidence unequivocally suggested he will not be returned to the program – or to
Northern – unless he incurs significant new disciplinary reports.  Under these circumstances, the
requests for injunctive relief are moot.  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir.
2006)("In this circuit, an inmate's transfer from a prison facility generally moots claims for
declaratory and injunctive relief against officials of that facility.")  Even if they were not moot,
they would fail to satisfy the requirement of ongoing harm necessary to warrant injunctive relief.

*Alston v. Sharpe*, 2015 WL 4715340 *7 (D. Conn. Aug. 7, 2015)(dismissing claim for injunctive relief because "[t]he complaint concerns one incident that occurred in January 2010" and "[t]here is no ongoing irreparable harm that could be addressed by an award of injunctive relief.").  I therefore dismiss Williams' requests for injunctive relief.

## VII. Conclusion

For the reasons set forth above:

1.  I deny Marinelli's motion for judgment as a matter of law and motion for a new trial (ECF No. 190).

2.  I deny William's motion for judgment as a matter of law (ECF No. 192).

3.  I grant in part and deny in part Marinelli's motion for remittitur: the motion is denied with respect to compensatory damages and granted with respect to punitive damages because I conclude that the punitive damage award was excessive.  I order a new trial on damages unless, within 21 days of this ruling, Mr. Williams agrees to remit the punitive damage award to $50,000 for a total damage award of $300,000.

4.  I dismiss Williams' claims for injunctive relief.

5.  I deny without prejudice Williams' motion for reimbursement of costs of suit (ECF No. 184).

6.  I deny without prejudice Williams' motion to enjoin the State from imposing a statutory lien.

7.  I deny as moot Williams' motions for clarification and for a status report.  (ECF Nos. 200 and 202.)

IT IS SO ORDERED.

/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              February 8, 2017