# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RASHAD WILLIAMS,

     Plaintiff,

     v.

PETER MURPHY, ET AL.,

     Defendants.

No. 3:13-cv-01154 (MPS)

## RULING ON MOTIONS FOR AID OF JUDGMENT AND RELEASE OF FUNDS

### I.     Introduction

In 2016, a federal jury found that a Connecticut Department of Correction ("DOC") employee maliciously violated the Eighth Amendment rights of inmate Rashad Williams and awarded him compensatory and punitive damages under 42 U.S.C. Section 1983 ("Section 1983"). After the judgment became final, the State of Connecticut chose to indemnify its employee and has since been clawing back from Williams the bulk of his award using state laws that allow it to recover the costs of incarcerating him and providing him with public defender services. I must decide whether the State's actions in indemnifying its employee from a civil rights judgment and using state laws to recoup most of its indemnity expense conflict with and are thus preempted by Section 1983, a federal law aimed at deterring state officials from violating citizens' civil rights and compensating victims of such violations. If federal law preempts the State's actions, then they are of no legal effect and Williams remains free to recover the judgment from the DOC employee who violated his rights; if not, then the judgment

has been satisfied and that employee owes him nothing (other than a small amount of outstanding interest and costs).

I conclude that the collective impact of the State's actions in this case, some of which are ongoing, will be virtually to nullify Williams's judgment, leaving it with little deterrent or compensatory value and thereby undermining Congress's purposes in enacting Section 1983. The message the State is sending to its DOC employees is that even when they maliciously violate an inmate's civil rights, neither they nor their employer will suffer significant financial consequences; instead, the State will hold them harmless and then recapture the cost of doing so from the inmate whose rights were violated. A Section 1983 lawsuit—even when found by a jury to have merit—will amount to little more than a nuisance. Because such a result would so starkly clash with the history and intent behind Congress's enactment of Section 1983—a federal remedy adopted in the wake of the Civil War to combat civil rights violations by state officials—, the State's actions in this case are preempted. Those actions have therefore done nothing to satisfy the judgment owed by the DOC employee.

My conclusions are occasioned by Williams's Motion for Aid of Judgment under Fed. R. Civ. P. 69 and his related Motion to Unfreeze Assets, which ask me to (1) declare that the State's application of its incarceration cost recovery statute is preempted by Section 1983, (2) order the State of Connecticut to pay the outstanding judgment, (3) order the State to release monies in Williams's inmate trust account that it froze to secure payment of the cost of public defender services, and (4) order that his judgment not be reduced by the State's cost recovery efforts. The Eleventh Amendment, which sets forth a rule of state sovereign immunity in federal courts, bars me from granting much of this relief, but it does not prevent me from finding that the State's

actions in this case cannot reduce the amount of the judgment against its employee, which remains due and owing.

Williams's Motion for Aid of Judgment is therefore GRANTED IN PART AND DENIED IN PART, and his Motion to Unfreeze Assets is DENIED. Williams remains free to execute on the judgment, which, with interest, currently amounts to **$287,433.92**. His requests for monetary relief against the State of Connecticut, including an order requiring payment and an order requiring release of funds in his inmate account, are denied.

A fuller explanation of the reasons for this ruling is set forth below.

## II.  Background[1]

### A.  Underlying Litigation

In 2010, Williams was an inmate at Northern Correctional Institution ("Northern") serving a 30-year sentence. (ECF No. 214 at 5). Dennis Marinelli, the judgment debtor in this case, was a captain at Northern who helped oversee the Administrative Segregation program to which Williams was assigned. (*Id.*). From the time he arrived at Northern in November, 2009, until October, 2010, Williams "never had a cellmate." (*Id.* at 6). In early 2010, Williams pleaded with prison officials not to "double cell" him—i.e., place him in the same cell—with a gang member. (*Id.* at 7). He "conveyed fears for his safety and, in particular, concerns about receiving a cellmate and the possibility of attacks by gang members" due in part to having "previously been attacked by other inmates." (*Id.* at 7). In the months leading up to October of 2010, Williams also complained to multiple prison officials about the prison's "sequential uncuffing practice." (*Id.* at 7). Under that practice, two inmates living in the same cell would

---

[1] Since the details of the underlying litigation are not in dispute for the purposes of these motions, I rely mainly upon my ruling on the parties' post-verdict motions (ECF No. 214) for these facts. What follows is a summary of the more detailed factual recitation set forth in that ruling.

have their handcuffs removed in sequence, leaving one inmate cuffed for a brief time after the other had been uncuffed. (*Id.* at 7-8). Williams specifically told prison officials "that he was afraid that he would be unable to defend himself from assaults" as a result of this practice. (*Id.* at 7). In particular, "he feared he would be assaulted while cuffed behind his back." (*Id.* at 8). Although prison officials did little in response to Williams's concerns, he nonetheless remained living alone—until October 28, 2010. (*Id.* at 8).

On that date, Williams was informed that he would be moved to another cell and would live with a cellmate, inmate Darnell Walker. (*Id.* at 10). Walker "was an active member of the Bloods" and was also designated by the DOC as a "Security Risk Group Threat Member, which means that he was an active gang member who had engaged in violence in the prison system and who potentially pose[d] a threat to institutional operations." (*Id.* at 11 (internal quotation marks omitted)). Marinelli was involved in the plan to move Williams to a double cell and was aware of his background. (*Id.* at 9-10). Further, Marinelli "would have reviewed Walker's [DOC] designations and disciplinary history before the move." (*Id.* at 11). He nonetheless did nothing to prevent Williams from being celled with Walker. Despite Williams's protestations, he was being placed in the very situation he most feared.

Upon learning of the plan to place him with Walker, Williams immediately asked to speak to mental health staff, who had promised him numerous times that he would remain living alone. (*Id.* at 8-11). Williams was told to calm down and that his situation would be investigated prior to his moving into the cell. (*Id.* at 10). Nonetheless, Williams was escorted to his new cell shortly thereafter. (*Id.* at 11). As he approached the cell, he informed the officers escorting him that "he had been told by mental health that he would be living alone," and he urged them to contact various mental health staff members to confirm this guarantee. (*Id.* at 12).

4

They informed him that they would do so and left him in the cell, uncuffed, with inmate Walker. (*Id.*).

For the first few minutes, Williams's double celling with Walker was uneventful. He and Walker remained in the cell for four to six minutes, uncuffed, without incident. (*Id.*). Then the officers returned and escorted Williams to the day room. (*Id.*). One of the officers then went to speak with Marinelli, and subsequently "reported that Marinelli had instructed that Williams be returned to the cell with Walker and that, if he refused, he would be issued a disciplinary report," amongst other sanctions. (*Id.*). Facing sanctions should he choose otherwise, Williams allowed the officers to escort him back to the cell. (*Id.* at 13).

Williams then returned to the cell while cuffed behind his back. (*Id.*). Walker, who was waiting in the cell, was then cuffed prior to Williams's entrance into the cell. (*Id.*). However, once both inmates were in the cell together and the door locked, "Walker went immediately to . . . uncuff" through a slot in the cell door. (*Id.*). The officers uncuffed Walker, who then proceeded to assault Williams while he remained cuffed behind his back. (*Id.*). Walker "punched [Williams] in the head, knocked him to the floor, kicked him, and stomp[ed] on him." (*Id.* (internal quotation marks omitted)). Williams suffered injuries to his head, ankle, back, and knee as a result of the assault. (*Id.* at 12). Immediately after the assault, Walker angrily said "that the correctional staff knew what [they] were doing when they put him into a cell with an inmate on single cell status doing 30 years." (*Id.* at 13-14 (internal quotation marks omitted)). After the assault, Marinelli approached Williams and told him that he would receive another cellmate, leaving Williams "'terrified' that he would be assaulted again." (*Id.* at 14).

In the months after the assault, Marinelli repeatedly threatened Williams that he would be receiving a cellmate. (*Id.* at 14). Marinelli at one point told another inmate—who was also a

gang member—that he was going to be housed with Williams.  (*Id.*).  Even after the deputy

warden "specifically told Marinelli that he could not place anyone in the cell with Williams—

following a written complaint by Williams about Marinelli's threats—Marinelli continued to tell

Williams he would receive a cellmate."  (*Id.*).  Marinelli also spoke to another prison official "in

an attempt to persuade her to take Williams off single cell status."  (*Id.* (internal quotation marks

omitted)).  To make matters worse for Williams, Walker was placed a few cells away from him.

(*Id.*).  Walker and other prisoners taunted Williams about the assault, and threatened that it

would happen again.  (*Id.*).  "When Williams complained to Marinelli about being housed with

gang members, Marinelli told him to shut up and to lie down on his bunk."  (*Id.* (internal

quotation marks omitted)).  All the while, Williams had "recurring nightmares about being killed

by cellmates" and constant anxiety.  (*Id.* at 13).

Williams filed a complaint under Section 1983 on August 9, 2013, alleging, among other

things, that Northern personnel had been deliberately indifferent to unsafe conditions in violation

of the Eighth and Fourteenth Amendments to the United States Constitution.  (ECF No. 1 at 9).

Marinelli, along with the other defendants, was represented by the Connecticut Attorney

General's Office.  (*See* ECF No. 21).[2]  Williams's claims were ultimately submitted to a jury

with respect to four defendants in their individual capacities: Marinelli, Lieutenant Melvin

Saylor, and Correctional Officers Alphonso Lindsey and Dishana Robinson.  (ECF No. 214 at 4).

I instructed the jury that it could award punitive damages against a defendant if it found that the

defendant "engaged in any of the following conduct: a. [m]alicious or oppressive violation of

---

[2]  The State of Connecticut was not a party to the case at the time final judgment entered.
Although Williams at one time made claims for injunctive relief, which might be considered
"official capacity" claims, thereby implicating the State, *see Will v. Michigan Dept. of State
Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity . . .
is no different from a suit against the State itself." (internal citation omitted)), I dismissed those
claims as moot because Williams had left Northern before the trial.  (*See* ECF No. 214 at 61-62).

Mr. Williams's constitutional rights; or b. [r]eckless disregard or callous indifference as to whether he or she was violating Mr. Williams's constitutional rights." (ECF No. 171 at 24-25). On July 19, 2016, the jury rendered a verdict in favor of Williams against Marinelli in the amount of $250,000.00 in compensatory damages and $400,000.00 in punitive damages; and in favor of defendants Saylor, Lindsey, and Robinson against Williams. (ECF No. 178).

## B. Relevant Post-Judgment Procedural History

After the jury's verdict, Marinelli filed motions for judgment as a matter of law under Fed. R. Civ. P. 50, a new trial under Fed. R. Civ. P. 59, and remittitur. (ECF No. 190). I rejected Marinelli's motions for judgment as a matter of law and for a new trial, but granted in part and denied in part the motion for remittitur. (ECF No. 214 at 2-3). With regard to the latter, I offered Williams the choice of accepting a remittitur of the punitive damages award to $50,000 or having a new trial on damages. (ECF No. 214 at 3). Williams accepted the remittitur, leaving a total award of $300,000 in damages. (ECF No. 216; ECF No. 220). On July 27, 2016, Williams filed an "objection to [the] State of Connecticut's claim for repayment of cost of incarceration," in which he preemptively objected to the State of Connecticut's applying a lien against his judgment to recover the cost of his incarceration. (ECF No. 185). I construed this as a "motion to enjoin the State from setting off the costs of his incarceration," and denied it without prejudice "to refiling the motion when issues arising from collection of the judgment bec[a]me ripe. . . ." (ECF No. 214 at 3).

The defendants initially filed a notice of appeal (ECF No. 224) but withdrew the appeal on July 5, 2017. (ECF No. 231). On July 13, 2017, the Assistant Attorney General who had

defended Marinelli at the trial contacted Williams's counsel,[3] informing him by email that the amended judgment would be paid as follows: "1) $15,140 made payable to Connecticut Child Support for fulfilling his statutory obligation to reimburse a child support lien;[4] 2) $142,430 made payable to the Department of Administrative Services to fulfill statutory obligation for cost of incarceration; [and] 3) $142,430 made payable to Williams."  (ECF No. 241-1 at 3). Williams's counsel objected, asking that the State "not issue any checks at this time."  (*Id.* at 2).

On July 18, 2017, Williams's counsel filed a motion to extend the time to file a bill of costs until 14 days "after adjudication of Williams'[s] forthcoming motion concerning the State of Connecticut's attempt to seize a portion of Williams'[s] award under Connecticut's cost of incarceration statute."  (ECF No. 234 at 1.)  The Court granted the motion and scheduled a telephonic status conference, which it held on July 26, 2017.  During that conference, I discussed briefly with all counsel Williams's "forthcoming motion," which I directed his counsel to file by August 18, 2017, and the need to give notice to the State, a non-party, regarding the anticipated challenge to the constitutionality of its cost of incarceration statute.  (ECF No. 279; ECF Nos. 234 & 236; ECF No. 252 at 12-13); *see also* Fed. R. Civ. P. 5.1 and 28 U.S.C. § 2403(b).[5]

---

[3]  Williams represented himself at the trial (with assistance from stand-by counsel) but has been represented by pro bono counsel in these post-judgment proceedings.  (ECF Nos. 229-230; ECF No. 279 at 3).

[4]  Williams does not contest the $15,140 reduction in the judgment "to reimburse a child support lien."  (*See* ECF No. 241 at 4).  Counsel for the State represented at the March 14, 2018 hearing on these motions that the $15,140 was paid to the mother of Williams's child, not the State of Connecticut.

[5] There was no mention on the call that the State would seek to recover the costs of public defender services provided to Williams, and although the State mentioned that it had "cut" and was "prepared to disburse" checks reflecting a deduction of the costs of his incarceration from Williams's judgment, it did not mention that it intended actually to issue those checks before the legal issues were adjudicated.  (ECF No. 279 at 10-11.)  But I said nothing on the call prohibiting the State from taking such action.

On July 27, 2017, the Assistant Attorney General sent a check for $142,430 to the DOC with instructions that it be deposited into Williams's inmate account.[6] (*See* ECF No. 241-2 at 2). The check was deposited into the inmate account on August 1, 2017. (*See* ECF No. 241-3 at 2).

On August 17, 2017, Williams filed a "motion for aid of judgment" requesting "that the Court declare that Connecticut's cost of incarceration statute, codified at Conn. Gen. Stat. § 18-85b,[7] conflicts with 42 U.S.C. § 1983 in such a way as to stand as a substantial obstacle to Congress's goals and that, as a result and as applied to Williams's[] judgment, § 18-85b is preempted by federal law." (ECF No. 240 at 1). The motion also requested that "the Court order the State of Connecticut to pay the remainder of the outstanding judgment" and "order that [Williams's] judgment not be reduced through the application of Conn. Gen. Stat. § 18-85b." (*Id.* at 1, 11). A day later, the Court "certifie[d] to the Connecticut Attorney General that [Williams] ha[d] raised a constitutional challenge to Connecticut's cost of incarceration statute, Conn. Gen. Stat. § 18-85b," and that the State would have sixty days to intervene in the matter

---

[6] The DOC creates an account for each inmate and maintains control over the management of the account. *See* State of Connecticut Department of Correction, Administrative Directive 3.7 (2017) ("Administrative Directive 3.7") (Sec. 1: requiring DOC to "act as the fiduciary agent and maintain a financial management system to handle inmate monies"; Sec. 8: requiring DOC to open and maintain account for each inmate). The State controls the manner in which inmates can receive funds into the account, who can contribute such funds, and the subsequent disbursement of the funds. (*Id.*, sec. 6; *see also* State of Connecticut Department of Correction, Administrative Directive 3.2 (2017) ("Fiscal Services shall control and document all disbursement of funds.")). Further, the regulation authorizes the State to hold funds in the account to pay for "inmate obligations as provided by statute or Administrative Directive." (Administrative Directive 3.7, sec. 6.g).

[7] Section 18-85b(a) provides, in relevant part, that in "the case of causes of action of any person obligated to pay the costs of such person's incarceration under section 18-85a and regulations adopted in accordance with said section . . .," the state is entitled to "a lien against the proceeds therefrom in the amount of the costs of incarceration or fifty per cent of the proceeds received by such person after payment of all expenses connected with the cause of action, whichever is less."

under 28 U.S.C. § 2403(b).[8]  (ECF No. 243; *see also* Fed. R. Civ. P. 5.1).  The State of Connecticut eventually intervened and filed a brief averring that Williams's claim contained no merit and was, in any event, precluded by the Eleventh Amendment to the United States Constitution.  (ECF No. 268).[9]

In November of 2017, Williams filed a motion to unfreeze assets (ECF No. 256) claiming that the State of Connecticut had "unilaterally and without due process seized $65,000 of [his] judgment by unilaterally ordering a freeze on his inmate trust account."  (ECF No. 257 at 1).  A printout of the transaction history of Williams's inmate account demarcated this hold as the result of a "Court Order," although the record does not reflect the issuance of any such order by this Court or any other court. (ECF No. 257-2 at 2).  Williams's motion also included an attached complaint by the State of Connecticut in Connecticut Superior Court for "at least $48,842.42 for the services" rendered to Williams by the Connecticut "Division of Public Defender Services." (ECF No. 257-3 at 3).  The State filed an objection to Williams's motion to unfreeze assets, in which it represented that the hold on Williams's account was initiated as part of the State's

---

[8]   28 U.S.C. § 2403(b) provides that:

In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

[9]   The State of Connecticut later contended at the March 14 hearing on these motions that it has not actually intervened but rather just filed a brief out of respect for the Court.  (*See also* ECF No. 268 at 1 ("The State of Connecticut does not consent to being made a party to this litigation, [and] it has not waived its immunity to suit in this Court for an award of retrospective monetary relief. . . .").  Whether or not the State has intervened is irrelevant since the Eleventh Amendment protects it against monetary relief in any event, as is discussed later in this ruling.

ongoing effort to recover, by means of a lawsuit recently initiated in state court under Conn. Gen. Stat. § 51-298[10], the costs of state public defender services he has utilized over the years. (ECF No. 266 at 1-2). Williams later removed that lawsuit to this Court. *See Connecticut v. Williams*, 17CV02023 (MPS). In a ruling issued today, however, I grant the State's motion to remand that case to state court. (*See id.* at ECF No. 212).

I held a hearing on Williams's motions in this case and the State's motion to remand in *Connecticut v. Williams* on March 14, 2018. Counsel for the State represented at the hearing that the $48,000 amount mentioned in the complaint in *Connecticut v. Williams* covered only a portion of Williams's prior public defender services. He estimated that the total amount of the recoverable public defender costs would likely be higher and that, in particular, the $48,000 did not include expert costs, which he reserved the right to seek.[11]

## III. Discussion

---

[10] Conn. Gen. Stat. § 51-298 provides that the Public Defender Services Commission "shall have a claim against any person represented by a public defender, assistant public defender, deputy assistant public defender or Division of Public Defender Services assigned counsel pursuant to this chapter, for the reasonable value of services rendered to him. . . . The claim shall be enforceable by civil action brought in the name of the state on behalf of the commission by the Attorney General . . . ." Conn. Gen. Stat. § 51-298(b). The Attorney General has discretion in deciding whether to bring the claim. Conn. Gen. Stat. § 51-298(c) ("The Attorney General may compromise and make settlement of, or with the concurrence of the Chief Public Defender, forego any claims for services performed for any person pursuant to this chapter whenever the financial circumstances of a person are such that the best interest of the state will be served by such action.").

[11] At the hearing, Williams mentioned that the State has informed him that it will be seeking recovery of additional child support costs, including money owed to the State. The State subsequently submitted an affidavit noting that it intended to recover an additional $13,127, $11,794 of which would go to the State. (*See Connecticut v. Williams*, 17cv2023 at ECF No. 21-1 at 1). Because the parties have not briefed the impact of any such additional cost recovery efforts on the preemption issue and because the State represented in its affidavit that the child support cost recovery efforts are intertwined with the State's own obligations under federal law, *see id.* at 2, I do not rely on the State's future efforts to recover child support costs in this ruling.

Williams's Motion for Aid of Judgment and Motion for Release of Funds seek various forms of relief, including: (1) "that the Court declare that Connecticut's cost of incarceration statute [Conn. Gen. Stat. § 18-85b] . . . as applied to Williams's judgment . . . is preempted by federal law," (2) "that the Court order that his judgment not be reduced through application of Conn. Gen. Stat. § 18-85b"; (3) that the Court order "that the State of Connecticut pay him the remainder of [his] judgment" (*id.*); and (4) that the Court "order that the State of Connecticut release its hold on monies in his inmate trust account" on the ground that "the State's efforts to reduce Mr. Williams's § 1983 judgment to recover public defender fees suffers from the same constitutional defect as the State's cost of incarceration claim." (ECF Nos. 240 at 1, 241 at 11, 256, & 257 at 3.) As shown below in Section III.B, the Eleventh Amendment bars granting monetary relief against the State and thus forecloses some of Williams's requests. But the Eleventh Amendment does not affect the Court's jurisdiction over Marinelli, the actual defendant and judgment debtor in this case. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("We hold that state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits. . . ."). Also, Williams's request that I order that "his judgment not be reduced through application" of the State's cost recovery statutes raises the question whether the State's actions in this case have reduced or satisfied Marinelli's obligation to pay the judgment. Indeed, any "Motion for Aid of Judgment"—under Rule 69 or otherwise—raises the question whether the judgment debtor has satisfied the judgment, because, if he has, there is of course no need for aid and no basis to grant the motion. *See Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir. 2007) (holding that Rule 69 "applies to satisfaction of judgments").

A federal court possesses inherent authority to enforce its judgments. *See Degen v. United States*, 517 U.S. 820, 823 (1996) ("Courts invested with the judicial power of the United

States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."); *Young v. United States ex. rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809 (1987) (noting that courts' ability to enforce their orders and judgments is "a subject that directly concerns the functioning of the Judiciary"); *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (noting the existence of "a federal court's inherent power to enforce its judgments"). Implicit in that authority is the power to determine whether the judgment has been satisfied. *See Bryan v. Erie Cty. Office of Children & Youth*, 752 F.3d 316, 323 (3d Cir. 2014) ("In ongoing litigation, district courts have the jurisdiction to decide whether the parties have settled the action or have satisfied the judgment."); *Jarvis v. Comm'r of Soc. Sec.*, 2008 WL 2757608 at *5 n.7 (W.D. Mich. July 11, 2008) ("[I]t appears that this court would retain jurisdiction [in post-judgment proceedings involving questions over the proper payee] to determine whether the judgment has been satisfied."); Fed. R. Civ. P. 60(b)(5) (permitting relief from judgment if court concludes "the judgment has been satisfied, released or discharged").

To answer the question whether the judgment has been satisfied—or even reduced—in this case, I must decide the legal effect of the State's actions in indemnifying Marinelli and recovering the associated expense from Williams through its use of the cost recovery statutes. Specifically, I must decide whether those actions have served (or will serve, with respect to the ongoing efforts to recover costs of public defender services) to reduce Marinelli's obligation to pay Williams or whether, as Williams contends, those actions are preempted by Section 1983 and thus of no legal effect. It is to that issue I turn now.

## A.  Preemption

### 1.  The Supremacy Clause

Preemption involves the enforcement of the Supremacy Clause, which provides that the laws and treaties of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Under the Supremacy Clause, "state laws that conflict with federal law are without effect." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008); *see also Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("The appropriate application of [the Supremacy Clause] is to such acts of the State Legislatures . . . enacted in the execution of acknowledged State powers, [that] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution. . . . In every such case, the act of Congress, or the treaty, is supreme; and the law of the State . . . must yield to it."). The "state laws" in question include more than just statutes. Also preempted by federal law are actions of state executive branch officials and state courts that conflict with federal law. *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 536 (2009) (National Banking Act preempted New York Attorney General from issuing letters to banks threatening to subpoena them concerning their lending practices); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (noting that the Airline Deregulation Act preempts "[s]tate enforcement actions having a connection with or reference to airline rates, routes, or services" (internal quotation marks omitted)); *Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 377 (1988) (state inquiry into reasonableness of FERC-approved prices for sale of nuclear power to wholesalers of electricity preempted due to conflict with FERC's jurisdiction); *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Virginia*, 812 F.2d 898, 904 (4th Cir. 1987) ("Preemption principles deny state authority to act in a way that would undermine the purposes of federal law."); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323-30 (2008) (holding that FDA regulation preempted plaintiff's state common law claims).

A federal law may preempt state law in at least three ways.  First, Congress may include an express preemption provision in a statute clearly indicating its intent to preempt contrary state law.  *See, e.g.*, *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1426 (2014) (concluding that state common law claim fell within ambit of Airline Deregulation Act's preemption provision); *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 947 (2016) (concluding that preemption provision in Employee Retirement Income Security Act of 1974 (ERISA) preempted state law as applied to ERISA plans).  Second, Congress may "occupy the field" regulated by a statute, thereby preempting all contrary state law.  *See, e.g.*, *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (holding that Natural Gas Act occupied field upon which state act impinged and therefore preempted state act).  Congress's intent to occupy the field "can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Third, a federal law may conflict with state law, thereby preempting it.  *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 387 (2000) (holding state law regulating trade with Burma was preempted because it conflicted with federal law addressing same subject); *PLIVA, Inc. v. Mensins*, 564 U.S. 604, 619 (2011) (holding state law claims conflicted with federal drug regulations and were therefore preempted).

Williams invokes only the third of these theories—conflict preemption—in support of his motions for aid of judgment and release of funds.  (ECF No. 241 at 11; ECF No. 257 at 3.) Conflict preemption involves situations in which "compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citations and quotation marks omitted). Williams argues that the State of Connecticut's actions in this case fall under the latter category of conflict preemption, known as obstacle preemption. (ECF No. 241 at 11; ECF No. 257 at 3).

Because "in all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), "the party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (internal quotation marks omitted). That burden is a heavy one when obstacle preemption is at issue: "[F]ederal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* at 102 (internal quotation marks omitted). "The mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption. . . ." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (internal quotation marks omitted). Nonetheless, "the purpose of Congress is the ultimate touchstone," *Wyeth*, 555 U.S. at 565, and "[w]hat constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 101.

### 2. The History and Purposes of Section 1983

In order "[t]o determine whether a state law conflicts with Congress's purposes and objectives," I must "first ascertain the nature of the federal interest" at issue. *Hillman v. Maretta*, 569 U.S. 483, 491 (2013); *MTBE Prod. Liab. Litig.*, 725 F.3d at 102 ("To determine whether a

state law (or tort judgment) poses an obstacle to accomplishing a Congressional objective, we must first ascertain those objectives as they relate to the federal law at issue.").

The original "purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster*, 407 U.S. 225, 240 (1972) (quoting *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879)). Section 1983 was originally enacted as part of the Klu Klux Klan Act of April 20, 1871, § 1, 17 Stat. 13. *See Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 581 (1976) (noting this origin). The legislative history of the act demonstrates Congress's goal of creating a federal judicial remedy against violations of citizens' federal rights by state officials. Representative David Lowe, for example, noted that "[w]hile murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective." Cong. Globe, 42d Cong., 1st Sess., p. 374. The proponents of the Act viewed it as a vehicle of federal power to fill in the gaps of justice created when states, "from lack of power or inclination, practically denied the equal protection of the law" to their citizens. *Id.*, p. 428 (remarks of Representative John Beatty of Ohio); *see also Mitchum*, 407 U.S. at 240 ("Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights."). The ultimate result of the passage of the Klu Klux Klan Act was that "the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established." *Id.*

The Supreme Court has since boiled down the purposes of Section 1983 to compensation and deterrence. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268 (1981) (noting that "compensation and deterrence" are the most prominent purposes of Section 1983); *Hardin v. Straub*, 490 U.S. 536, 539 (1989) (denoting "§ 1983's chief goals of compensation and deterrence"). Thus, the federal interest implicated in Section 1983 is to compensate the victims of civil rights violations and to deter state officials from committing such violations in the first instance.

To determine whether the State of Connecticut's actions in this case irreparably conflict with the purposes of Section 1983, I must examine those actions and their combined effects more closely. Those actions include (1) the State's voluntary decision to indemnify Marinelli, and (2) the State's use of its cost recovery statutes to recoup the bulk of the judgment.

### 3. The State's Voluntary Decision to Indemnify Marinelli

First, as the State acknowledges, it made a voluntary, "discretionary" choice to indemnify Marinelli. (ECF No. 268 at 8). It did so in reliance on Connecticut's statute providing for the indemnification of state employees, which provides in relevant part:

> The state shall save harmless and indemnify any state officer or employee . . . from financial loss and expense arising out of any claim . . . or judgment by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer . . . is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious.

Conn. Gen. Stat. § 5-141d(a); (*see* ECF No. 268 at 7-8 (noting that the state indemnified Marinelli under Conn. Gen. Stat. § 5-141d)). As noted above, the Court's jury instructions provided that the jury could only "award punitive damages against a Defendant with respect to

[Williams's] claims under § 1983 if you find that the Defendant engaged in . . . [m]alicious or oppressive violation of [Williams's] constitutional rights [or] [r]eckless disregard or callous indifference as to whether he or she was violating [Williams's] constitutional rights." (ECF No. 171 at 24-25). As such, the jury could not have issued its award of punitive damages against Marinelli without concluding that his conduct was malicious or reckless. Thus, the State of Connecticut was under no obligation to indemnify Marinelli under Conn. Gen. Stat. § 5-141d(a). Rather, it chose to indemnify him in spite of the jury's findings.[12] The effect of this decision, of course, was to hold Marinelli harmless from the entire judgment, and at the March 14 hearing the State confirmed that Marinelli did not contribute to the payments referred to in the State's July 13 email to Williams's counsel.

The State's "discretionary" decision to indemnify Marinelli (ECF No. 268 at 8) for a malicious violation of Williams's civil rights by itself raises at least a question about preemption, because it holds the wrongdoer harmless and thereby diminishes the deterrent effect of the judgment. Based on similar effects of state indemnity and contribution laws, which dilute the

---

[12] It is worth noting that the text of Conn. Gen. Stat. § 5-141d(a) does not unambiguously countenance the State's actions. While that provision requires the State to indemnify an employee for conduct that was "found *not* to have been wanton, reckless or malicious," it does not on its face provide authority for the state voluntarily to indemnify an employee whose conduct *was* found to have been wanton, reckless or malicious. At the March 14 hearing, the State suggested that subsection (b) of the same statute, which affords the Connecticut Attorney General discretion to decide whether to provide a state employee a defense, Conn. Gen. Stat. § 5-141d(b), also authorized the decision to indemnify Marinelli. Whether the State has complied with its own statute, however, is beyond my purview, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) (concluding that a "claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment"), and I assume for purposes of this decision that it did. This does not mean, of course, that the State may use its laws effectively to immunize violations of the Constitution by its employees. *See Gronowski v. Spencer*, 424 F.3d 285, 297 (2d Cir. 2005) ("The Supremacy Clause of the Constitution guarantees that state law will not preempt or otherwise erode § 1983 causes of action and state law may not be used to immunize conduct violative of § 1983. To hold otherwise would transmute a basic guarantee into an illusory promise." (internal quotation marks omitted)).

impact of a civil rights judgment against a wrongdoer by redistributing the cost of the judgment

to third parties, some district courts have found Section 1983 to preempt such state laws.  *See*

*Hoa v. Riley*, 78 F. Supp. 3d 1138, 1154 (N.D. Cal. 2015) (concluding state rights of contribution

and indemnification conflicted with Section 1983 because "[a]llowing a right of contribution or

indemnification . . . would allow a deliberately indifferent defendant to offset his liability,"

thereby "conflict[ing] with [Section 1983's] aim of deterrence"); *Hepburn ex rel. Hepburn v.*

*Athelas Inst., Inc.*, 324 F. Supp. 2d 752, 759 (D. Md. 2004) (concluding that state right of

contribution conflicted with Section 1983 because the statute's "twin goals of compensation and

deterrence are not furthered by reducing the defendants' costs of violations").  The Ninth Circuit

has found, however, that a municipality's decision to indemnify a governmental employee for a

punitive damages award is not, by itself, preempted by Section 1983.  *See Cornwell v. City of*

*Riverside*, 896 F.2d 398, 399 (9th Cir. 1990) ("There is no doubt that the damages awardable

under [Section 1983] are a matter of federal law. . . .  But [there is no] federal policy prohibiting

a city from paying punitive damages when the city finds its employees to have acted without

malice and when the city deems it in its own best interest to pay.").  In that case, the court

pointed out that prohibiting indemnification in such cases might operate to undermine the

compensatory purpose of Section 1983, by leaving the successful plaintiff to collect his judgment

against an individual wrongdoer of uncertain financial wherewithal.[13]  *See id.* at 400 ("If [Section

1983] were construed to prohibit a municipality from paying punitive damages, there would be

occasions when civil rights plaintiffs would go unsatisfied because the individual defendants lack

---

[13] At the March 14 hearing, the State raised the possibility that the same problem may exist in this case, although the State's counsel stated she was unaware whether Marinelli, who was retired even at the time of the trial, has sufficient assets to pay the judgment.  Williams's counsel also stated that he had no information concerning Marinelli's financial situation, and there is nothing in the record on that subject.

the assets to pay.").  I need not decide whether Section 1983 preempts the State's indemnification decision by itself, however, because in this case the State did not stop at indemnifying Marinelli from the judgment.

### 4.  The State's Use of the Cost Recovery Statutes

Shortly after the Assistant Attorney General who was representing Marinelli withdrew the appeal initially filed on his behalf, the State (acting through the same lawyer) unilaterally applied the fifty percent cost of incarceration lien against Williams's judgment by issuing the checks in the manner described above (*see* page 8, *supra*).[14]  Later, the State filed an action in state court to recover for Williams's usage of public defender services dating back several years to the time when he was defending against the criminal charges that ultimately resulted in his term of incarceration.  (ECF No. 257-3 at 2).  There is nothing in the record to suggest that the State ever took an interest in recovering costs from Williams before he won the judgment against Marinelli, and the attorneys for the State at the March 14 hearing were unaware of any previous efforts to monitor Williams's assets for that purpose.

The combined amounts the State has been seeking to recover from Williams comprise well over half of his judgment against Marinelli.  The cost of incarceration lien, as intended,

---

[14]  Conn. Gen. Stat. § 18-85b(a) appears to contemplate some sort of action in state court to recover an inmate's cost of incarceration.  *See* Conn. Gen. Stat. § 18-85b(a) ("In the case of causes of action of any person obligated to pay the costs of such person's incarceration . . ., the claim of the state shall be a lien against the proceeds therefrom. . . .").  Indeed, there are multiple Connecticut state court cases that appear to illustrate as much.  *See, e.g.*, *State by Semple v. Sebben*, No. HHDCV155039364, 2017 WL 4399565, at *2 (Conn. Super. Ct. Aug. 18, 2017) (assessing State of Connecticut's attempt to recover from defendant for his costs of incarceration); *State v. Ham*, 253 Conn. 566, 566 (2000) (noting State of Connecticut had instituted action to recover from defendant for his costs of incarceration).  Here, the record makes clear that the State did not initiate any sort of process in state court prior to halving Williams's judgment.  As noted above, however, any missteps by the State in implementing the cost of incarceration lien are beyond my purview (see note 12, *supra*), and I assume that the State complied with its own laws.

divested fifty percent of Williams's judgment.  When this lien is combined with the monies the

State froze in Williams's inmate account to support its attempt to recover public defender costs,

Williams has lost access to nearly seventy percent of his judgment; and as noted, the State has

reserved its rights to seek a higher amount for Williams's public defender costs, including expert

costs.   It is therefore not yet known how much of Williams's judgment will ultimately be

siphoned off upon the State's recovery of its full cost of providing public defender services.  It is

clear, however, that the State of Connecticut stands to recoup most of Williams's judgment

through its cost recovery efforts.

   5.   *The State's Actions Clash with Congress's Goals*

    I conclude that the collective impact of the State's actions—its voluntary indemnification

of Marinelli for an award including punitive damages followed by its application of the cost of

incarceration and public defender cost statutes to recover seventy percent or more of its

indemnity expense—irreconcilably conflict with the purposes of Section 1983.  First, the State's

actions have ensured that most of Williams's judgment will never be paid by anyone, thereby

undercutting its deterrent effect.  The State chose to indemnify Marinelli in this case despite the

fact that a jury found he had committed malicious or reckless conduct and, as a result, Marinelli

will not have to pay a dime for his violation of Williams's civil rights.  But if the State had

merely indemnified Marinelli and left the judgment in Williams's hands, at least the

compensatory purpose of Section 1983 would be left intact, as the Ninth Circuit suggested in

*Cornwell*; and there would arguably even be some deterrent effect:  As Marinelli's employer,

and that of similarly situated DOC employees, the State would have to bear the cost of his

wrongdoing, and would thus have an incentive to take steps to avoid the recurrence of such

misconduct.  Through its use of the cost recovery statutes, however, the State has largely

squelched that incentive, too, and may ultimately leave Williams with little to show for his victory in the courtroom. The State has thus avoided internalizing the costs of a malicious civil rights violation committed by its employee. A judgment can deter and compensate only if it is paid. Here, due to its indemnification of its employee and its cost recovery efforts, the State is ensuring that no one will ultimately have to pay the bulk of the judgment against Marinelli.

The conflict with the deterrence purpose of Section 1983 is heightened by the punitive damages component of Williams's award. "[T]he purpose of punitive damages . . . focuses on punishment and deterrence." *Keenan v. City of Philadelphia*, 983 F.2d 459, 478 (3d Cir. 1992); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("[Punitive damages] are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."). The availability of punitive damages in Section 1983 cases accentuates the deterrence goal of the statute, and the Second and Seventh Circuits have concluded that state law that has the functional impact of denying punitive damages under Section 1983 clashes with that goal. *See McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir. 1983) ("State law that would preclude a claim for punitive damages . . . is manifestly inconsistent with federal law"); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1241 (7th Cir. 1984) ("To disallow punitive damages in Section 1983 actions solely on the basis of restrictive tort law would seriously hamper the deterrence effect of Section 1983.") In this case, the jury's award of punitive damages was intended to send a message to DOC employees and deter civil rights violations like the one committed by Marinelli. But the State's actions have quashed that message and sent a contrary one: DOC employees across Connecticut are being told that the State will indemnify them for malicious civil rights violations and then

utilize cost recovery statutes applicable to most inmates to recoup the judgment. It will be almost as if the inmate had not brought suit at all.[15]

Further, the State of Connecticut is not in this situation by happenstance; it chose to indemnify Marinelli and then to use cost recovery statutes to recoup the bulk of its indemnity expense. Both decisions were discretionary. (ECF No. 268 at 8 (State's brief describing its decision to indemnify Marinelli as "discretionary"); Conn. Gen. Stat. § 18-85a(b) (providing that Attorney General … *may* bring an action" to recover the costs of incarceration (emphasis added)); § 51-298(c) (affording Attorney General discretion to forego recovery of public defender costs "whenever the financial circumstances of a person are such that the best interest of the state will be served by such action"). As set forth in the legislative history of Section 1983 recounted above, such a discretionary decision virtually to nullify a federal civil rights judgment echoes the discretionary state law enforcement actions that prompted Congress to enact the statute; indeed, that legislative history evidences a strong congressional purpose of ensuring that states not apply their laws in such a way as to negate rights afforded by the Constitution and federal law. *See, e.g.*, Cong. Globe, 42d Cong., 1st Sess., p. 428 (Remark from Rep. John Beatty: "[T]he State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination,

_____

[15] At the March 14 hearing, the State asserted that the burden of litigation and the stigma of an adverse jury finding will preserve some of the judgment's deterrent value in this case. But those costs, while genuine, are a feature of any lawsuit in which a defendant loses, regardless of the nature of the claims. When Congress enacted Section 1983, it was undoubtedly aware of such costs and obviously found them inadequate to deter wrongdoing by state officials and compensate victims. The State's argument also ignores the impact of its actions on inmates who might contemplate bringing Section 1983 claims in response to civil rights violations. Section 1983 can be an effective remedy only if it is used. Sapping the remedy of its deterrent and compensatory force as the State is doing in this case risks discouraging its use by inmates, who may conclude that, even if they win, they will walk away with little and the wrongdoer will face no financial consequences.

practically denied the equal protection of the law to these persons."); *Monroe v. Pape*, 365 U.S. 167, 180 (1961) ("It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies."), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

The Eighth Circuit's decision in *Hankins v. Finnel*, 964 F.2d 853 (8th Cir. 1992) is instructive. In *Hankins*, a state inmate won a judgment under § 1983 awarding him one dollar in nominal damages and three thousand dollars in punitive damages against a prison official indemnified by the State of Missouri. *Id.* at 854. Missouri then brought an action in state court seeking to apply a cost of incarceration lien to recover ninety percent of the inmate's judgment. *Id.* Shortly thereafter, the state debited the inmate's account for the cost of incarceration lien before depositing an identical amount (representing the judgment) into the overdrawn account. *Id.* at 855. The *Hankins* court held that Missouri's application of the cost of incarceration lien conflicted with the purposes of Section 1983, and was therefore preempted. *Id.* at 861.

In reaching this conclusion, the *Hankins* court noted that "[a]lthough [Missouri] agreed to pay [the inmate's] judgment, it voluntarily and deliberately took actions designed to ensure that the money never reached [the inmate's] hands." *Id.* at 857. The court concluded that, "in essence, [Missouri] achieve[d] the advantage of protecting both its employees and its own coffers by paying a judgment with one hand that it intend[ed] to take back with the other." *Id.* at 858. "To allow [Missouri] to largely recoup [the inmate's] award would be inimical to the goals of [§ 1983]," which were "to compensate victims and to deter future deprivations of federal

constitutional rights." *Id.* at 861.  If it were to rule otherwise, the *Hankins* court averred, "neither [Missouri] nor its employees would have the incentive to comply with federal and constitutional rights of prisoners." *Id.* (internal quotation marks omitted).

The facts and logic of *Hankins* are directly apposite in this case.  Here, the State of Connecticut has voluntarily chosen to indemnify Marinelli for an award including punitive damages and then sought to recoup most of Williams's judgment.  The State "has, in essence, devised . . . a shell game that allows it to pay a judgment while simultaneously recouping the proceeds." *Id.* at 860 (internal quotation marks omitted).  By undertaking such actions, the State has ensured that neither DOC employees nor itself will have the incentive to uphold the constitutional rights vindicated by the judgment in this case.  The State's actions thus irreconcilably conflict with the purposes of Section 1983 and are preempted.  They are therefore without legal effect and have done nothing to satisfy the judgment in this case.

The State argues in opposition to this conclusion that Williams has received "compensation for his § 1983 judgment from the named defendant found liable in this case" and that the state "liens" applied to the judgment are irrelevant given "that [Williams] was compensated in the first instance." (ECF No. 268 at 16).  This argument is flawed for three reasons.  First, it is undisputed that the "the named defendant found liable in this case" has contributed nothing to Williams's Section 1983 judgment.   The State confirmed at the March 14 hearing that Marinelli had contributed none of his own funds to reimburse the State for the checks it issued in July 2017.[16]  Second, the State's actions in depositing $142,430 into

---

[16] This suggests that the judgment in this case would not be deemed satisfied even under state law.  "Under Federal Rule of Civil Procedure 69(a)(1), federal courts look to state law regarding the satisfaction of judgments." *Alhassid v. Nationstar Mortgage, LLC*, No. 14-CV-20484 (BFB), 2018 WL 745956, at *2 (S.D. Fla. Feb. 7, 2018).  Under Connecticut law, there are two prerequisites to the satisfaction of a judgment: (1) "the judgment creditor must have obtained a valid money judgment against the judgment debtor"; and (2) "*the judgment debtor*

Williams's inmate account and sending a check for the same amount to a state agency did not "compensate[]" Williams, because they did not put any monies under his sole dominion and control.   As shown above (see note 6, *supra*), his inmate account remains under the control of the DOC, as illustrated by the State's unilateral freezing of some  of the monies it had earlier placed in that account.[17]  The State's placing money into an account over which it has control cannot fairly be said to "compensate" Williams.

Third, the State's argument elevates form over substance to the extent it suggests that the State's decision to invoke its cost recovery statutes was somehow unrelated to its decision to indemnify its employee.  Nothing in the record suggests that the State had ever previously sought to recover costs from Williams, and the procedural history set forth above shows that the State's indemnification of Marinelli and launching of its cost recovery actions took place in rapid succession shortly after it withdrew the appeal on Marinelli's behalf.  Thus, to the extent Williams was compensated "in the first instance," this compensation amounted to "little more than a stealth payment"—half of "the judgment proceeds vanished before [Williams] even knew he had been paid," *Hankins*, 964 F.2d at 858, and the State shortly thereafter froze a substantial portion of the remainder.  Thus, even if Williams was initially compensated, the impact of the

---

must have paid the amount of that judgment." *Coyle Crete, LLC v. Nevins*, 137 Conn. App. 540, 552 (2012) (emphasis added).  It is undisputed that Marinelli has not contributed a penny to the judgment.  Further, no one has suggested that the State obtained Williams's agreement to treat the checks it issued in July 2017 as satisfaction of the judgment on Marinelli's behalf (or even partial satisfaction); as noted, Williams's counsel objected to the State's issuing those checks at the time.  (*See* ECF No. 241-1 at 2 (email from Williams's counsel prior to the issuance of the checks asking that State "not issue any checks at this time")); *cf. United Mktg. Sols., Inc. v. Fowler*, 512 F. App'x 271, 275 (4th Cir. 2013) (judgment debtor's payment to judgment creditor's third-party creditor without consent of judgment creditor did not satisfy judgment).

[17] According to Williams, the State froze the funds and made the notation "Court Order" in the inmate account before it had even filed suit to recover the cost of public defender services. (ECF No. 257 at 2-3).  I express no view as to the legality of the State's asset freeze under state law.

State's actions on the deterrent value of the judgment remains the same: By effectively clawing back half of the judgment and now seeking to recover substantially more, the State has severely undercut the deterrent effect of the judgment.

The State also argues that the logical progression of Williams's argument would prevent it from ever using its cost recovery statutes against a judgment rendered under Section 1983. (ECF No. 268 at 16-17). Whatever may be said about Williams's argument, however, my ruling is limited to the peculiar facts of this case—where the State voluntarily indemnified an employee found to have committed malicious or reckless conduct and then attempted to recoup most of the judgment, thereby nearly eliminating its own indemnity expense. Had the State not indemnified Marinelli and simply used its cost recovery statutes to recover amounts paid by *him*, there would have been a lesser impact on the deterrent effect of the judgment; although that course of action might have diminished the judgment's compensatory value, it would not have communicated to DOC employees that they may violate an inmate's constitutional rights without fear of financial consequences.

The State also suggests that Williams's failure to object to the reduction for his "child support arrearage" undermines his argument that the State's use of the cost of incarceration and cost of public defender recovery statutes is preempted. (*Id.* at 17; *see* note 4, *supra*). To be sure, Williams's acquiescence in the payment of $15,140 to the custodial parent of his child means that that payment should be treated as "compensation" to Williams—in the amount of about 5 percent of the judgment—because it satisfied a debt he owed a third party. By contrast, the cost of incarceration and public defender "liens" concern payments that flow to the State of Connecticut. The significance of that distinction comes back to the State's indemnity expense: the State's use of the cost of incarceration and public defender cost recovery mechanisms will

reduce its own expense in indemnifying Marinelli and thereby go towards erasing the effects of the judgment, whereas the payment of a small portion of the judgment to the custodial parent of Williams's child does nothing to reduce the State's indemnity expense or sap the judgment of its deterrent effect. Other courts have cited the same distinction. *See Vincent v. Sitnewski*, No. 10 CIV. 3340 TPG, 2011 WL 4552386, at *4 (S.D.N.Y. Sept. 30, 2011) (concluding that state's seizure of inmate's Section 1983 judgment "so that victims of that person's crimes may receive compensation" did not conflict with Section 1983); *Beeks v. Hundley*, 34 F.3d 658, 661 (8th Cir. 1994) ("This case does not present the same [deterrence-undermining] concerns [as *Hankins*]. Here, the money was applied to the inmates' pre-existing obligations to the victims of their crimes. . . . [T]he State does not ultimately receive the § 1983 proceeds.").

The State's remaining arguments merit only a brief response. It points to the doctrines of immunity that limit liability under Section 1983 as exemplary of Congress's respect of other important policy interests such as the state cost recovery statutes at issue in this case. (ECF No. 17 at 18). The State fails to explain, however, why Congress's creation of certain limited immunity doctrines has any bearing on this case, in which I concluded that Marinelli was not entitled to immunity. (*See* ECF No. 214 at 27-29). The State also contends that Congress has "evinced an intention to limit the use of § 1983 to achieve Congress's general goals of compensation and deterrence" by enacting legislation imposing "requirements and restrictions on prisoner plaintiffs that simply do not apply in other contexts," such as the Prison Litigation Reform Act of 1995. (ECF No. 268 at 19-20). Williams's successful prosecution of his suit despite these restrictions, however, suggests that Congress intended a suit like his to enjoy the full extent of the remedies available under Section 1983. The State also points to the fact that the "federal government itself recovers cost of incarceration liens from federal inmates . . . and has

done so since at least 1994." (ECF No. 268 at 21). The State points to no case, however, in which the federal government has used that authority to recover the expense of indemnifying a federal employee for maliciously violating the constitutional rights of a federal inmate. As shown, those distinctions are critical here.

The final arrow in the State's quiver is a smattering of case law distinguishing *Hankins*. (*See id.* at 22-23). None of the cases the State cites speak to the peculiar circumstances of this case, however, as none of them involve a state's simultaneous indemnification of a defendant and subsequent effort to recoup the judgment. The cases are also distinguishable on other grounds. I have already distinguished two of the cases on the basis that they involved state liens for the benefits of third parties. *See Vincent*, 2011 WL 4552386, at *4 (concluding that state's seizure of inmate's Section 1983 judgment "so that victims of that person's crimes may receive compensation" did not conflict with Section 1983); *Beeks,* 34 F.3d at 661 (same). The State also cites case law concerning the attachment of liens to a far lower proportion of a plaintiff's judgment under Section 1983, *see Colondres v. Scopetta*, 290 F. Supp. 2d 376, 384-85 (E.D.N.Y. 2003) (concluding that city public assistance lien for fourteen percent of judgment under Section 1983 was not preempted) or to instances where the plaintiff's judgment was against a municipality rather than the state itself, *see Bonilla v. Semple*, No. 3:15-CV-1614 (VAB), 2016 WL 4582038, at *7 (D. Conn. Sept. 1, 2016) (concluding state cost of incarceration lien against plaintiff's Section 1983 judgment against municipality was not preempted given lack of reduction of deterrence against municipality).

The most promising case the State cites is *Brown v. Stone*, 66 F. Supp. 2d 412 (E.D.N.Y. 1999). That case concerned the New York State Office of Public Health's ("Office of Public Health") policy of counterclaiming for the cost of care provided to mentally ill indigents in

actions against it for injuries stemming from the psychiatric treatment of those indigents. *Id.* at 415-16. In *Brown*, plaintiffs sued the Commissioner of the Office of Public Health ("Commissioner") under Section 1983 challenging the counterclaim policy on several grounds, including preemption. *Id.* at 416. The *Brown* court rejected the preemption argument, and specifically distinguished *Hankins* in doing so, in part on the basis that "the logical conceptual reach of plaintiffs' § 1983 preemption claim would immunize all civil rights recoveries in any § 1983 litigation by one indebted to the State since the issue of deterrence would always be implicated." *Id.* at 439. But *Brown* did not concern indemnification of a punitive damages award—a point the *Brown* court emphasized in its analysis. *See id.* (noting "[i]n respect to the issue of deterrence" that "employees who commit intentional torts, and are thereby subject to punitive damages, cannot seek indemnification from the State").[18] As explained above, the State's indemnification of its employee for his malicious or reckless violation of Williams's civil rights is critical to my conclusion that its actions are preempted in this case, and I do not hold that the State may never use the cost recovery statutes at issue in this case to reduce a Section 1983 award.

***

The State of Connecticut's application of its authority to recover the costs of incarceration and providing public defender services after its voluntary indemnification of Marinelli for an award including punitive damages so undermines the purposes of federal law as

---

[18] On appeal of the *Brown* ruling, the Second Circuit in a summary order affirmed the district court's conclusion on the preemption issue "for substantially the reasons stated by the district court." *See Mental Disability Law Clinic, Touro Law Ctr. v. Carpinello*, 189 F. App'x 5, 8 (2d Cir. 2006).

to be preempted.  I therefore conclude that these actions have not reduced the amount of the judgment owed by Marinelli, the judgment debtor.

### B.  Eleventh Amendment

My conclusion that the State of Connecticut's actions in this case are preempted by Section 1983 does not resolve the issue of the relief to which Williams is entitled.  As noted previously, Williams's Motion for Aid of Judgment and Motion for Release of Funds seek a variety of forms of relief, including: (1) a declaration that the State's application of its incarceration cost recovery statute is preempted by Section 1983; (2) an order that Williams's judgment "not be reduced through application of Conn. Gen. Stat. § 18-85b"; (3) an order "that the State of Connecticut pay him the remainder of [his] judgment" (*id.*); and (4) an order "that the State of Connecticut release its hold on monies in his inmate trust account" (ECF No. 240 at 1; ECF No. 241 at 11; ECF No. 256 at 1).  The latter two of these requests, however, trigger significant concerns under the Eleventh Amendment to the United States Constitution.

#### 1.  *Monetary Relief Against the State*

The Eleventh Amendment "prohibits the 'Judicial power of the United States' from extending to 'any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'"  *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (quoting U.S. Const. Amend. XI).  "While the Amendment by its terms does not bar suits against a State by its own citizens," the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).  This state sovereign immunity extends to all entities of the state and, in

certain circumstances, state officials acting in their official capacities. *In re Deposit Ins. Agency*, 482 F.3d at 617.

There are three exceptions to Eleventh Amendment immunity. First, Congress may abrogate state sovereign immunity under the Fourteenth Amendment where there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). Second, a party may bring a claim against a state official acting in his or her official capacity for prospective injunctive relief, as long as the party does not request a "retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 676 (1974) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Third, a state waives its sovereign immunity "respecting the adjudication of a claim that it voluntarily files in federal court" or in cases "where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination. . . ." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (internal quotation marks omitted).

None of these exceptions to state sovereign immunity would allow this Court to issue an order requiring the State of Connecticut to pay Williams any portion of his judgment. Section 1983 does not abrogate Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341-45 (1979), and the only state official who is still a party in this case is Marinelli, who was sued in his individual capacity and against whom no injunctive relief is being sought in any event. The only exception that could possibly countenance the payment order sought by Williams is the waiver exception. The Supreme Court has held that a state waives its immunity when it voluntarily intervenes in a suit, *see Clark v. Barnard*, 108 U.S. 436, 448 (1883) (holding that state ceded sovereign immunity when it voluntarily intervened in suit in federal court), files a

claim in federal court, *see Gardner v. State of N.J.*, 329 U.S. 565, 574 (1947) ("When the State becomes the actor and files a claim . . . it waives any immunity which it otherwise might have had respecting the adjudication of a claim."), or removes a suit from state court, *see Lapides*, 535 U.S. at 624 (concluding that "State's action joining the removing of . . . case to federal court waived its Eleventh Amendment immunity"). In contrast a State "does not consent to suit in a federal court . . . by consenting to suit in the courts of its own creation," by "stating its intention to sue and be sued," or "even by authorizing suits against it in any court of competent jurisdiction." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (internal quotation marks and citations omitted). The general principle governing waiver of state sovereign immunity, then, is that a state waives sovereign immunity when it voluntarily "become[s] a party to a cause, and submits its rights for judicial determination. . . ." *Gunter v. Atl. Coast Line R. Co.*, 200 U.S. 273, 284 (1906).

Here, the State of Connecticut has done no such thing. Indeed, the State is not even a party to this action, except for the limited purpose specified in 28 U.S.C. § 2403, i.e., to defend the constitutionality of its statutes. (*See* ECF No. 243). 28 U.S.C. § 2403 provides that a state may intervene for the limited purpose of defending the constitutionality of its statutes. *See* 28 U.S.C. § 2403(b) ("In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality."). The statute provides that a State "shall . . . have all the rights of a party and be subject to all liabilities of a party as to court costs *to the extent necessary for a*

*proper presentation of the facts and law relating to the question of constitutionality.*" *Id.*

(emphasis added). Thus, the statute contemplates that the State may be liable as a party only in

relation to the question of constitutionality—it does not contemplate a waiver of sovereign

immunity that would subject it to liability. *See Tennessee v. Garner*, 471 U.S. 1, 22 (1985)

("The state is a party only by virtue of 28 U.S.C. § 2403(b) and is not subject to liability.");

*Comfort ex rel. Neumyer v. Lynn Sch.*, 131 F. Supp. 2d 253, 254 n.2 (D. Mass. 2001) (holding

intervention under 28 U.S.C. § 2403(b) "is limited to presentation of evidence and argument on

the questions of constitutionality, and does not unmistakably evidence an intent by the [state] to

subject itself in federal court to the entire gamut of the plaintiff's state and federal claims"

(internal quotation marks omitted)). Thus, the State of Connecticut has not waived its sovereign

immunity to monetary relief by appearing in this proceeding. (*See also* note 9, *supra* (noting the

State of Connecticut's position that it has not formally intervened in this matter)).

Williams contends that the Court's inherent authority empowers it to order the State to

pay the remainder of his judgment. (*See* ECF No. 241 at 8; ECF No. 269 at 3-4). In support of

this proposition, Williams relies primarily on *Hankins*. (*See* ECF No. 269 at 3-5). When the

inmate in *Hankins* challenged the State's application of the cost of incarceration lien, the State

raised the Eleventh Amendment as a defense. 964 F.2d. at 855-56. The *Hankins* court rejected

this argument, however, on the basis that Missouri had waived such a defense when it

"voluntarily and deliberately took actions designed to ensure that the money never reached [the

inmate's] hands." *Id.* at 857. In the court's view, there was "little difference between this

situation and a case in which a state simply reneges on its promise to pay" a judgment. *Id.* at

858. For these reasons, the *Hankins* court concluded that "the State of Missouri made a limited

waiver of its Eleventh Amendment immunity with regard to the judgment in [the] case." *Id.*

*Hankins* does not support Williams's request for an order of payment for two reasons. First, the State of Missouri did not appear in *Hankins* under 28 U.S.C. § 2403(b). Thus, Missouri did not take on the same statutorily limited role in that case as the State of Connecticut has here. Second, the lower court decision in *Hankins*, which the Eighth Circuit affirmed, did not include an order requiring the State of Missouri to pay the inmate's judgment; rather, it permanently enjoined the State from attaching the funds received by the inmate as damages and determined that the State's cost of incarceration statute was preempted to "the extent that it conflict[ed] with Congress's intent to award damages under [Section 1983]." *See Hankins v. Finnel*, 759 F. Supp. 569, 574 (W.D. Mo. 1991); *see also Hankins*, 964 F.2d at 859 (noting that the district court's injunctive relief could properly be directed at state officials under the *Ex Parte Young* doctrine). In short, *Hankins* did not answer a plaintiff's prayer for a federal court order mandating that an unconsenting state pay money out of its treasury to satisfy a judgment against a third party.

Because the State of Connecticut has not waived its Eleventh Amendment immunity to monetary relief, I cannot order it to pay any portion of Marinelli's judgment. Nor can I order it to unfreeze the assets in Williams's inmate account. Under the circumstances of this case, such an order would function much like an order requiring the State to pay a portion of Williams's judgment from its treasury, at least to the extent it permitted Williams to take the money out of the inmate account and place it in his own private bank account. Even if such an order could be characterized as prospective, the Eleventh Amendment would bar its issuance against the State itself, *Monger v. Connecticut Dep't of Transportation*, No. 3:17-CV-00205 (JCH), 2017 WL 3996393, at *5 (D. Conn. Sept. 11, 2017) ("The *Ex parte Young* exception does not apply, however, when the party sues for injunction . . . against a state agency or the state itself."); and

*Ex Parte Young* relief would not be available because the state official who controls the inmate account – the Commissioner of Corrections – is not before the Court at all.[19]

### 2. *Relief Against Marinelli and Declaratory Judgment*

This does not, however, necessarily leave Williams without a remedy. Although the Eleventh Amendment bars the monetary relief Williams seeks against the State, it does not bar his request that I order that "his judgment not be reduced." As noted previously, the power to issue such relief stems from my inherent authority to enforce the judgments of this Court. Further, the Eleventh Amendment does not prevent me from exercising jurisdiction over Marinelli, the actual judgment debtor in this case, as he was sued in his individual capacity. *See Hafer*, 502 U.S. at 31. Thus, while the Eleventh Amendment prevents me from ordering the State of Connecticut to pay any portion of Williams's judgment against Marinelli, it does not prevent me from concluding that the State's actions have not satisfied that judgment and that Marinelli remains liable for the full amount.

Nonetheless, because my conclusion that the judgment remains unsatisfied rests on my conclusion that Section 1983 preempts the State's actions in this case, there is still a question about whether I may issue such a declaration about the constitutionality of the State's actions. While the *Ex parte Young* doctrine permits a plaintiff to seek prospective relief for an ongoing violation of federal law, such relief "is barred by the Eleventh Amendment when it would serve to declare only past actions in violation of federal law. . . ." *Neroni v. Coccoma*, No. 3:13-CV-1340 GLS/DEP, 2014 WL 2532482, at *9 (N.D.N.Y. June 5, 2014) (internal quotation marks omitted); *see also Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) ("A plaintiff may not

_____

[19] Williams will have an opportunity to challenge the State's actions concerning his inmate account in state court in the State's lawsuit aimed at recovering public defender costs, which I am remanding today. (*See Connecticut v. Williams*, 17cv2023 at ECF No. 22.).

use [the *Ex parte Young*] doctrine to adjudicate the legality of past conduct."). The leading case on the line between prospective and retrospective relief is *Green v. Mansour*, 474 U.S. 64 (1985).

In *Green*, the Supreme Court addressed petitioners' claim for a declaratory judgment that a state official's "calculation of [their] benefits under the federal Aid to Families With Dependent Children ('AFDC') program violated certain provisions of federal law." 474 U.S. at 65. Prior to the issuance of any decision on the merits of this claim, Congress had amended the relevant statutory provisions such that the state official's calculations thereafter indisputably conformed to federal law. *Id.* Thus, the question before the Court was whether the petitioners were entitled to a declaratory judgment that the state official's past calculation of the petitioners' AFDC benefits did not comply with federal law. *Id.* The *Green* Court concluded that the petitioners were not entitled to such declaratory relief. *Id.* at 73. The Court reasoned that the case concerned only "a dispute about the lawfulness of [the respondent state official's] past actions" and that there was "no claimed continuing violation of federal law. . . ." *Id.* As such, the only utility of the declaratory judgment for the petitioners would be to "resolv[e] the dispute over the past lawfulness of [the respondent state official's] action" and then allow the petitioners to offer the judgment "in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution could be computed." *Id.* Such relief, the *Green* Court concluded, "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." *Id.* Thus, the moral of the *Green* case is that "a declaratory judgment is not available when the result would be a partial 'end run' around" the Court's decision in *Edelman* barring a grant of retroactive monetary relief against a state. *Id.*

*Green* does not bar a declaration that the State's actions are preempted in this case. While some of the State's actions—its indemnification of Marinelli and its issuance of checks reflecting the cost-of-incarceration lien—have already taken place, its effort to recover public defender costs is ongoing. And thus when viewed as a whole, the State's effort to recover its indemnity expense–and thereby nullify most of Williams's judgment—remains ongoing. Consequently, *Green* and other cases prohibiting declaratory judgments concerning the legality of entirely past conduct—i.e., where there is no remaining ongoing conduct—are not on point. *Contrast Green*, 474 U.S. at 73 (concluding Eleventh Amendment barred claim in part because it did not involve a "claimed continuing violation of federal law"); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000) (concluding declaratory relief barred by Eleventh Amendment because "[a]ny declaration could say no more than that Connecticut had violated federal law in the past"). Williams is not asking me merely to reflect upon the legality of the State's past actions but rather to determine whether its ongoing course of action aimed at recouping its indemnity expense through its cost recovery statutes conflicts with Section 1983. (*See* ECF No. 257 at 1 ("By virtue of these two actions, the State is *now* attempting to claw back nearly 70% of the entire § 1983 judgment. . . . [T]he State's efforts to reduce Mr. Williams's § 1983 judgment to recover public defender fees suffers from the same constitutional defect as the State's cost of incarceration claim. . . ." (emphasis added))). The harms he alleges are therefore ongoing and conducive to prospective relief.

The Supreme Court's opinion in *Papasan v. Allain*, 478 U.S. 265 (1986) is instructive on this point. *Papasan* concerned in part whether the Eleventh Amendment barred an equal protection claim averring that various Mississippi state officials had denied them the bounty of certain lands granted to the State by the United States in the mid-19[th] century. 476 U.S. at 267-

68, 281-82. The petitioner's claim specifically spoke of "past, present and future deprivations of and to Plaintiffs and the Plaintiff class of the use and benefits of" the lands in question. *Id.* at 281. The Court concluded that the Eleventh Amendment permitted this claim to be brought under the *Ex parte Young* doctrine despite the fact that certain actions underlying it had taken place in the past. *Id.* at 282. The Court noted that while "[i]t may be that the current disparity [in the distribution of the benefits from the State's lands] results directly from . . . actions in the past . . .," "the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not the past actions of the State." *Id.* The Second Circuit has echoed such analysis. *See Russell v. Dunston*, 898 F.2d 664, 668 (2d Cir. 1990) ("We do not agree with the district court that the existence of a past harm renders an otherwise forward-looking injunction retroactive. If it did, the rule allowing prospective relief would be substantially undermined because the need for prospective relief often arises out of a past injury."); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985) (holding Eleventh Amendment did not bar terminated employee from seeking reinstatement on basis that he was terminated without due process of law).

My ruling that the State's actions are preempted also does not raise any prospect that the State will be forced to pay money from its treasury in a state court action—by means of res judicata or some other preclusive doctrine—one of the concerns animating the *Green* Court. *See Green*, 474 U.S. at 73. My determination that the State's actions have done nothing to satisfy the judgment against Marinelli because they are preempted by federal law confers on Williams no claim for money damages against the State; it just makes clear that he may still collect the judgment from Marinelli.[20] It thus does not run afoul of the "impetus for the Eleventh

_____

[20] Even if it also would permit Williams to make preclusion arguments in the remanded lawsuit to collect public defender costs, that prospect does not pose an Eleventh Amendment

40

Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994).

***

The Eleventh Amendment does not prohibit Williams from attaining a declaratory judgment that the State's actions are preempted by Section 1983 and are of no legal effect. Accordingly, I grant Williams declaratory relief and hold that his judgment against Marinelli has not been satisfied because Section 1983 preempts the State's voluntary indemnification of Marinelli for a punitive damages award and subsequent attempt to recoup the bulk of the judgment using its cost recovery statutes. I hold that the State's actions are without effect with respect to Williams's judgment. He may proceed against Marinelli for the full amount of the judgment, reduced to reflect the payment to the custodian of his minor child.

### C. Post-Judgment Interest

It remains to ascertain the exact amount of the outstanding judgment and, in particular, to resolve a dispute over the amount of post-judgment interest to which Williams is entitled. "Post-judgment interest is mandatory and is 'calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date

---

problem because, if those arguments were successful, they would simply prevent the State from recovering monies it previously placed in Williams's inmate account. The possibility that the State might be prevented from recovering monies it previously voluntarily paid would impose no new drain on the State's treasury and raises no Eleventh Amendment issue. Such a cost would, at most, be "ancillary" to the main impact of the declaratory relief—i.e., the "bring[ing] of an end to a present violation of federal law." *Papasan*, 478 U.S. at 278; *see also Dwyer*, 777 F.2d at 836 (holding that the fact that reinstatement of plaintiff's employment would "requir[e] the expenditure of state funds" was "ancillary to such a prospective injunction" and therefore not barred by Eleventh Amendment).

of the judgment.'" *Fraser v. Wyeth, Inc.*, 992 F. Supp. 2d 68, 102 (D. Conn. 2014) (quoting 28 U.S.C. § 1961(a)).  Such judgment "is computed daily to the date of payment and compounded annually."  *Id.* (citing 28 U.S.C. § 1961(b)).

The parties dispute which date 28 U.S.C. § 1961(a) contemplates when it refers to "the date of the entry of the judgment."  Marinelli avers that the statute contemplates the amended judgment entered on February 24, 2017, while Williams contends that it contemplates the original judgment entered on July 20, 2016.  (*See* ECF No. 277; ECF No. 278).   The Second Circuit addressed this question in *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998), where, as in this case, the district court had entered both an original judgment and, later, an amended judgment in a reduced amount.  The *Greenway* court held "post-judgment interest commences from the date a judgment is ascertained in a meaningful way and supported by evidence."  143 F.3d at 55 (internal quotation marks omitted).  This meant in that case that the operative judgment was the original judgment, but that interest accrued only on the amount of the amended judgment.  *See id.* ("In this case, judgment was ascertained in a meaningful way on [the date of the original judgment].  [The plaintiff] is thus entitled to post-judgment interest from that date. Interest should only accrue, however, on the amount of the reduced [amended] judgment we have permitted to stand after this appeal.").  Following *Greenway*, I find that post-judgment interest in this case accrues from July 20, 2016, but must be calculated based on the amount of the amended judgment, i.e., $300,000.

The weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding July 20, 2016 is 0.516 percent per year.  *See* Board of Governors of the Federal Reserve System's Selected Interest Rates,

https://www.federalreserve.gov/datadownload/Chart.aspx?rel=H15&series=e30653a4b627e9d1f2490a0277d9f1ac&lastobs=&from=07/10/2016&to=07/16/2016&filetype=csv&label=include&layout=seriescolumn&pp=Download (last visited March 28, 2018).  618 days have passed since the July 20, 2016 judgment, and the statute requires the compounding of interest annually, 28 U.S.C. § 1961(b).  A further complication is that, on July 27, 2017, the State made payment of $15,140 to the custodial parent of Williams's child[21]—a payment that Williams does not contest and, as noted above, should be treated as compensation to him.  The amount of the judgment should thus be considered reduced by $15,140 as of July 27, 2017, after which interest continued to accrue on the reduced amount.   The calculation of the unpaid judgment as of today, then, is as follows:

(1) .516% of $300,000 leads to a total of $1,548, the amount of interest accrued for the first year, i.e., until July 20, 2017;

(2) after compounding, the calculation of interest for the elapsed portion of the second year prior to July 27, 2017—i.e., prior to the State's payment of the $15,140 in child support—is .516% of  the judgment with compounded interest added, $301,548, multiplied by 7/365, which amounts to  $29.84;

(3) the calculation of interest for the time between July 27, 2017 and today is .516% multiplied by $286,408 (the compounded judgment as of July 20, 2017 minus the child support) multiplied in turn by 246/365, which amounts to $996.08;

---

[21]  Although the parties' briefing does not specifically denote this date as the day on which the State made said payment, I assume as much given that the Assistant Attorney General representing Marinelli issued the check for $142,430 to Williams's inmate account on that date (ECF No. 241-2 at 2) and had previously represented to Williams's counsel that the State would issue all three checks—for half the judgment, the cost of incarceration lien, and the child support lien—at the same time.  (ECF No. 241-1 at 3).

Based on these calculations, the outstanding amount of the judgment Marinelli owes to Williams with post-judgment interest is therefore as follows: $29.84+$286,408+$996.08=**$287,433.92**.[22]

## IV.    Conclusion

For the reasons discussed above, Williams's motion for aid of judgment (ECF No. 241) is hereby GRANTED IN PART AND DENIED IN PART.  I grant Williams declaratory relief and hold that his judgment against Marinelli has not been satisfied due to the fact that the State of Connecticut's actions in this case—i.e., its voluntary indemnification of Marinelli for a punitive damages award and subsequent application of various liens against Williams's judgment to recoup the vast majority of the judgment—conflict with Section 1983 and are therefore preempted.  As such, I hold that the State of Connecticut's prior actions in this case are null and without effect with respect to Williams's judgment.  He may proceed against Marinelli for the full amount of his outstanding judgment with post-judgment interest, which is **$287,433.92**.  Williams's motion to unfreeze assets (ECF No. 256), however, is hereby DENIED.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut

---

[22]  Given the fact that the parties have not briefed this issue in light of this ruling, the Court will allow the parties to file supplemental briefs of no more than five pages limited solely to the calculation of post-judgment interest.  Any such briefs shall be filed within **seven days of this ruling**.

March 29, 2018