MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of February, two thousand twenty-one.

Before:      Pierre N. Leval,
                Susan L. Carney,
                     *Circuit Judges*,
                Timothy C. Stanceu,
                     *Judge.*[*]

---

Rashad Williams,

           Plaintiff - Appellee,

v.

Dennis Marinelli, individually and in his official capacity,

           Defendant - Appellant,

Peter Murphy, individually and in their official capacity, Quiros, individually and in their official capacity, Cahill, individually and in their official capacity, Powers, individually and in their official capacity, Butkiewicus, individually and in their official capacity, Melvin Saylor, individually and in their official capacity, UCONN Correctional Managed Health Care, Alphonso Lindsey, individually and in their official capacity, Robinson, individually and in their official capacity, Fran, Doctor, individually and in their official capacity, Redding, individually and in their official capacity, Jill Doe, individually and in their official capacity, Mike Doe, individually and in their official capacity, Jill Haga, individually and in their official capacity, Paul Wilbur, individually and in their official capacity,

           Defendants.

---

**JUDGMENT**

Docket No. 18-1263

The appeal in the above captioned case from rulings of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs. Upon consideration thereof,

---

[*] Chief Judge Timothy C. Stanceu, United States Court of International Trade, sitting by designation.

MANDATE ISSUED ON 02/25/2021

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's rulings are AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

18-1263
Williams v. Marinelli

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT

4    August Term, 2019

6    (Argued: October 4, 2019          Decided: February 4, 2021)

8    Docket No. 18-1263

10   _____

12   RASHAD WILLIAMS,

14   *Plaintiff-Appellee*,

16   v.

18   DENNIS MARINELLI, individually and in his official capacity,

20   *Defendant-Appellant*,

22   *and*

24   PETER MURPHY, individually and in their official capacity; QUIROS,
25   individually and in their official capacity; CAHILL, individually and in their
26   official capacity; POWERS, individually and in their official capacity;
27   BUTKIEWICUS, individually and in their official capacity; MELVIN SAYLOR,
28   individually and in their official capacity; UCONN CORRECTIONAL
29   MANAGED HEALTH CARE; ALPHONSO LINDSEY, individually and in
30   their official capacity; ROBINSON, individually and in their official capacity;
31   FRAN, DOCTOR, individually and in their official capacity; REDDING,
32   individually and in their official capacity; JILL DOE, individually and in their
33   official capacity; MIKE DOE, individually and in their official capacity; JILL
34   HAGA, individually and in their official capacity; PAUL WILBUR,
35   individually and in their official capacity,
36

1       *Defendants.* *

2

3    _____

4

5 Before:

6

7    LEVAL and CARNEY, *Circuit Judges*, and STANCEU, *Judge.* **

8

9    Defendant, former Connecticut corrections officer Dennis Marinelli,
10 appeals from post-judgment rulings of the United States District Court for the
11 District of Connecticut (Michael P. Shea, *J.*), concluding that an award of
12 compensatory and punitive damages against Marinelli in favor of Plaintiff
13 prisoner Rashad Williams on § 1983 claims remains unsatisfied
14 notwithstanding the State of Connecticut's voluntary undertaking to pay the
15 judgment, paying more than half of the amount of the judgment to itself, or
16 its agencies, to satisfy state statutory debts owed by the Plaintiff to
17 Connecticut, primarily for the cost of his incarceration. AFFIRMED.

18

19         J. TYLER BUTTS (Linda L. Morkan, *on the*
20         *brief*), Robinson & Cole LLP, Hartford,
21         CT, *for Plaintiff-Appellee.*

22

23         TERRENCE M. O'NEILL, Assistant
24         Attorney General, *for* William Tong,
25         Attorney General of the State of
26         Connecticut, Hartford, CT, *for*
27         *Defendant-Appellant.*

28

_____

* The Clerk of Court is directed to amend the caption as set forth above.
** Chief Judge Timothy C. Stanceu, United States Court of International
Trade, sitting by designation.

1    LEVAL, *Circuit Judge*:

2          Defendant, former Connecticut corrections officer Dennis Marinelli,

3    appeals from post-judgment rulings of the United States District Court for the

4    District of Connecticut (Michael P. Shea, *J.*), concluding that an award of

5    compensatory and punitive damages against Marinelli in favor of Plaintiff

6    prisoner Rashad Williams remains unsatisfied notwithstanding the State of

7    Connecticut's voluntary undertaking to pay the judgment, paying more than

8    half of the judgment to itself, or its agencies, to satisfy debts owed by the

9    Plaintiff to Connecticut, primarily for the cost of his incarceration.

10         Williams, a Connecticut inmate, brought this suit under 42 U.S.C.

11   § 1983 against Marinelli and other Connecticut state officials, alleging

12   deprivation of his Eighth Amendment rights. The jury found Marinelli liable

13   for violating Williams's constitutional rights and awarded Williams

14   compensatory and punitive damages. Following post-verdict motions,

15   Williams obtained an amended judgment against Marinelli in the amount of

16   $300,000, consisting of $250,000 in compensatory damages and $50,000 in

17   punitive damages.

1    The present dispute concerns the satisfaction of Williams's judgment.

2  After the judgment became final, the State of Connecticut, having no statutory

3  or legal obligation to do so, voluntarily undertook to satisfy the judgment on

4  Marinelli's behalf. In doing so, the State took several actions against Williams

5  under Connecticut law to recoup portions of its payment: (1) the State paid

6  nearly half of Williams's $300,000 judgment to the State's own Department of

7  Administrative Services, pursuant to a Connecticut statute granting the State

8  a lien on part of the proceeds of an inmate's civil action to pay part of the

9  inmate's costs of incarceration;[1] (2) after depositing a check for the remainder

10  of the judgment into Williams's inmate trust account, the State sued Williams

11  in state court for reimbursement of "at least $48,843.42" in costs for public

12  defender services rendered to Williams, pursuant to a state statute permitting

13  such a suit; and (3) the State froze $65,000 in Williams's inmate trust account

_____

[1] The State also paid $15,140 of Williams's judgment to the mother of
Williams's child, in satisfaction of a statutory child support lien. The parties
agree that this sum should be credited towards the satisfaction of the
judgment.

1   to secure payment for those public defender costs. Through its actions, the

2   State recouped or sought to recoup more than 60% of Williams's judgment.[2]

3          Williams then filed a "motion in aid of judgment" and a "motion to

4   unfreeze assets," seeking, *inter alia*, a ruling declaring that the State's actions

5   were preempted by § 1983 and that the damages award against Marinelli

6   therefore remained unsatisfied. The district court found that the collective

7   impact of the State's actions was "virtually to nullify Williams's judgment,

8   leaving it with little deterrent or compensatory value." App'x at 80. The court

9   concluded that the State's actions so undermined the purposes and objectives

10  of Congress in enacting § 1983 that they were preempted and were therefore

11  without legal effect with respect to Williams's judgment. The court

12  determined that Marinelli remained liable for the full amount of the

13  judgment, reduced by $15,140 that the State paid to the mother of Williams's

14  child as child support he owed.

---

[2] The precise amount of the State's potential recoupment is impossible to ascertain at this time, as Marinelli asserts that the amount of recoverable public defender costs "continues to rise due to ongoing habeas proceedings." Appellant's Br. 10**.** Moreover, the State's initial calculation of $48,843.42, as its recoverable public defender costs, did not include expert costs, which the State has reserved the right to seek.

1    Marinelli subsequently filed a "motion for credit against judgment,"

2    arguing that some or all of the money paid to Williams by the State should be

3    credited towards Marinelli's satisfaction of the judgment. The district court

4    granted Marinelli's motion with respect to $16,800 of the State's payment that

5    Williams had already spent but denied the remainder of Marinelli's requested

6    credits.

7        On appeal, Marinelli contends principally that the district court erred in

8    finding the State's actions preempted by § 1983. For the reasons below, we

9    affirm the rulings of the district court.

10                            **I.    BACKGROUND**

11        **A. Factual Background**[3]

12       Williams is currently serving a 30-year sentence as an inmate in the

13   custody of the Connecticut State Department of Correction (DOC). In 2010,

14   Williams was incarcerated at Northern Correctional Institution ("Northern").

15   Marinelli was a captain at Northern and helped oversee the Administrative

---

[3] The underlying facts are not in dispute for the purposes of this appeal. The following summary of the facts giving rise to Williams's § 1983 claim is taken primarily from the district court's ruling on the parties' post-verdict motions. *See* App'x at 9–18.

6

1    Segregation Program, a restrictive housing program to which Williams was

2    assigned during the relevant period.

3         In early 2010, Williams conveyed to officials at Northern that he feared

4    for his safety, particularly in the event he was placed in a cell with a gang

5    member. He was afraid that, in such a circumstance, he would be unable to

6    defend himself from an assault due to what the district court termed the

7    "sequential uncuffing" practice at Northern. Under that practice, upon

8    returning prisoners to a shared cell, prison staff remove the prisoners'

9    handcuffs seriatim through a hole in the cell door only after the prisoners are

10   securely locked in the cell, so that one prisoner remains cuffed and

11   defenselessly exposed to the risk of violence from the other, previously

12   uncuffed, prisoner. Williams expressed concern that this practice would

13   expose him to assault by a cellmate, particularly if he were made to share a

14   cell with a gang member. Although Williams had been living without a

15   cellmate since his arrival at Northern, he feared that he would be placed with

16   a cellmate as he progressed through the Administrative Segregation Program.

17   From May to October 2010, Williams repeatedly conveyed these concerns to

1   mental health professionals at Northern, who assured him that he would

2   continue living alone.

3          On October 28, 2010, Northern officials informed Williams that he

4   would be placed in a cell with Darnell Walker, an active member of the

5   Bloods. Walker had been designated a security risk based on his past acts of

6   violence in prison. Marinelli was involved in the decision to move Williams,

7   would have been informed if Williams was on "single cell" status, and would

8   have reviewed Walker's security risk designation and disciplinary history

9   prior to the move. Upon learning of the planned move, Williams protested

10  that he had been assured he would remain on "single cell" status, and urged

11  prison officials to contact Northern's mental health staff to confirm. The

12  officers brought the issue to Marinelli, who instructed the officers to return

13  Williams to the cell with Walker and indicated that Williams would be issued

14  a disciplinary report if he refused to comply.

15         Williams was escorted back to the cell with his hands cuffed behind his

16  back. Before opening the door, the officers cuffed Walker through the hole in

17  the cell door. Williams then entered the cell. Once the door was closed, the

18  officers then uncuffed Walker, per the "sequential uncuffing" procedure

8

1    described above. Once Walker was uncuffed, he assaulted Williams, whose

2    hands remained cuffed behind his back. Walker punched the defenseless

3    Williams in the head, knocked him to the floor, kicked him, and stomped on

4    him. Because the cell door was operated by the control room down the hall,

5    the officers could not immediately intervene. Williams suffered injuries to his

6    head, ankle, back, and knee, as well as anxiety and recurring nightmares, as a

7    result of the attack.

8        Following the assault, Marinelli repeatedly threatened to assign

9    Williams another cellmate. After the Northern deputy warden instructed

10   Marinelli not to place Williams in a cell with another inmate, Marinelli

11   continued to tell Williams that he would receive a cellmate, and attempted to

12   persuade mental health staff at Northern to remove Williams from the "single

13   cell" list.

14       **B.  Procedural History**

15       In 2013, Williams filed this § 1983 action against Marinelli (as well as

16   other Connecticut prison officials), alleging deliberate indifference to unsafe

17   conditions in violation of Williams's rights under the Eighth and Fourteenth

18   Amendments of the United States Constitution. The case proceeded to a jury

1    trial with respect to four individual defendants, including Marinelli.[4] The

2    court instructed the jury that it could award punitive damages against a

3    defendant if it found that the defendant had engaged in either "[m]alicious or

4    oppressive violation of Mr. Williams's constitutional rights" or "[r]eckless

5    disregard or callous indifference as to whether [the defendant] was violating

6    Mr. Williams's constitutional rights." App'x at 84–85. The jury rendered a

7    verdict in favor of Williams against Marinelli, awarding $250,000 in

8    compensatory damages and $400,000 in punitive damages.[5] With respect to

9    the punitive damage award, the jury answered "Yes" to the question "[D]o

10   you choose to award punitive damages against [Marinelli] in order to punish

11   or deter similar conduct?" Dkt. No. 176, at 2–3.[6]

12       The parties filed post-verdict motions. The district court denied both

13   parties' motions for judgment as matter of law, as well as Marinelli's motion

14   for a new trial. However, it granted in part Marinelli's motion for remittitur,

15   ordering a new trial on damages if Williams did not accept a reduced award

_____

[4] By the time of the trial, Marinelli had retired from DOC and was no longer a
State employee.

[5] The jury found the other three defendants not liable.

[6] "Dkt. No." refers to docket entries for the proceedings below. *See Williams v.
Murphy*, No. 3:13-cv-01154 (MPS) (D. Conn. 2017).

10

1    of $300,000 (consisting of $250,000 in compensatory damages and $50,000 in

2    punitive damages).[7] Williams accepted the remittitur and obtained an

3    amended judgment in the amount of $300,000.

4          Marinelli initially appealed from the amended judgment, but later

5    withdrew the appeal. After Marinelli withdrew his appeal, the Assistant

6    Attorney General who had defended Marinelli at trial informed Williams's

7    attorney by email that the State would pay the judgment on Marinelli's

8    behalf, making payments as follows: (1) $15,140 to Connecticut Child Support

9    in fulfillment of Williams's statutory obligation under a child support lien;[8]

10    (2) $142,430 to the Connecticut Department of Administrative Services in

11    partial fulfillment of Williams's statutory obligation to reimburse Connecticut

12    for the cost of his incarceration; and (3) $142,430 to Williams. The State sent a

13    check for $142,430 to DOC to be deposited into Williams's inmate trust

---

[7] Williams had also filed a post-verdict motion to enjoin the State from imposing a cost-of-incarceration lien on his award. Because Marinelli was at that point still entitled to appeal the judgment on the merits, the district court denied Williams's motion as unripe, "without prejudice to his refiling the motion when issues arising from collection of the judgment become ripe." App'x at 64.

[8] The State later represented to the district court that this $15,140 sum was paid to the mother of Williams's child, not the State or any agency thereof.

1    account, asserting that this represented "payment in full" of Williams's

2    judgment. Dkt. No. 241-2, at 2.

3         In response, Williams filed a "motion for aid of judgment," seeking,

4    *inter alia*, a ruling that the damages award against Marinelli remained

5    unsatisfied, notwithstanding Connecticut's payments described above. In

6    particular, Williams sought the district court's declaration that Connecticut's

7    cost of incarceration lien statute, Conn. Gen. Stat. § 18-85b, at least as the State

8    had applied it to these facts, was preempted by § 1983. Williams agreed that

9    the State's payment of $15,140 to the mother of his child pursuant to a child

10   support lien should be counted towards the satisfaction of the judgment. At

11   the court's invitation, the State filed a "response" arguing that the Eleventh

12   Amendment barred the relief sought by Williams, and that in any event its

13   actions were not preempted.

14        While Williams's motion was pending, on October 16, 2017, the State

15   ordered a freeze on $65,000 in Williams's inmate trust account.

16   Approximately a month later, the State filed a lawsuit against Williams in

17   state court, seeking recovery of "at least $48,843.42" that it had paid to the

18   Connecticut Division of Public Defender Services for legal services rendered

1   to Williams.[9] Williams filed a "motion to unfreeze assets," arguing that the

2   State's actions with respect to the public defender costs "suffer[ed] from the

3   same constitutional defect as the State's cost of incarceration claim."[10] Dkt.

4   No. 257, at 3.

5         The district court granted in part and denied in part Williams's "motion

6   for aid of judgment" and denied his "motion to unfreeze assets." On the

7   question of preemption, the court found that the combined effect of the State's

8   actions — its voluntary indemnification of Marinelli and its attempt to recoup

9   more than half of Williams's judgment — was "virtually to nullify [the]

10  judgment, leaving it with little deterrent or compensatory value and thereby

11  undermining Congress's purposes in enacting Section 1983." App'x at 80. The

12  State's actions, the court reasoned, sent to its DOC employees the message

---

[9] It is undisputed that the purpose of the $65,000 hold is to facilitate the State's recovery of the public defender costs. The State subsequently explained that it reserved the right to seek additional funds beyond the $48,843.42, on account of funds expended by the Division of Public Defender Services for expert witnesses not included in the original sum sought, and perhaps also on account of further public defender services that might be rendered to Williams.

[10] Williams also removed the state-court action to federal court, where it was assigned to Judge Shea. On the same day that the district court ruled on Williams's motions for aid of judgment and to unfreeze assets, it also ruled that it lacked removal jurisdiction over the state-court action, and remanded the action to the Connecticut Superior Court.

1    that "even when they maliciously violate an inmate's civil rights, neither they

2    nor their employer will suffer significant financial consequences." *Id.* Finding

3    that such a result "starkly clash[ed]" with Congress's purposes in enacting

4    § 1983, the court concluded that the State's actions were preempted. *Id.* The

5    court made clear that its ruling was "limited to the peculiar facts of this case,"

6    which involved the voluntary indemnification of a former employee "found

7    to have committed malicious or reckless conduct," followed by attempted

8    recoupment of most of the judgment. *Id.* at 106. It "d[id] not hold that the

9    State may never use the cost recovery statutes at issue in this case to reduce a

10   Section 1983 award." *Id.* at 109.

11       The court next considered what relief was available under the Eleventh

12   Amendment. It concluded that, while the Eleventh Amendment would

13   prohibit the court from ordering the State to pay Williams the remainder of

14   the judgment or vacating the freeze on assets in Williams's inmate trust

15   account, the Amendment did not prohibit the court from ruling that

16   Connecticut's attempt to discharge the judgment against Marinelli was

17   preempted by § 1983, and therefore failed to satisfy Marinelli's obligation to

14

1    pay the damages award.[11] The court concluded that $287,433.92 of the

2    judgment against Marinelli remained outstanding.[12]

3         Marinelli then filed his "motion for credit against judgment,"

4    requesting that he be credited with the entire balance of the judgment by

5    reason of the State's payments. The district court granted Marinelli's motion

6    to the extent of $16,800 which Williams had received in his inmate trust

7    account and had spent. This credit was in addition to the $15,140 child

8    support payment that the court had already credited to Marinelli. The court

9    otherwise denied Marinelli's motion, calculating Marinelli's remaining

10   liability to be $270,983.72.

---

[11] The court did not at first explain in its ruling why the unfrozen portion of the money paid by the State into Williams's inmate account should not count towards satisfaction of the judgment. The court, at a later time, explained that while the $65,000 initially frozen by the State represented only approximately half of the State's payment into Williams's inmate trust account, the State remained apparently capable at will of freezing the entirety of the account in connection with its efforts to collect debts from Williams. The court concluded that money allegedly available in Williams's inmate account should not be credited to Marinelli until Williams exercised "dominion and control" over that money. App'x at 176.

[12] The court credited to Marinelli the $15,140 paid by the State to the custodial parent of Williams's child in satisfaction of a child support lien. *See* Notes 1 & 8, *supra*. Marinelli moved for reconsideration of the district court's ruling, which the court denied.

1    Marinelli appeals from the district court's rulings on Williams's

2  "motion for aid of judgment" and "motion to unfreeze assets," Marinelli's

3  motion for reconsideration, and Marinelli's "motion for credit against

4  judgment."

5                    **II.    DISCUSSION**

6    **A. Eleventh Amendment**

7    Marinelli contends that the declaratory relief granted by the district

8  court was barred by the Eleventh Amendment. The presentation of this

9  argument in Marinelli's brief, scanty at best, says no more than that the trial

10 court's ruling — which it describes as issued under the "*Ex parte Young*

11 exception to the Eleventh Amendment," Appellant's Br. 13 — was "clearly

12 barred by the Eleventh Amendment," and that "[n]o exception to Eleventh

13 Amendment immunity applies to lift the bar," *id*. at 16. Williams argues that

14 Marinelli's Eleventh Amendment challenge is therefore waived due to

15 insufficient briefing. Although these conclusory utterances might not suffice

16 to preserve other issues for appellate review, we nonetheless must consider

17 the Eleventh Amendment issue here because, if the relief sought by Williams

18 would violate the Amendment, we would lack the power to grant it. *See, e.g.,*

16

1    *Atlantic Healthcare Benefits Tr. v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (raising

2    Eleventh Amendment immunity *sua sponte* "because it affects our subject

3    matter jurisdiction"); *cf. Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382

4    (1884) ("[T]he rule . . . is inflexible and without exception which requires this

5    court, of its own motion, to deny its own jurisdiction, and, in the exercise of

6    its appellate power, that of all other courts of the United States, in all cases

7    where such jurisdiction does not affirmatively appear on the record . . . .").

8    "[A]bsent waiver by the State or valid congressional override, the

9    Eleventh Amendment bars a damages action against a State in federal court."

10   *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This rule of immunity extends to

11   cases where "the action is in essence one for the recovery of money from the

12   state," even when individual officials are the nominal defendants. *Ford Motor*

13   *Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945), *overruled on other grounds by*

14   *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002); *accord*

15   *Edelman v. Jordan*, 415 U.S. 651, 662–71 (1974) ("[The relief at issue] is in

16   practical effect indistinguishable in many aspects from an award of damages

17   against the State. It will to a virtual certainty be paid from state funds, and not

18   from the pockets of the individual state officials . . . ."). Similarly, the Eleventh

1    Amendment bars declaratory relief that would have the same effect as an

2    award of damages against the state. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

3        As discussed above, the relief granted by the district court in this case

4    consisted of a declaration that the State's actions in purported satisfaction of

5    Williams's judgment against Marinelli were preempted by § 1983, and that

6    Marinelli therefore remained liable for the bulk of the judgment. The relief

7    took nothing from the State of Connecticut; it was directed at Marinelli, sued

8    in his individual capacity in this § 1983 action. The Eleventh Amendment

9    does not bar a federal court from granting monetary relief against such a

10    defendant. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("We hold that state

11    officials, sued in their individual capacities, are 'persons' within the meaning

12    of § 1983. The Eleventh Amendment does not bar such suits . . . .").

13        The district court carefully refrained from granting Williams's requests

14    for various forms of monetary relief from the State, including orders that the

15    State pay the remainder of his judgment and that the State unfreeze the assets

16    in his inmate trust account. Nor would the declaratory relief granted by the

17    district court operate in effect as a damages award against the State. As the

18    State acknowledged below, its decision to indemnify Marinelli was

18

1    "discretionary." Dkt. No. 268, at 8. Marinelli has made no showing that the

2    State is under any obligation to contribute at all to the payment of Marinelli's

3    remaining liability under the judgment. We see no reason why the Eleventh

4    Amendment would bar the district court's ruling that Marinelli's debt to

5    Williams has not been satisfied.[13]

---

[13] Marinelli's assertion that the district court's ruling depended on the exception to Eleventh Amendment immunity established by *Ex parte Young*, 209 U.S. 123 (1908), is misguided. As the district court correctly noted in its ruling on Marinelli's motion for reconsideration, *Ex parte Young* was not the basis for its ruling that the judgment remained unsatisfied.

Ordinarily, a suit against a state official in her official capacity is deemed an action against the state itself, and Eleventh Amendment immunity applies. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122–23 (2d Cir. 2020). However, under the *Ex parte Young* exception, the Eleventh Amendment does not bar a suit for "prospective relief against an individual acting in his official capacity . . . to end an ongoing violation of a federal law." *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020); *see also Ex parte Young*, 209 U.S. at 160.

Here, the district court's ruling did not purport to order the State, or any State official acting in her official capacity, to do anything or refrain from doing anything. Nor did it declare the rights or obligations of the State (or a State official acting in official capacity) vis-à-vis Williams. Rather, it merely ruled that certain of the State's actions had no effect on the obligations of Marinelli, a former state official who was sued in his individual capacity and thus not protected by Eleventh Amendment immunity. *See Hafer v. Melo*, 502 U.S. at 31. The court had no need to rely on *Ex parte Young* to rule that the judgment against Marinelli remained unsatisfied.

1      **B. Preemption**

2          Marinelli contends that the district court erred in concluding that

3     Connecticut's actions were preempted by 42 U.S.C. § 1983. "We review *de*

4     *novo* a district court's application of preemption principles." *New York SMSA*

5     *Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (per curiam)

6     ("*SMSA*").

7          The doctrine of federal preemption provides that "[u]nder the

8     Supremacy Clause of the Constitution, state and local laws that conflict with

9     federal law are without effect." *Id.* at 103–04 (internal quotation marks

10    omitted). Although preemption often applies to state statutes, preemption can

11    also invalidate actions of state executive branch officials and state courts that

12    conflict with federal law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374,

13    383–84, 391 (1992) (holding that Airline Deregulation Act preempted use of

14    state's general consumer protection laws to bring enforcement actions

15    "having a connection with or reference to airline 'rates, routes, or services'");

16    *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 357, 370

17    (1988) (holding that FERC order requiring power company to purchase

18    portion of nuclear plant's output at rate deemed by FERC to be just and

1    reasonable preempted state agency proceedings to determine whether

2    expenses associated with construction of plant were prudently incurred).

3        We have said that "[i]n general, three types of preemption exist:

4    (1) express preemption, where Congress has expressly preempted local law;

5    (2) field preemption, where Congress has legislated so comprehensively that

6    federal law occupies an entire field of regulation and leaves no room for state

7    law; and (3) conflict preemption, where local law conflicts with federal law

8    such that it is impossible for a party to comply with both or the local law is an

9    obstacle to the achievement of federal objectives." *SMSA*, 612 F.3d at

10   104 (internal quotation marks omitted). When state law "stands as an obstacle

11   to the accomplishment and execution of the full purposes and objectives of

12   Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), this form of conflict

13   preemption is sometimes described as obstacle preemption.

14       "In all pre-emption cases . . . we 'start with the assumption that the

15   historic police powers of the States were not to be superseded by the Federal

16   Act unless that was the clear and manifest purpose of Congress.'" *Medtronic,*

17   *Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331

21

1   U.S. 218, 230 (1947)). "[T]he purpose of Congress is the ultimate touchstone in

2   every pre-emption case." *Id.* (internal quotation marks omitted).

3          In order to establish obstacle preemption, the party asserting

4   preemption must show more than the "mere fact of tension between federal

5   and state law." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d

6   Cir. 2006) (internal quotation marks omitted). Rather, there must be a "sharp"

7   conflict between state law and federal policy. *Marsh v. Rosenbloom*, 499 F.3d

8   165, 178 (2d Cir. 2007). "[F]ederal law does not preempt state law under

9   obstacle preemption analysis unless the repugnance or conflict is so direct

10  and positive that the two acts cannot be reconciled or consistently stand

11  together." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d

12  65, 102 (2d Cir. 2013) (*"MTBE"*) (internal quotation marks omitted).

13         "What constitutes a 'sufficient obstacle' is 'a matter of judgment, to be

14  informed by examining the federal statute as a whole and identifying its

15  purpose and intended effects.'" *Id.* at 101 (quoting *Mary Jo C. v. N.Y. State &*

16  *Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013)).

1      **1.  The State Statutory Backdrop**

2          A number of Connecticut statutes underlie or otherwise inform the

3      State's actions with respect to Williams's judgment.

4          Conn. Gen. Stat. § 18-85a provides that the State of Connecticut "shall

5      have a claim against each inmate for the costs of such inmate's incarceration

6      under this section, and regulations adopted in accordance with this section,

7      for which the state has not been reimbursed." Conn. Gen. Stat. § 18-85a(b). "In

8      addition to other remedies available at law, the Attorney General . . . may

9      bring an action in the superior court for the judicial district of Hartford to

10     enforce such claim." *Id.* Such action of the Attorney General must generally be

11     brought within two years of the date the inmate is released from

12     incarceration. *Id.* Connecticut state court precedent establishes that the State

13     may bring an action for costs of incarceration while the inmate is still

14     imprisoned. *See State v. Ham*, 253 Conn. 566, 568–69 & n.4 (2000) (per curiam)

15     (considering action under section 18-85a against incarcerated defendant).

16     Under regulations promulgated by the Commissioner of Corrections under

17     section 18-85a, "inmate" refers to any "individual confined, or formerly

18     confined, in a correctional facility serving a sentence imposed by any

23

1    Connecticut state court." Conn. Agencies Regs. § 18-85a-1(b). The regulations

2    also establish the method for calculating the costs of incarceration. *Id.*

3    §§ 18-85a-1(a), 18-85a-2. According to Marinelli, under the current regulatory

4    rate, Williams's total costs of incarceration for his 30-year sentence will equal

5    $1,818,393.

6           Conn. Gen. Stat. § 18-85b provides that, for twenty years following a

7    Connecticut inmate's release from incarceration, for any causes of action

8    brought by such inmate, the claim of the state for recovery of the cost of the

9    inmate's incarceration "shall be a lien against [funds recovered by the inmate

10    in such action] in the amount of the costs of incarceration or fifty per cent of

11    the proceeds received by such person after payment of all expenses connected

12    with the cause of action, whichever is less." Conn. Gen. Stat. § 18-85b(a). "The

13    proceeds of such causes of action shall be assignable to the state for payment

14    of the amount due under section 18-85a . . . ." *Id.*

15           Additionally, under Conn. Gen. Stat. § 51-298(b), the Connecticut

16    Public Defender Services Commission

17          shall have a claim against any person represented by a public defender
18          . . . for the reasonable value of services rendered to him, as determined
19          in accordance with the schedule of reasonable charges for public
20          defender services provided by the commission. The claim shall be

1          enforceable by civil action brought in the name of the state on behalf of
2          the commission by the Attorney General, at any time within ten years
3          from the last date on which any services were rendered. Money so
4          recovered shall be repaid to the commission.
5
6          Finally, in certain instances, the State is required to indemnify a state

7 employee for any loss arising out of a claim against the employee acting

8 within the scope of his employment: "The state shall save harmless and

9 indemnify any state officer or employee . . . from financial loss and expense

10 arising out of any claim . . . by reason of his alleged negligence or alleged

11 deprivation of any person's civil rights or other act or omission resulting in

12 damage or injury, if the officer . . . is found to have been acting in the

13 discharge of his duties or within the scope of his employment and such act or

14 omission is found not to have been wanton, reckless or malicious." Conn.

15 Gen. Stat. § 5-141d(a). In this case, however, in which Marinelli was subjected

16 to punitive damages based on a jury finding that his conduct was "malicious"

17 or "reckless," Marinelli does not contend that the statutory obligation of

18 Connecticut to indemnify a state officer applies to him, and the district court

19 operated under the assumption that the State was under no obligation to

20 indemnify Marinelli under § 5-141d(a). Marinelli does not contest this point

21 on appeal.

## 2.  The Purposes and Objectives of § 1983

To determine whether the State's actions create a sufficient obstacle to

the purposes and objectives of a federal law, we must determine what those

purposes and objectives are. *See Hillman v. Maretta*, 569 U.S. 483, 491 (2013);

*MTBE*, 725 F.3d at 102. With regard to § 1983, those purposes are well

established.

As the Supreme Court has observed, Congress's intent in enacting

§ 1983 "was to interpose the federal courts between the States and the people,

as guardians of the people's federal rights — to protect the people from

unconstitutional action under color of state law, 'whether that action be

executive, legislative, or judicial.'" *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)

(quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)). Proponents of the

legislation believed it necessary to provide effective protection to citizens'

federal rights. One such supporter, for instance, stated:

> [The] records of the [state] tribunals are searched in vain for evidence of
> effective redress [of federally secured rights]. . . . The Federal
> Government cannot serve a writ of mandamus upon State Executives
> or upon State courts to compel them to protect the rights, privileges
> and immunities of citizens . . . . The case has arisen . . . when the
> Federal Government must resort to its own agencies to carry its own
> authority into execution. Hence this bill throws open the doors of the

1  United States courts to those whose rights under the Constitution are
2  denied or impaired.

3  *Id.* at 240 (internal quotation marks omitted) (quoting Cong. Globe, 42d

4  Cong., 1st Sess., 374–76 (1871) (remarks of Representative David Lowe)). In

5  other words, the legislation provided a federal remedy to counteract the

6  perceived failure of the states to provide effective redress for violations of

7  federal rights.

8       The "chief goals" of § 1983 are to provide compensation for violations

9  of federal rights, and to deter such violations. *Hardin v. Straub*, 490 U.S. 536,

10  539 (1989); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose

11  of § 1983 is to deter state actors from using the badge of their authority to

12  deprive individuals of their federally guaranteed rights and to provide relief

13  to victims if such deterrence fails."); *Owen v. City of Independence*, 445 U.S. 622,

14  651 (1980) ("§ 1983 was intended not only to provide compensation to the

15  victims of past abuses, but to serve as a deterrent against future constitutional

16  deprivations, as well.").

17       **3.  The Effects of the State's Actions on the Objectives of § 1983**

18       Marinelli contends that the district court erred in concluding that § 1983

19  preempted Connecticut's satisfaction of Marinelli's judgment obligations by

27

1    making payments largely to itself in reliance on its statutes. We disagree.

2    Upon consideration of all the facts of this unusual case, we conclude that

3    Connecticut's actions conflict irreconcilably with § 1983's purpose of

4    deterring constitutional violations. The deterrent effect of Williams's § 1983

5    award is eviscerated if both the constitutional tortfeasor and his employer, the

6    State, are relieved of the bulk of the financial consequences of the violation.

7    We conclude that the State's actions here conflict sufficiently sharply with

8    § 1983's goals, particularly the goal of deterring state officers from abusing

9    prisoners in their charge in violation of their constitutional rights, to justify

10   the district court's conclusion that the State's attempt to discharge Marinelli's

11   judgment obligations while recouping more than half the judgment through

12   its cost-recovery statutes is preempted by § 1983, and the judgment against

13   Marinelli remains outstanding.

14       Our holding is very much dependent on the facts of this case. It is not a

15   broad holding that would prevent the normal operation of the Connecticut

16   statutes in question. Our ruling is based on the following factors: (1) the jury's

17   finding that Marinelli engaged in malicious or reckless violation of Williams's

18   rights and its award of punitive damages to "punish or deter similar

1    conduct," Dkt. No. 176, at 2–3;[14] (2) the seriousness of the injuries suffered by

2    Williams resulting from Marinelli's malicious or reckless conduct; (3) the

3    State's voluntary undertaking to pay Marinelli's judgment obligations (the

4    State's undertaking to indemnify Marinelli in the face of his malicious or

5    reckless harmful conduct substantially undermines the deterrent effect that

6    the risk of personal liability otherwise would have on a state official);[15] (4) the

7    fact that the State's recoupment would deprive Williams of at least 60% of his

8    judgment; (5) the length of Williams's sentence, which ensures that the cost of

9    his incarceration will be high, and thus informs corrections officers from the

10    day of his imprisonment that the risk of suit against them is diminished by

11    the likelihood that any recovery achieved by the prisoner can be very

12    substantially reduced by the State's cost recovery; and (6) the fact that the

---

[14] As courts have recognized, punitive damages are "aimed . . . principally at retribution and deterring harmful conduct," rather than compensating the victim. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008).

[15] Because Marinelli, having been found liable for a malicious or reckless violation of Williams's rights, does not contend that Connecticut was required to indemnify him under Conn. Gen. Stat. § 5-141d, *see supra*, we have no occasion to opine on whether the preemption analysis would be different had the State been required under state law to pay the judgment. We note, however, that if the State's payment of Marinelli's obligations had been pursuant to a state-law requirement, rather than a voluntary decision, the financial impact of those actions would remain unchanged.

1    cost-of-incarceration and public defender debts at issue here, unlike other

2    debts that may give rise to liens on § 1983 recoveries, apply broadly to a

3    significant portion of the inmate population (or, in the case of the cost of

4    incarceration statutes, apparently all of that population), making it easier for

5    officials to know *ex ante* that prisoners' civil recoveries will likely be reduced

6    by operation of the Connecticut cost-recovery statutes.

7         Marinelli advances a number of arguments against our conclusion. We

8    find them unpersuasive. First, he argues that § 1983's goals of compensation

9    and deterrence are not without limits, pointing to the existence of various

10    immunity doctrines that shield officials from § 1983 liability (doctrines which,

11    Marinelli points out, Congress has not sought to limit or eliminate), as well as

12    various restrictions imposed by Congress on prisoner lawsuits in the PLRA.

13    We recognize that, as these examples suggest, the goals of compensation and

14    deterrence are not absolute, and they may occasionally give way to

15    competing policy interests. The existence of these limitations on § 1983 suits,

16    however, has little bearing on whether the State's actions are preempted in

17    this case, where the Plaintiff has successfully obtained a judgment despite

18    those limitations. The rationale for the district court's finding of preemption

1   was not that § 1983's goals of compensation and deterrence are absolute and

2   must never give way to other interests, but rather that the State's actions in

3   this case conflicted so sharply with those goals that they were preempted. It is

4   perfectly consistent to acknowledge that plaintiffs' ability to recover under

5   § 1983 is limited in certain circumstances, on the one hand, and, on the other,

6   to find that state-law actions with respect to a § 1983 judgment obtained

7   despite those limitations are preempted when they conflict with § 1983's

8   purposes.

9          Second, Marinelli argues that Congress tacitly approved of state lien

10  statutes like Conn. Gen. Stat. § 18-85b by enacting the PLRA against the

11  backdrop of the "wide prevalence" of such statutes. Appellant's Br. 30.

12  Congress's curtailing of prisoner § 1983 litigation in the PLRA, Marinelli

13  asserts, "suggests it undertook an active and careful examination of the use of

14  § 1983 to address areas that it deemed problematic," and that "[s]tate

15  incarceration lien statutes were not one of those problem areas." *Id.* Moreover,

16  Marinelli cites to a report indicating that, prior to the enactment of the PLRA,

17  thirty-six states had statutes imposing costs of incarceration on inmates.

18  However, as Marinelli's counsel admitted at oral argument, he was aware of

31

1    no evidence that Congress has considered state collection statutes in the

2    context of § 1983. In the absence of any such evidence, we do not interpret

3    Congress's silence to mean that it intended to permit states to use such

4    statutes in ways that sharply conflict with the purposes of § 1983.

5         In any event, our finding of preemption is based on the combined effect

6    of the State's actions here, including not just the operation of the cost-of-

7    incarceration lien but also the State's voluntary decision to pay Marinelli's

8    obligation under the judgment, the jury's award of punitive damages

9    pursuant to a finding that Marinelli had engaged in malicious or reckless

10   conduct, and the State's efforts to recover public defender costs from

11   Williams. Thus, even if we agreed with Marinelli that Congress has tacitly

12   approved of the use of cost-of-incarceration statutes in the § 1983 context, this

13   would not disprove that the State's actions here, *in the aggregate*, sharply

14   conflict with § 1983's goals.

15         Third, Marinelli contends that the existence of a federal regulation

16   providing for the recovery of costs of incarceration from federal inmates,

17   28 C.F.R. § 505.1, suggests that the State's actions do not sharply conflict with

18   § 1983. According to Marinelli, it is "difficult to discern why Congress would

1    manifestly seek to preempt a state law that is virtually identical to federal

2    prison regulations." Appellant's Br. 31. However, it is not the

3    cost-of-incarceration statute itself that the district court declared to be

4    preempted; it was the use of the statute, along with others, to recoup more

5    than half of a § 1983 award including punitive damages after holding

6    harmless the actual judgment debtor who had engaged in malicious or

7    reckless conduct. As the district court observed, Marinelli points to no case in

8    which the federal government has sought to recover costs of incarceration

9    after voluntarily satisfying a federal employee's obligations to pay a

10   judgment for a malicious or reckless violation of constitutional rights. And at

11   oral argument, counsel for Marinelli indicated that he could not find any

12   information about the federal government's actual practice of recovering costs

13   of incarceration. Furthermore, the analogy Marinelli draws to the federal

14   regulatory scheme is imperfect for several reasons: First, unlike in the case of

15   federal preemption of state law, there is no higher sovereignty that enjoys

16   supremacy over federal law; nor is there a federal statutory equivalent to

17   § 1983's role in preempting the operation of the cost-recovery statutes in this

18   circumstance. Furthermore, the existence of the federal regulatory scheme

33

1    does not necessarily mean that, if federal officers acted in a manner akin to

2    Connecticut's actions in this case, those actions might not be found to conflict

3    with the objective of the Eighth Amendment to protect federal prisoners from

4    cruel and unusual punishment. We are not persuaded that the mere existence

5    of a federal regulation permitting recovery of costs of incarceration weighs

6    against a finding that the State's actions were preempted in this case.

7         Fourth, Marinelli argues that the effect of Connecticut's cost-recovery

8    statutes on deterrence is uncertain or remote. Given that, under § 1983, an

9    employee's actions cannot be imputed to the State under a theory of

10   *respondeat superior*, Marinelli contends, "[o]nly a strained understanding of

11   deterrence can link a state incarceration lien statute or a [public defender

12   services] recoupment of fees statute to the individualized and unauthorized

13   conduct of a state employee who is found to have acted in a manner contrary

14   to established state policy and practice years before a lien is even enforced."

15   Appellant's Br. 27. We disagree. The impact of the State's actions on § 1983's

16   deterrence goal is plain. By voluntarily undertaking to satisfy Marinelli's

17   obligations, the State sends the message that individual defendants will not

18   suffer financial consequences for even malicious or reckless violations of

34

1    constitutional rights. Moreover, by application of the cost-recovery statutes,

2    the State has drastically reduced its own financial loss resulting from the

3    judgment, thereby decreasing its own incentive to take measures to prevent

4    its employees from violating constitutional rights. In addition, the ability of

5    the State to recoup a significant portion of any recovery will discourage

6    inmates from bringing suit in the first place — a fact that prison officials can

7    easily infer *ex ante*, given that apparently all Connecticut inmates are

8    chargeable for the costs of their incarceration, *see* Conn. Agencies Regs.

9    § 18-85a-1(b), and many are also chargeable for public defender services. As

10    the district court noted, the combined effect of the State's actions is to severely

11    reduce any incentive created by Williams's § 1983 judgment to refrain from

12    even malicious constitutional violations.

13         Fifth, Marinelli argues that the district court's ruling ignored the

14    significant resources spent by the State to ensure that state employees respect

15    citizens' constitutional rights, and that "there was no finding" in this case

16    "that the State, through its training or policies . . . caused the harm to

17    Williams." Appellant's Br. 25–26. This argument misses the mark. The district

18    court's finding of preemption in no way depended on a finding that the State

1    caused the harm, or that the State was deficient in its efforts to ensure that its

2    employees do not violate constitutional rights. It depended simply on the

3    conclusion that the State's actions with respect to Williams's judgment, in the

4    circumstances of the case, sharply conflicted with the purposes of § 1983. The

5    State is not free to interfere with the deterrent purpose of § 1983 simply

6    because it takes independent measures to avoid constitutional violations.

7          Sixth, Marinelli argues that there is no conflict between the State's

8    actions and § 1983's goal of compensation, because Williams has received

9    compensation in the form of satisfaction of his debts. Marinelli argues that,

10    with respect to compensation, there is no difference between applying part of

11    the judgment to Williams's statutory debts to the State (or the Public

12    Defender Services Commission), on the one hand, and applying part of the

13    judgment to Williams's child support debt, which Williams agrees should be

14    treated as compensation to him, on the other. Williams responds that, unlike

15    satisfaction of a third-party debt, the State's attempt to reduce its own liability

16    has the "practical effect of allowing the State to keep the money for itself."

17    Appellee's Br. 16. He also contends that depositing money into his inmate

18    trust account should not be considered compensation because it did not "put

1    any monies under [Williams's] sole dominion and control." Appellee's Br. 17

2    (quoting App'x at 105). Because we find that the State's actions so sharply

3    conflict with § 1983's goal of deterrence that they are preempted, we express

4    no view on the difficult question whether the State's actions conflict with

5    § 1983's goal of compensation.

6          Finally, Marinelli relies on several court precedents in which district

7    courts or our sister circuits held that the application of lien statutes or other

8    victim or creditor remedies to § 1983 awards was not preempted by § 1983. As

9    an initial matter, these cases are not binding on us. But in any event, in all of

10   these cases, the impact of the state's actions on the deterrence goal of § 1983

11   was less substantial than the impact of Connecticut's actions in this case.

12   None of Marinelli's cases persuade us that our finding of obstacle preemption

13   in this case is incorrect.

14         First, he relies on *Bonilla v. Semple*, No. 3:15-cv-1614 (VAB), 2016 WL

15   4582038 (D. Conn. Sept. 1, 2016), in which the plaintiff argued that

16   Connecticut's application of Conn. Gen. Stat. § 18-85b (the cost-of-

17   incarceration lien) to the proceeds of the plaintiff's § 1983 settlement with

18   three municipal police officers was preempted. 2016 WL 4582038, at *1–2. The

1   court rejected the plaintiff's argument, finding that the conflict between

2   section 18-85b and § 1983 was not sufficiently sharp to warrant obstacle

3   preemption. *Id.* at *7. Unlike the present case, however, there was no

4   indication in *Bonilla* that the State of Connecticut paid the officers' obligations

5   under the settlement agreement and thereby relieved the officers of the

6   financial burden of the plaintiff's § 1983 suit. Thus, the state's recoupment did

7   not diminish the incentive of the police officers to respect constitutional

8   rights, if only to protect themselves from liability.

9      Second, Marinelli relies on *Beeks v. Hundley*, 34 F.3d 658 (8th Cir. 1994),

10  in which the Eighth Circuit held that a state's seizure of most of an inmate's

11  § 1983 recovery to pay victim restitution was not preempted by § 1983. With

12  respect to deterrence, the court reasoned that victim restitution did not defeat

13  § 1983's deterrence goal because "the money was applied to the inmates'

14  pre-existing obligations to the victims of their crimes," and in most cases "the

15  State [did] not ultimately receive the § 1983 proceeds." *Beeks*, 34 F.3d at 661. In

16  *Beeks*, the state's actions reduced neither the § 1983 judgment debtor's

17  burdens nor its own, and they therefore did not reduce the deterrent effect of

18  the judgment in the way that Connecticut's actions did here.

1       Third, Marinelli relies on *Vincent v. Sitnewski*, No. 10 Civ. 3340 (TPG),

2   2011 WL 4552386 (S.D.N.Y. Sept. 30, 2011), which, following *Beeks*, held that a

3   statute facilitating the recovery of part of a § 1983 judgment by a crime victim

4   did not conflict with § 1983's deterrence purpose. 2011 WL 4552386, at *4. As

5   the district court recognized in *Vincent*, the statute at issue "[did] not allow

6   [New York state or its agencies] to 'recoup' funds from a convicted person on

7   its own behalf, but rather, on behalf of individual crime victims." *Id.* at *3.

8   Thus, like *Beeks*, *Vincent* did not contemplate a situation in which a state's

9   actions reduce the financial impact of a § 1983 judgment on either the

10  judgment debtor or the state itself.

11      Fourth, Marinelli relies on *Colondres v. Scoppetta*, 290 F. Supp. 2d 376

12  (E.D.N.Y. 2003), in which the plaintiff argued that the City of New York's

13  assertion of a $4,222.26 lien on a $30,001 judgment for reimbursement of the

14  costs of public assistance was preempted by § 1983. 290 F. Supp. 2d at 379.

15  The court disagreed, reasoning that "[u]nlike other cases in which the amount

16  of the lien was nearly or even exceeded the full amount of the recovery, the

17  amount of the lien in this case is only 14% of plaintiff's . . . judgment . . . .

18  Enabling the City to assert a lien in this case does not establish a dangerous

39

1    incentive for City employees to ignore the civil rights of those on public

2    assistance." *Id.* at 384. Here, by contrast, where the State recovers more than

3    60% of a judgment incurred by reason of the malicious or reckless conduct of

4    its officer, the deterrent effect on officers of the risk of liability is substantially

5    undermined.

6            Finally, Marinelli relies on *Brown v. Stone*, 66 F. Supp. 2d 412 (E.D.N.Y.

7    1999), in which the district court rejected the plaintiffs' requests for a

8    declaration that § 1983 preempted the New York State Office of Mental

9    Health (OMH) from applying state statutes permitting it to recover care and

10   treatment charges to "reach[] any sums which any patient or former

11   patient . . . may recover against OMH or its employees in any litigation

12   emanating from the patient's maltreatment." 66 F. Supp. 2d at 416. This court

13   affirmed the district court's preemption finding by summary order "for

14   substantially the reasons stated by the district court." *Mental Disability Law*

15   *Clinic, Touro Law Ctr. v. Carpinello*, 189 F. App'x 5, 8 (2d Cir. 2006).

16           *Brown* is distinguishable from this case. The court emphasized that

17   "employees who commit intentional torts, and are thereby subject to punitive

18   damages, cannot seek indemnification from the State." *Brown*, 66 F. Supp. 2d

40

1    at 439. Here, by contrast, the State has voluntarily paid the judgment on

2    behalf of the employee who was found to have committed a malicious or

3    reckless violation of rights, and who was assessed punitive damages. The

4    conflict between the State's actions and the goal of deterrence is thus sharper

5    here — where the State has sent the message that even malicious or reckless

6    wrongdoers will not face financial consequences for their actions, and where

7    the jury has awarded punitive damages with the express purpose of

8    "punish[ing] or deter[ring] similar conduct" Dkt. No. 176, at 2–3 — than in

9    *Brown*.[16]

10        A party seeking to establish obstacle preemption faces the high bar of

11    showing that the conflict between federal and state law is "so direct and

12    positive that the two . . . cannot be reconciled or consistently stand together."

13    *MTBE*, 725 F.3d at 102. Williams has met that bar here. By ensuring that

14    neither it nor Marinelli will bear the bulk of the consequences of Marinelli's

15    malicious or reckless violation of Williams's constitutional rights, the State's

_____

[16] We note that, in a case whose facts resembled the present case much more
closely than any of the precedents relied upon by Marinelli did, the Eighth
Circuit found that a state's application of its cost-of-incarceration statute was
preempted by § 1983. *See Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir. 1992)
(holding that § 1983 preempted use of Missouri Incarceration Reimbursement
Act to largely recoup prisoner's § 1983 award including punitive damages).

1   actions have severely undermined the incentives that the judgment is meant

2   to produce and that the jury wished to generate when it awarded punitive

3   damages. Such a result conflicts starkly with the manifest purpose of

4   Congress in enacting § 1983, which was to establish an effective federal

5   remedy for violations of federally protected rights when states failed to

6   provide such a remedy. We find no error in the district court's conclusion that

7   the State's attempt to discharge Marinelli's judgment obligations in significant

8   part through payments to itself and payments to Williams that the state might

9   eventually recoup undermines the objectives of § 1983, and is therefore

10  preempted.

11      Marinelli also appeals from the district court's denial of his motion for

12  reconsideration. Marinelli offers no argument with respect to his

13  reconsideration motion distinct from those discussed above. We therefore

14  affirm the district court's denial of reconsideration for the same reasons that

15  we affirm its ruling on Williams's post-judgment motions.

16  **C.  Double Recovery**

17      Marinelli additionally appeals from the district court's denial in part of

18  his motion for credit against judgment. Because he makes no arguments as to

1   why the district court's denial was in error apart from his central argument

2   against the district court's finding of preemption, any such additional

3   arguments are waived. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir.

4   1998) ("Issues not sufficiently argued in the briefs are considered waived and

5   normally will not be addressed on appeal."). Nonetheless, because some of

6   the arguments Marinelli made below were directed at preventing "double

7   recovery" Appellant's Br. 15, we explain why our affirmance of the district

8   court's rulings does not create the risk of double recovery.

9           Our ruling in no way allows Williams to receive more than his

10  entitlement to the judgment and in no way implies that Connecticut cannot,

11  in the Connecticut courts, recover payments it made to Williams in the

12  mistaken belief that those payments would both satisfy the judgment against

13  Marinelli and be available to satisfy the state's own recoupment actions. Nor

14  does it prevent Connecticut from undoing the credit that Williams has

15  received against his debt to the State for the cost of his incarceration by

16  cancelling its payment to its agency. Nor does our ruling undo the credits

17  Marinelli has received against his payment of the judgment. Connecticut is

43

1    free to seek measures that would avoid double recovery, either in the district

2    court or in the Connecticut courts, as appropriate.

3                                    **CONCLUSION**

4            For the foregoing reasons, the district court's rulings are AFFIRMED.